**2025-1244**

# United States Court of Appeals for the Federal Circuit

SHIRLEY LAVIOLETTE,
OLD MILL INVESTMENT LLC, CAMP DOUBLE J, LLC,

*Plaintiffs-Appellants,*

PERRY LOVERIDGE, *et al.,*

*Plaintiffs,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

*On Appeal from the United States Court of Federal Claims
in No. 1:16-cv-00912-DAT, Honorable David A. Tapp, Judge*

## BRIEF FOR PLAINTIFFS-APPELLANTS

THOMAS SCOTT STEWART
REED W. RIPLEY
STEWART, WALD & SMITH, LLC
2100 South Central, Suite 22
Kansas City, Missouri 64108
(816) 303-1500
stewart@swslegal.com
ripley@swslegal.com

*Counsel for Plaintiffs-Appellants*

FEBRUARY 19, 2025

CP COUNSEL PRESS   (800) 4-APPEAL • (335700)

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1244

**Short Case Caption** Loveridge v. US

**Filing Party/Entity** Appellants Shirley Laviolette, Old Mill Investments, LLC, & Camp Double J, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/16/2024

Signature: /s/ Thomas S. Stewart

Name: Thomas S. Stewart

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Shirley Laviolette | N/A | N/A |
| Old Mill Investment, LLC | N/A | N/A |
| Camp Double J, LLC | N/A | N/A |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable       ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable       ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................vi

STATEMENT OF RELATED CASES ...................................................1

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.......................................................5

STATEMENT OF THE ISSUES.............................................................5

STATEMENT OF THE CASE.................................................................6

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT ........................................................................................16

  I.  THE STANDARD OF REVIEW....................................................16

 II.  OCSR'S PERIODIC OPERATIONS, DERIVED FROM POTB'S EASEMENT, ARE IRRELEVANT FOR VALUATION PURPOSES IN THE BEFORE CONDITION AS A MATTER OF LAW .......................................16

       A.  The CFC Erred In Requiring Consideration of OCSR's Use in the Before Condition Because There Was Only One Easement, Which Belonged to POTB and Not OCSR, and POTB's Easement was Abandoned Prior to the NITU ..........................................18

       B.  *Loveridge VII*'s Valuation Conclusion, Which Relied on OCSR's Presence, Was Based on *Loveridge VI*'s Misinterpretations, Both Factually and Legally, of *Loveridge I-IV* and *Rasmuson* .................23

III.  THE CFC ALSO MADE NUMEROUS VALUATION ERRORS IN THE AFTER CONDITION, WHICH WERE DERIVED PRIMARILY BECAUSE THE CFC IGNORED THE NITU DATE AS THE VALUATION DATE AND MADE INCORRECT CONCLUSIONS OF LAW RELATED TO THE NATURE OF THE NEWLY-IMPOSED HIKING AND BIKING TRAIL EASEMENT....................................................................................29

A.     The CFC Erred in the After Condition By Considering OCSR's Continuing Operations, By Considering the Likelihood of Construction of the Trail, and By Ignoring the NITU Date as the Valuation Date ...............................................................30

B.     Because the Trails Act Imposed an Exclusive Easement in the After Condition, Appellants Lost all of Their Land Within the Area of Take and the Market Value of All Improvements Within the Area of Take Has Been Reduced to Zero Too ............................................34

IV.    THE EVIDENCE DEMONSTRATES THAT APPELLANTS' APPRAISER'S FINDINGS ON THE VALUE OF APPELLANTS' TAKEN PROPERTY REPRESENTS APPROPRIATE JUST COMPENSATION AND THE CFC'S DETERMINATION OF ZERO COMPENSATION IS UNCONSTITUTIONAL...............................................................42

A.     Appellants Established Their Entitlement to Just Compensation for Both Their Land and Their Improvements Through Credible Expert Appraisal Testimony .....................................................................44

B.     The CFC Failed to Properly Credit Appellants' Valuation Evidence Based on Several Fundamental Misunderstandings of Law and Fact and Appellants Met Their Burden of Proof to Establish Just Compensation for Both the Land and the Improvements ..............51

V.   CONCLUSION ...............................................................................58

# TABLE OF AUTHORITIES

*Agapion v. United States*,
167 Fed. Cl. 761 (2023) .......................................................................*passim*

*Almota Farmers Elevator & Warehouse Co. v. United States*,
409 U.S. 470 (1973).................................................................................43

*Anna F. Nordhus Family Trust v. United States*,
106 Fed. Cl. 289 (2012) ..........................................................................51

*Barclay v. United States*,
443 F.3d 1368 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007) ...........23

*Boston Chamber of Comm. v. City of Boston*,
217 U.S. 189 (1910)...........................................................................38, 42

*Caldwell v. United States*,
391 F. 3d 1229 (Fed. Cir. 2004), *cert. denied*, 547 U.S. 826 (2005) ............23

*Caquelin v. United States*,
959 F.3d 1360 (Fed. Cir. 2020) ...............................................................37

*Cary v. United States*,
552 F.3d 1373 (Fed. Cir. 2009) ...............................................................16

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)...........................................................................36, 42

*Cheshire Hunt v. United States*,
158 Fed. Cl. 101 (2022) .......................................................................*passim*

*Childers v. United States*,
116 Fed. Cl. 486 (2013)...........................................................................35

*Fendall v. Miller*,
196 P. 381 (Or. 1921) ..............................................................................21

*Gadsden Indus. Park, LLC v. United States*,
956 F.3d 1362 (Fed. Cir. 2020) ...............................................................54

*Georgia-Pac. Corp. v. Miller*,
304 P.2d 428 (Or. 1956) ..................................................................41

*Hardy v. United States*,
141 Fed. Cl. 1 (2018) ..............................................17, 18, 33, 35, 51

*Hardy v. United States*,
965 F.3d 1338 (Fed. Cir. 2020) ....................................................16

*Holland v. United States*,
621 F.3d 1366 (Fed. Cir. 2010) ....................................................16

*Howard v. United States*,
106 Fed. Cl. 343 (2012) ...................................................18, 35, 51

*Illig v. United States*,
274 Fed. Appx. 883 (Fed. Cir. 2008),
*cert. denied*, 129 S. Ct. 2860 (2009) ..........................................23

*Ingram v. United States*,
105 Fed. Cl. 518 (2012) ..........................................................18, 51

*Jackson v. United States*,
155 Fed. Cl. 689 (2021) ..............................................17, 18, 35, 51

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) .......................................................................35

*Kirby Forest Indus., Inc. v. United States*,
467 U.S. 1 (1984) ...........................................................................32

*Ladd v. United States*,
110 Fed. Cl. 10 (2013) ...................................................................51

*Ladd v. United States*,
630 F.3d 1015 (Fed. Cir. 2010), *reh'g and reh'g en banc denied*,
646 F.3d 910 (Fed. Cir. 2010) ................................................23, 52

*LKL Assoc. Inc. v. Union Pacific R.R. Co.*,
17 F.4th 1287 (10th Cir. 2021) ....................................................41

*Loveridge v. United States*,
139 Fed. Cl. (2018) ("*Loveridge I*") .......................................................*passim*

*Loveridge v. United States*,
2019 WL 495578 (Fed. Cl. Feb. 8, 2019) ("*Loveridge II*") ..................*passim*

*Loveridge v. United States*,
148 Fed. Cl. 279 (2020) ("*Loveridge III*") .............................................*passim*

*Loveridge v. United States*,
149 Fed. Cl. 64 (2020) ("*Loveridge IV*") ................................................*passim*

*Loveridge v. United States*,
150 Fed. Cl. 143 (2020) ("*Loveridge V*").....................................8, 11, 25, 27

*Loveridge v. United States*,
167 Fed. Cl. 44 (2023) ("*Loveridge VI*") ................................................*passim*

*Loveridge v. United States*,
174 Fed. Cl. 379 (2024) ("*Loveridge VII*") ............................................*passim*

*Lutheran High School Ass'n. of the Greater Salt Lake Area v. Woodlands III
Holdings, LLC*, 81 P.3d 792 (Utah App. 2003)..............................................21

*Macy Elevator, Inc. v. United States*,
105 Fed. Cl. 195 (2012) .....................................................................18, 19, 51

*Marvin M. Brandt Revocable Trust v. United States*,
572 U.S. 93 (2014).........................................................................................35

*McCann Holdings, Ltd. v. United States*,
111 Fed. Cl. 608 (2013) ..........................................................................35, 54

*Minto v. Salem Water, Light & Power Co.*,
250 P. 722 (Or. 1926) ..............................................................................21, 22

*Moore v. United States*,
54 Fed. Cl. 747 (2002)..................................................................................35

*New Mexico v. United States Tr. Co. of New York*,
  172 U.S. 171 (1898)............................................................41

*Nicholson v. United States*,
  170 Fed. Cl. 399 (2024).....................................................28

*Otay Mesa Prop., L.P. v. United States*,
  670 F.3d 1358 (Fed. Cir. 2012) ........................................17

*Precision Pine & Timber, Inc. v. United States*,
  596 F.3d 817 (Fed. Cir. 2010) ..........................................54

*Preseault v. Interstate Commerce Comm'n.*,
  494 U.S. 1 (1990) ("*Preseault I*").............................35, 37

*Preseault v. United States*,
  100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*").........19, 23, 26, 35

*Rasmuson v. United States*,
  807 F.3d 1343 (Fed. Cir. 2015) .................................*passim*

*Raulerson v. United States*,
  99 Fed. Cl. 9 (2011) ...................................................18, 51

*Realvest Corp. v. Land Cnty.*,
  100 P.3d 1109 (Or. App. 2004) ........................................22

*Rogers v. United States*,
  101 Fed. Cl. 287 (2011)..........................................18, 35, 52

*Rose Acre Farms, Inc. v. United States*,
  559 F.3d 1260 (Fed. Cir. 2009) ........................................16

*Seaboard Airline Ry. Co. v. United States*,
  261 U.S. 299 (1923)............................................................42

*Technical College of the Lowcountry v. United States*,
  145 Fed. Cl. 408 (2019)..........................................17, 18, 51

*Toews v. United States*,
    376 F.3d 1371 (Fed. Cir. 2004) .....................................35

*Toscano v. United States*,
    107 Fed. Cl. 179 (2012).......................................*passim*

*Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*,
    338 F.3d 1353 (Fed. Cir. 2003) .....................................55

*United States v. Chandler-Dunbar Water Power Co.*,
    229 U.S. 53 (1913)..................................................32

*United States v. Clarke*,
    445 U.S. 253 (1980)................................................31

*United States v. Dow*,
    357 U.S. 17 (1958).................................................31

*United States v. Miller*,
    317 U.S. 369 (1943)................................................17

*United States v. Virginia Elec. & Power Co.*,
    365 U.S. 624 (1961)............................................17, 42

*Ward v. Southern Pac. Co.*,
    36 P. 166 (Or. 1894) ..............................................41

*Whispell Foreign Cars, Inc. v. United States*,
    106 Fed. Cl. 635 (2012) ...........................................51

*Wood v. Ashby*,
    253 P.2d 351 (Utah 1952)...........................................21

*W. Union Tel. Co. v. Pa. R.R. Co.*,
    195 U.S. 540 (1904)................................................41

*Ybanez v. United States*,
    102 Fed. Cl. 82 (2011).........................................18, 51

**Other Authorities**

28 U.S.C. § 1295(a)(3) ..................................................................4

Trails Act 16 U.S.C. § 1247(d) .......................................................1

Tucker Act 28 U.S.C. § 1491(a)(1) ...........................................4, 31

*Uniform Appraisal Standards for Federal Land Acquisitions* (6th Ed. 2016)
    ("Yellow Book") § 1.3.1.2 ......................................................36

                § 2.3.3.1.1. ..........................................................17

                § 2.3.3.2 ...............................................................17

                § 2.3.2.3.2 ............................................................36

                § 2.3.4.3.2 ............................................................36

                § 4.4.3.2 ...............................................................17

## STATEMENT OF RELATED CASES

No appeals from this same civil action were previously before this Court or any other appellate court. Undersigned counsel is not aware of any pending related cases within the meaning of Federal Circuit Rule 47.5.

## INTRODUCTION

Three Plaintiffs/Appellants[1] owned land along the northwest Oregon coast adjacent to and underlying an abandoned railroad right-of-way as of July 26, 2016. On that date, the United States took Appellants' property, both land and encroaching improvements, when the railroad[2] abandoned its easement, and the United States authorized conversion of the right-of-way to a hiking and biking trail pursuant to the Trails Act.[3]

The underlying taking, and the government's liability for the same, are not at issue in this appeal. Instead, the issues on appeal are the Court of Federal Claims' ("CFC") findings at trial, which the CFC held purely to determine appropriate

---

[1] The three Plaintiffs/Appellants and their properties subject to this appeal are (1) Camp Double J, LLC, represented through its sole Member Jeff Joslin, whose subject property is a residence and part-time vacation rental property (referred to herein as "Joslin"); (2) Shirley Laviolette, whose subject property is a marina, RV park, and residence known as the Jetty Fishery (referred to herein as "Jetty Fishery"); and (3) Old Mill Investment, LLC, whose subject property is an RV park and campground (referred to herein as "Old Mill").

[2] The Port of Tillamook Bay ("POTB") was the operating railroad before abandonment.

[3] *See* the Trails Act, 16 U.S.C. § 1247(d).

amounts of just compensation owed to Appellants. Although the government's liability was established, and the CFC accordingly acknowledged that the government took Appellants' valuable property rights, the CFC concluded that Appellants did not meet their burden to prove amounts of just compensation due and awarded zero just compensation for the taking. The CFC significantly erred, both legally and factually, and ultimately reached an unconstitutional result.

Indisputably, POTB possessed an easement for railroad purposes across the land Appellants owned. Although POTB's own railroad use ceased entirely more than a decade before the government authorized trail use, POTB leased out a portion of its easement to the Oregon Coast Scenic Railroad ("OCSR") for periodic scenic train use. POTB petitioned the Surface Transportation Board ("STB") to abandon its easement for railroad purposes, and the STB agreed and issued a Notice of Interim Trail Use ("NITU") on July 26, 2016, thus authorizing the conversion of POTB's easement for railroad purposes to an easement for a hiking and biking trail.

Myriad legal and factual errors led to the CFC's conclusion of zero just compensation:

> 1)   Even though the CFC recognized that POTB's easement was extinguished for liability and valuation purposes, the CFC erroneously concluded that OCSR's "easement," which was not a standalone easement

and rather flowed completely from POTB's extinguished easement, had to be considered in the Before Condition;[4]

2)    The CFC erroneously ignored well-settled precedent that proper appraisal methodology views a landowner's property as "unencumbered" with any railroad easement in the Before Condition, and specifically in this case, POTB's easement and any subordinate rights thereunder;

3)    The CFC erroneously concluded that OCSR possessed a separate easement, rather than rights entirely reliant upon, and subordinate to, POTB's abandoned easement, and that OCSR's "easement" was not extinguished for valuation purposes when the NITU issued;

4)    In the After Condition following the NITU's issuance, the CFC erroneously considered both OCSR's continuing operations and the trail's status as "unconstructed" and/or "unlikely to materialize" and failed to recognize the importance of using the NITU's issuance as the valuation date;

---

[4] As explained in Section II *infra*, the "Before Condition" is a hypothetical appraisal scenario in which the government did not take the landowner's property, and it is compared with the "After Condition," an appraisal of the landowner's property following the government taking, to capture the full market value of a landowner's taken property, *i.e.*, the market value difference between the "Before" and the "After."

5)     Even assuming the CFC properly considered OCSR's presence in the After Condition—notwithstanding direct and contrary precedent—the CFC still factually erred by concluding that OCSR used the entire width of the right-of-way;

6)     The CFC failed to recognize the scope and impact of the Trails Act easement imposed on Appellants' land and improvements, namely, that the federally-imposed easement for a hiking and biking trail is exclusive and deprived Appellants of their own rights of exclusivity, which led to the CFC's erroneous findings that Appellants were entitled to neither the value of their taken lands nor the value of their taken, encroaching improvements; and

7)     The CFC determined that Appellants did not meet their evidentiary burden to prove just compensation, again based on a purported failure to consider OCSR's operations, despite the fact that Appellants incorporated significant evidence regarding OCSR's operations into their position on valuation through their appraiser's testimony.

Even one lone error from the above-enumerated list would provide this Court grounds for reversal, which speaks to the CFC decision's broad invalidity. As it stands, the CFC's decision completely deprives Appellants of their owed just compensation without any factual or legal basis to do so. That is an unjust and

unconstitutional result, and this Court should therefore reverse the CFC's decision and confirm that Appellants are entitled to proper just compensation.

## STATEMENT OF JURISDICTION

The CFC had jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), and entered Final Judgment pursuant to Rule 58 of the Rules of the Court of Federal Claims on November 26, 2024. *See* Appx37. The Appellants filed their Notice of Appeal on November 27, 2024 (Appx1915-1916). This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

Appellants present the following issues for panel review:

1) Did the CFC err as a matter of law in the Before Condition by considering OCSR's operations, by failing to recognize that the proper appraisal standard is "unencumbered," and by failing to recognize that the NITU extinguished OCSR's rights to operate along with POTB's railroad easement for valuation purposes?

2) Did the CFC err in the After Condition by failing to value the taking as of the NITU date and by considering whether the trail has been or will be built?

3) Did the CFC err in its valuation conclusion of zero dollars by failing to recognize that the Trails Act imposes an exclusive easement and

that the Plaintiffs lost the value of the land that was taken and the value of the encroaching improvements?

4) Did the CFC err in determining that Appellants did not meet their evidentiary burden to demonstrate owed just compensation?

## STATEMENT OF THE CASE

The railroad right-of-way at issue extends 87.01 miles along the northwest coast of Tillamook County, Oregon. The railroad initially constructed its Corridor in 1906 for freight transportation to facilitate logging operations and shipments from the Oregon coast, and the Corridor runs adjacent to all Appellants' properties. The Joslin and Jetty Fishery properties are north of Rockaway Beach along Oregon's northwest coast and the Old Mill property is approximately 7 miles away, just south of the old depot in Garibaldi.

Joslin purchased his property in December 2004, and he uses the property and the residence as a vacation location to support his fishing hobby and as a rental income property. *See* Joint Stip., at ¶ 25 (Appx645).[5] Joslin's driveway, parking area, and about 12 feet of his house encroach upon the Corridor. *See* Joint Stip., at ¶¶ 29 (Appx642-648), 31 (Appx645); Tr. 42:16-43:25 (Appx886-887); 45:14-46:24 (Appx889-890); JX4 (Appx1924), JX5 (Appx1926), JX8 (Appx1928).

---

[5] For photographs of the Joslin property, *see* JX10.1-5 (Appx1930-1934), 9-10 (Appx1938-1939), 13-16 (Appx1942-1945), 18 (Appx1947); Tr. 41:2-16 (Appx885); Tr. 48:14-51:25 (Appx892-895).

The Jetty Fishery property, which is next door to Joslin's property, has operated as an active marina, RV park, and residence for decades. *See* Tr. 95:7-96:16 (Appx939-940), 99:25-100:19 (Appx943-944), 159:6-20 (Appx1003). Approximately 12-15 feet of the house, approximately 5-7 feet of the business office and the repair facility, and most of the Jetty Fishery's commercial parking encroach on the Corridor. *See* Joint Stip., at ¶ 13 (Appx644); Tr. 101:1-103:11 (Appx945-947); 104:25-106:12 (Appx948-950), 160:19-162:11 (Appx1004-1006), 163:7-164:8 (Appx1007-1008), 166:24-167:13 (Appx1010-1011).

Old Mill's property, which operates primarily as an RV park and campground, is south of OCSR's depot in Garibaldi. Although no issues existed with respect to encroachments, in addition to the land within the right-of-way which was taken, Old Mill was also damaged by the loss of a crossing and access to Highway 101. *See* Joint Stip., at ¶ 45 (Appx647), 48 (Appx647); PX1.L (Appx2693); Tr. 330:19-332:23 (Appx1174-1176); 334:22-336:2 (Appx1178-1180), 343:5-344:4 (Appx1187-1188), 348:22-349:3 (Appx1192-1193), 349:8-351:13 (Appx1193-1195).

The CFC found, and it is undisputed, that the original source conveyances to the railroad adjacent to Appellants' properties conveyed easements limited to

railroad purposes.[6] After the CFC's liability decisions, 45 Plaintiffs proceeded to the valuation phase. All but these remaining three Plaintiffs settled their takings claims with the government (the only distinction being the existing encroachments).

POTB, a non-railroad created by the Oregon Legislature, became the successor-in-interest to the Corridor. In December 2007, catastrophic storm damage led to POTB's cessation of freight services within the Corridor. *See Loveridge V*, 150 Fed. Cl. at 146. On May 26, 2016, POTB initiated STB abandonment proceedings with its Notice to abandon the Corridor, which led to the Salmonberry Trail Intergovernmental Agency's ("STIA") NITU request on June 17, 2016, which in turn prompted the STB to issue the NITU on July 26, 2016. *See* Joint Stip., at ¶¶ 1-4 (Appx642). The following year, on October 23, 2017, POTB and STIA notified the STB of the parties' executed trail use agreement, thereby making the government's taking permanent. *See* Joint Stip., at ¶ 5 (Appx643).

---

[6] *See Loveridge v. United States*, 139 Fed. Cl. (2018) ("*Loveridge I*") (holding that some deeds in question conveyed a fee interest title to the railroad whereas others granted an easement limited to railroad purposes); *Loveridge v. United States*, 2019 WL 495578 (Fed. Cl. Feb. 8, 2019) ("*Loveridge II*") (allowing for reconsideration of four deeds); *Loveridge v. United States*, 148 Fed. Cl. 279 (2020) ("*Loveridge III*") (ruling on the scope of the various easement deeds); *Loveridge v. United States*, 149 Fed. Cl. 64 (2020) ("*Loveridge IV*") (ruling that just compensation must be measured assuming the subject properties were not encumbered by a rail easement); and *Loveridge v. United States*, 150 Fed. Cl. 143 (2020) ("*Loveridge V*") (ruling that the alternative path to liability, state law abandonment, did not apply).

In 2006, OCSR first entered a "lease" agreement with POTB. *See* JX52 (Appx2157-2174). Although POTB and OCSR's agreement is titled "lease," OCSR's rights are in fact subordinate to, and extend from, POTB's railroad purpose easements. OCSR and POTB signed another lease on March 29, 2012, and renewed the lease again in 2016, this time giving OCSR the unilateral option for two five-year renewals. *See* JX51 (Appx2131-2155). OCSR subsequently exercised both renewal options, so the current lease term ends in 2026. *See* Tr. 666:16-21 (Appx1510).

OCSR had limited operations before the NITU and, although its operations increased after the NITU, even following such increased usage, OCSR's scenic trains did not, and do not, run on the Corridor much of the year—its high season is summer, from May through September (*see* Tr. 564:9-24 (Appx1408), 590:24-591-21 (Appx1434-1435), 650:2-8 (Appx1494), 663:16-664:15 (Appx1507-1508)), it does not run at all adjacent to Old Mill's property in Garibaldi except for occasional internal switching and storage (*see* Tr. 648:4-649:23 (Appx1492-1493)) and, because OCSR's operations primarily occur between Garibaldi and Rockaway Beach (south of Joslin and the Jetty Fishery and north of Old Mill), OCSR in fact does not even operate adjacent to the Joslin and Jetty Fishery properties, except on weekends, for the vast majority of the year (*see* Tr. 607:13-18 (Appx1451), 664:16-665:3 (Appx1508-1509)).

*Loveridge I*, *Loveridge II*, and *Loveridge III* settled the government's liability. In *Loveridge IV*, in response to the government's argument that POTB's easement continued despite the implementation of the Trails Act, the CFC comported with extensive precedent and reiterated that a liability determination necessarily sets just compensation as "the difference between the value of Plaintiffs' land unencumbered by a railroad easement and the value of Plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad." *See Loveridge IV*, 149 Fed. Cl. at 71.[7]

After reassignment, *Loveridge VI* was issued in response to the government's motion for partial summary judgment that once again sought to establish that POTB's easement continued in both the Before and After Condition as a matter of law for valuation purposes. The CFC ruled, despite *Loveridge IV*'s holdings, that the parties' appraisers "may" or "must" consider OCSR's operations and that "damages must be calculated utilizing the real-world conditions of a property," which included the pre-existing contract between POTB and OCSR. *See Loveridge v. United States*, 167 Fed. Cl. 44, 50 (2023) ("*Loveridge VI*").

In reaching its decision, the CFC relied largely on *Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015) and afforded little weight to the CFC's prior

---

[7] Judge Nancy B. Firestone issued *Loveridge I-V* and presided over this case from December 2, 2016, until October 3, 2022, when the case was transferred to Judge David A. Tapp.

decisions in *Loveridge I*, *Loveridge II*, *Loveridge III*, and especially *Loveridge IV*, because the CFC was purportedly unaware of OCSR's presence at the time of the decisions. Nothing in the record suggests that Judge Firestone was in fact unaware of OCSR's presence and, indeed, evidence suggests the opposite—that OCSR, and its scenic train use, were part of the record before Judge Firestone when she issued her decisions. *See Loveridge V*, 150 Fed. Cl. at 146, 150 (citing to multiple pieces of evidence, including the trail use agreement that incorporated the POTB-OCSR operations agreement, that identified OCSR's use).

Against the backdrop of *Loveridge VI*, the CFC conducted a valuation trial in Portland, Oregon, from February 21 through February 27, 2024, to determine appropriate just compensation due to Appellants. Following trial and the parties' post-trial briefing, the CFC issued its Opinion and Order on November 26, 2024. *See Loveridge v. United States*, 174 Fed. Cl. 379 (2024) (hereinafter "*Loveridge VII*") (Appx1-36). The CFC concluded that Appellants did not meet their burden to establish the amount of owed just compensation, primarily because Appellants' appraiser purportedly did not properly consider OCSR's continuing operations, both before and after the NITU. *Id.* at 410–11. The CFC entered Judgment in favor of the United States on November 26, 2024 (Appx37), and Appellants timely filed their Notice of Appeal on November 27, 2024 (Appx1915-1916).

## SUMMARY OF THE ARGUMENT

It is undisputed that POTB possessed an easement for railroad purposes over Appellants' land as the CFC decided in *Loveridge I*, *Loveridge II*, and *Loveridge III*. It is also undisputed that OCSR used the Corridor for its scenic train operations pursuant to its agreement with POTB. After years of POTB's non-use, POTB sought and received permission to abandon its easement, and the STB issued the NITU on July 26, 2016. *See* Joint Stip., at ¶¶ 1-4 (Appx642).

The first issue on appeal relates to the CFC's consideration of OCSR's use of POTB's easement before the NITU's issuance, and specifically how OCSR's use impacts valuation. The CFC repudiated prior rulings in *Loveridge IV* and held in *Loveridge VI* that the Before Condition must consider OCSR's use. That ruling is incorrect as a matter of law, and it led directly to *Loveridge VII*, a valuation Opinion of zero dollars of just compensation, which is an unconstitutional result.

The CFC's holdings in *Loveridge IV* already established that the Before Condition must be valued without POTB's easement, and therefore necessarily without OCSR's use. As the CFC found in *Loveridge IV*, proper appraisal methodology requires appraisers to value the property "as unencumbered in the Before Condition" because there was only one easement on the property, possessed by POTB and not OCSR, which POTB abandoned.

In *Loveridge VI*, in holding that the Before Condition must consider OCSR's usage, the CFC disregarded *Loveridge IV*'s ruling that POTB abandoned its easement, and the CFC justified its disregard because the CFC in *Loveridge IV* was purportedly unaware of OCSR's operations, and because this Court's *Rasmuson* decision purportedly required consideration of OCSR's operations. The CFC erred on both conclusions—(1) in *Loveridge IV*, the CFC incorporated OCSR's use through specific reference to documentation that explicitly detailed OCSR's use (including the POTB/OCSR agreements and STIA's Final Plan Report), indicating that the CFC was aware of OCSR, and the CFC also specifically cited *Toscano*,[8] a prior similar case that established that a use like OCSR's, which derived from the abandoning railroad's easement, was irrelevant for valuation purposes; and (2) *Rasmuson* has nothing to do with whether OCSR's use of POTB's easement must be considered during a valuation trial because *Rasmuson* merely discussed the physical condition related to the presence of the rails and ties and not the legal condition of the property (*see* discussion in Section II *infra*).

The second issue on appeal relates to myriad valuation errors the CFC made in the After Condition. Trails Act takings cases are inverse condemnation cases whereby, once liability is determined, the government is obligated to compensate landowners based on the market value of the property on the date of taking, which

---

[8] *See Toscano v. United States*, 107 Fed. Cl. 179 (2012).

is July 26, 2016 (the NITU date). The CFC ignored the cardinal principle that the NITU date is the valuation date by wrongly considering OCSR's continuing operations after the NITU date and through 2026, when OCSR's rights under its agreement with POTB expired, and by repeatedly referencing the irrelevant facts that the trail had yet to be constructed and the future probability of construction was low, to improperly conclude that Appellants did not demonstrate that the imposition of a new hiking and biking trail easement on their property caused damage (*see* discussion in Section III.A *infra*).

Critically, the CFC also failed to recognize the impact of the Trails Act's imposed easement in the After Condition, namely, that the Trails Act imposes an exclusive easement on the Appellants' property. The CFC ruled the exact opposite— that the easement was non-exclusive. In doing so, the CFC failed to recognize what the government took from Appellants—their right to exclude—and that Appellants lost the entire market value of both their land within the corridor and their encroaching improvements (*see* discussion in Section III.B *infra*).

The CFC erred by concluding that appraisers must consider OCSR's operations in the Before Condition. The CFC then made both factual and legal errors by concluding that Appellants' appraiser did not consider OSCR in the Before Condition when, in fact, Appellants' appraiser specifically addressed OCSR's use of a 17-foot width for its scenic train adjacent to the Joslin and Jetty Fishery

properties. Appellants' appraiser, the most experienced and well-qualified appraiser in the United States in rails-to-trails cases, filed a supplemental report pertaining to the Joslin and Jetty Fishery properties and recalculated the amount of just compensation due given OCSR's presence in the Before Condition, and in *Loveridge VII*, the CFC actually published that chart of supplemental conclusions. The CFC's conclusion that Appellants' appraiser did not account for OCSR's presence in the Before Condition is a clear error of fact.

The third issue on appeal is whether the Appellants met their burden to establish just compensation. The CFC wrongly considered OCSR's presence and wrongly ignored the new exclusive easement imposed on the Appellants' land and dramatically erred by holding that Appellants did not meet their burden to establish just compensation. The Appellants' appraiser first submitted traditional Before and After appraisals, then submitted supplemental appraisals to address the CFC's incorrect standard enunciated in *Loveridge VI,* and properly appraised what was taken from the Appellants, land and improvements, both ways. Because Appellants presented overwhelming evidence with "reasonable certainty" pertaining to just compensation, Appellants indisputably met their burden (discussed in Section IV *infra*).

The CFC's failures in both the Before Condition and After Condition completely undermined Appellants' ability to obtain just compensation. Even

though the CFC recognized that Appellants lost significant property rights, the CFC's numerous legal errors and the cited fictional shortcomings with Appellants' expert testimony negated the undisputable fact that the conclusion of zero compensation deprived Appellants of just compensation under the Fifth Amendment of the United States Constitution.

## ARGUMENT

### I. THE STANDARD OF REVIEW

When reviewing a CFC decision, this Court reviews legal conclusions *de novo* and findings of fact for clear error. *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1266 (Fed. Cir. 2009); *Holland v. United States*, 621 F.3d 1366, 1374 (Fed. Cir. 2010). Under the Trails Act, "[W]hether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings." *See Hardy v. United States*, 965 F.3d 1338, 1344 (Fed. Cir. 2020) (citing *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009)). Accordingly, the Court reviews the legal issues in this appeal related to OCSR's operations and valuation *de novo* and the findings of fact for clear error.

### II. OCSR'S PERIODIC OPERATIONS, DERIVED FROM POTB'S EASEMENT, ARE IRRELEVANT FOR VALUATION PURPOSES IN THE BEFORE CONDITION AS A MATTER OF LAW

Once the CFC finds liability in a Trails Act takings case, as was the case here, the goal is to put a landowner in as good a financial position as they would have

enjoyed had the government not taken the landowner's property rights. *See Rasmuson*, 807 F.3d at 1345. The "just compensation" due a property owner is the fair market value of the property at the time of the taking. *See United States v. Miller,* 317 U.S. 369, 373 (1943). In Trails Act takings cases, the "Before" and "After" methodology is the conventional method.[9]

The monetary difference between Before and After valuations, which are two separate appraisals within the same valuation assignment, is the amount of just compensation. In the Before Condition, the appraiser must report an opinion of the land's value for its highest and best use, as if vacant and available for such use, because the vacant land in the right-of-way is the subject of the valuation.[10] As a matter of well-settled law, the CFC has always ruled that proper appraisal

---

[9] *See Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632 (1961)); *Rasmuson*, 807 F.3d at 1345; *Hardy v. United States*, 141 Fed. Cl. 1, 10 (2018); *Technical College of the Lowcountry v. United States*, 145 Fed. Cl. 408, 427 (2019); *Jackson v. United States*, 155 Fed. Cl. 689, 694 (2021).

[10] This is a requirement of the Uniform Appraisal Standards for Federal Land Acquisitions, known colloquially as the Yellow Book, which the government is required to follow. *See Uniform Appraisal Standards for Federal Land Acquisitions* (6th Ed. 2016) ("Yellow Book") (Appx2430-2693) at § 2.3.3.1.1 (Appx2503), § 2.3.3.2 (Appx2504), § 4.4.3.2 (Appx2573); *see also Hardy*, 141 Fed. Cl. at 11, 32.

methodology considers the taken land as vacant in the Before Condition, *i.e.*, the landowners' ownership interest is "unencumbered."[11]

The CFC erred in this case in the Before Condition based on substantial legal errors regarding OCSR's operations. Relying primarily on *Rasmuson*, the CFC wrongly concluded that OCSR's "easement," which was derived exclusively from POTB's easement, continued to exist for valuation purposes, even though the CFC already found liability in *Loveridge I-IV*, and even though the CFC concluded at trial that POTB's easement was extinguished for valuation purposes. *See Loveridge VII*, 174 Fed. Cl. at 390–91, 395-97.

> **A.  The CFC Erred In Requiring Consideration of OCSR's Use in the Before Condition Because There Was Only One Easement, Which Belonged to POTB and Not OCSR, and POTB's Easement was Abandoned Prior to the NITU**

Indisputably, upon the NITU's issuance, POTB merely owned an easement for railroad purposes, Appellants owned the underlying fee title to the Corridor, and recreational trail use falls outside the scope of POTB's easement. The only factual difference between a typical rails-to-trails Before Analysis, which requires a finding that the land is to be "valued as property unencumbered by any railroad purposes

---

[11] *See Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011); *Hardy*, 141 Fed. Cl. at 9; *Jackson*, 155 Fed. Cl. at 426; *Technical College*, 145 Fed. Cl. at 702; *Rogers v. United States*, 101 Fed. Cl. 287, 296 (2011); *Ybanez v. United States*, 102 Fed. Cl. 82, 88 (2011); *Macy Elevator, Inc. v. United States*, 105 Fed. Cl. 195, 198 (2012); *Ingram v. United States*, 105 Fed. Cl. 518, 539 (2012); *Howard v. United States*, 106 Fed. Cl. 343, 368–69 (2012); *Toscano*, 107 Fed. Cl. at 199.

easements,"[12] is OCSR's operation, but based on precedent, that operation is legally irrelevant. As shown though *Preseault II*,[13] all its progeny, myriad CFC decisions including *Toscano* and *Loveridge IV*, and Oregon law, the Before Condition must reflect that POTB abandoned its easement, including OCSR's use. The CFC erroneously found otherwise—that OCSR somehow held continuing rights distinct from POTB's easement—which constitutes reversible error.

Through *Toscano*, Appellants brought this exact issue to the CFC's attention. In *Toscano*, the government argued that a separate passenger train easement outside the STB's jurisdiction, just like OCSR's scenic train in this case, changed the analysis. *See Toscano*, 107 Fed. Cl. at 186. The CFC completely rejected that argument because, fundamentally, **"[t]here was only one easement granted to the railroad initially."** *Id.* at 187 (emphasis added). The CFC's full reasoning is worth repeating here:

> [T]he trail is inconsistent with the original easement, **thereby voiding the entire easement, not just a portion**. Moreover, while misuse of an easement can normally be prevented by injunction, **that is not possible here because of preemption by federal law**. When the misuse is inseparable, **the proper remedy may be extinguishment of the entire easement**.
>
> […]

---

[12] *See Macy Elevator*, 105 Fed. Cl. at 199 (in the Before Condition, the land is "valued as property unencumbered by any railroad purpose easements").

[13] *Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("*Preseault II*").

**As in any other Rails–to–Trails case**, we determine the state law reversionary property rights that would otherwise vest but are blocked from so vesting by the NITU. We do not look at the difference between the value of the property before the issuance of the NITU and the value of the land with the added burden of the trail easement. **The before value must reflect the value of the land without an easement of any kind because, but for the federal action, plaintiffs would have recovered the full use of their property as a result of the termination of the easement by contrary trail use. In other words, the NITU extinguished not just part of an easement but the whole easement.**

*See Toscano*, 107 Fed. Cl. at 187–88 (internal quotations and citations omitted) (emphasis added). In reaching the conclusion that the passenger train's corridor use did not change the original easement's abandonment for valuation purposes, the CFC cited widely to Federal Circuit and CFC precedent, precedent from other jurisdictions, and to respected property law treatises. *Id.*

As a matter of basic property law, the original constructing railroad, POTB's successor-in-interest, acquired one easement—the railroad easement that extinguished upon the NITU's issuance, a point with which both Judge Firestone and Judge Tapp agreed. Although the government continuously and inaccurately referenced the existence of a separate OCSR easement, an inaccuracy that the CFC mistakenly endorsed, that is a legal impossibility—Appellants and/or their predecessors-in-title never granted an easement to OCSR, and neither the government nor the CFC pointed to any contrary evidence. POTB's easement extinguished, and along with it, any operational rights of OCSR. Therefore, just as

20

in *Toscano*, absent the NITU, Appellants would have regained full use of their land without POTB's easement, and in turn, without OCSR's use. *See Toscano*, 107 Fed. Cl. at 187–88.

Although *Toscano* analyzed Utah law, the underlying principles are rooted in basic property law concepts, and those concepts apply in Oregon just as much as they do in Utah. In *Toscano*, the CFC stated that "the railroad presumably could sell the right to use all or part of that easement, [but] those sub-easements, would have to be consistent with railroad use,"[14] that "landowners can insist on adherence to the limitations inherent in the original easement," and when misuse [change in use] of an easement is "inseparable, the proper remedy may be extinguishment of the entire easement."[15] Importantly, the CFC found that the entire easement, including the sub-rights of passenger train use (again, analogous to OCSR's scenic train use), was extinguished for valuation purposes. *Id.* at 187-88.

If federal law did not impose a new use beyond the scope of the original easement, Oregon law provides the same potential state law remedies available in Utah. In *Minto v. Salem Water, Light & Power Co.*, 250 P. 722 (Or. 1926), the

---

[14] *See Toscano*, 107 Fed. Cl. at 187 (citing *Wood v. Ashby*, 253 P.2d 351, 354 (Utah 1952) ("a right-of-way founded upon deed or grant is limited to the uses of the extent thereof as fixed by the grant or deed")). Oregon law recognizes this same basic principle. *See, e.g.*, *Fendall v. Miller*, 196 P. 381, 383 (Or. 1921).

[15] *Id.* (citing *Lutheran High School Ass'n. of the Greater Salt Lake Area v. Woodlands III Holdings, LLC*, 81 P.3d 792, 795, n. 2 (Utah App. 2003)).

Oregon Supreme Court addressed a similar issue where an entity with eminent domain powers exceeded the scope of its easement, and *Minto* accordingly provides valuable insight. In *Minto*, the defendant utility company was contractually obligated to supply the City of Salem with water, yet in doing so, the company used the plaintiff landowner's property in excess of the terms of the easement, and the landowner sought an injunction, and the Court held that the plaintiffs should be paid or the utility company could be forced to abandon the easement. *See Minto*, 250 P. at 727 (emphasis added); *see also Realvest Corp. v. Land Cnty.*, 100 P.3d 1109, 1116 (Or. App. 2004) (quoting *Minto*).

Even though Oregon law would provide Appellants the state law remedy of injunctive relief to block trail construction, Appellants are blocked from requesting such relief thanks to federal preemption, just as the CFC found in *Toscano* pursuant to Utah law. *See Toscano*, 107 Fed. Cl. at 187 ("Moreover, while misuse of an easement can normally be prevented by injunction, that is not possible here because of preemption by federal law"). *Toscano* provides the exact blueprint for the Before Condition in this case, and the CFC erred in refusing to follow it.

As Judge Firestone found, POTB's easement extinguished because **imposed trail use** exceeds the easement's scope, thereby forestalling Plaintiffs' reversionary rights. Just as the "separate" passenger easement did not change the analysis in *Toscano*, OCSR's operations do not change the analysis here. OCSR's rights are

completely subsumed within POTB's easement—OCSR's rights extinguished alongside POTB's upon the extinguishment of POTB's easement, and therefore OCSR's operations cannot be considered in the Before Condition.

### B. *Loveridge VII*'s Valuation Conclusion, Which Relied on OSCR's Presence, Was Based on *Loveridge VI*'s Misinterpretations, Both Factually and Legally, of *Loveridge I-IV* and *Rasmuson*

Well before *Loveridge VI* and *Loveridge VII*, the CFC, through Judge Firestone, correctly followed extensive CFC and Federal Circuit precedent[16] to find that the original source conveyances at issue conveyed easements limited to railroad purposes (prong 1 of *Preseault II*), and that trail use exceeded the scope of those easements (prong 2 of *Preseault II*). *See Loveridge I*, 139 Fed. Cl. at 132–96; *Loveridge II*, 2019 WL 495578 at *59; *Loveridge III*, 148 Fed. Cl. at 289–91. In determining that the *Loveridge* Plaintiffs satisfied both prongs 1 and 2 of *Preseault II*, thus satisfying the liability test established by this Court, the CFC found that the government's action, through the NITU's issuance, effectively eliminated the Plaintiffs' state law reversionary rights. *See, e.g.*, *Loveridge I*, 139 Fed. Cl. at 128 (citing *Caldwell*, 391 F.3d at 1019).

---

[16] *See Preseault II*, 100 F.3d at 1533; *Caldwell v. United States*, 391 F. 3d 1229 (Fed. Cir. 2004), *cert. denied,* 547 U.S. 826 (2005); *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006), *cert. denied,* 549 U.S. 1209 (2007); *Illig v. United States*, 274 Fed. Appx. 883 (Fed. Cir. 2008), *cert. denied,* 129 S. Ct. 2860 (2009); *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010), *reh'g and reh'g en banc denied*, 646 F.3d 910 (Fed. Cir. 2010).

After determining liability in *Loveridge I*, *Loveridge II*, and *Loveridge III*, the CFC comported with Federal Circuit and CFC precedent in *Loveridge IV* and reiterated exactly what the government's liability means as to the value of Plaintiffs' just compensation:

> Upon issuance of a NITU, 'the STB retains jurisdiction for possible railroad use and the abandonment of the corridor is blocked.' Therefore, **where Plaintiffs can show that POTB would have abandoned its easement but for the Trails Act, the Plaintiffs' 'measure of damages for just compensation must be the difference between the value of Plaintiffs' land unencumbered by a railroad easement and the value of Plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.' This Court has uniformly rejected the government's contention to hold otherwise.** The Court declines to depart from this approach.

*See Loveridge IV*, 149 Fed. Cl. at 71 (emphasis added) (internal quotations and citations omitted).

The CFC went on to examine POTB's easement under Oregon law, which the CFC had already determined to be an easement for railroad purposes, and unequivocally found that POTB intended to abandon its easement and would have done so but for the Trails Act's operation. *See Loveridge IV*, 149 Fed. Cl. at 71–72. Specifically, the CFC cited POTB's failure to operate trains since 2007, together with its verified statement of intent before the STB to "fully abandon" its rail line for service.

In *Loveridge VI*, the CFC ruled that the appraisers "may" or "must" consider OCSR's operations in the Before Condition, at least to the extent the operations exist

until OCSR's rights expire in 2026. *See Loveridge VI*, 167 Fed. Cl. at 50. This effectively and wrongly reversed *Loveridge IV*'s valuation standard for two primary reasons—(1) the CFC repeatedly assumed that Judge Firestone was entirely unaware of OCSR's operations; and (2) relying on *Rasmuson*, the CFC saw OCSR's operations as a physical condition of the properties that the appraisers were required to consider. *Loveridge VII* repeatedly echoed these two reasons, and they clearly formed the primary basis for the CFC's zero just compensation conclusion. *See Loveridge VII*, 174 Fed. Cl. at 395–97.

However, both the record and the law demonstrate those reasons are inaccurate and unfounded. First, the *Loveridge* decisions that predate *Loveridge VI* demonstrate that Judge Firestone was aware of OCSR's operations, and that those operations were irrelevant to her findings. Second, as a clear matter of law as articulated in *Loveridge IV*, OCSR's operations were irrelevant to the Before Condition because the properties should have been appraised as unencumbered— *Rasmuson* has nothing to do with that standard because *Rasmuson* discusses **physical conditions**, not **legal conditions**, and the CFC wrongly conflated the two when considering OCSR.

The government did not specifically address OCSR's presence during summary judgment briefing that led to *Loveridge III*, *Loveridge IV*, and *Loveridge V*. Instead, the government simply pointed to POTB's contracts for certain Corridor

uses with third parties and argued that **POTB's railroad purposes easement was not abandoned** (as it did again leading up to trial), not that OCSR's use or easements had to be considered, even though the freight easement was clearly abandoned. As a result, Judge Firestone did not have to address OCSR's presence and different uses or divisions of POTB's railroad purposes easement, like in *Toscano*. However, even though the government did not specifically raise OCSR's presence, any fair reading of Judge Firestone's Opinions demonstrates that she was aware of OCSR's operations and *Toscano* (because she cited it).

In *Loveridge IV*, in rejecting the argument that, for valuation purposes, the Court should find POTB's railroad purposes easement encumbered the Corridor in the Before Condition (an argument the government repeated before *Loveridge VI* was issued, and then again during and after trial), Judge Firestone specifically cited to *Toscano*, which holds that, where trail use exceeds the scope of a railroad's easement under prong 2 of *Preseault II*, the entire easement is extinguished for valuation purposes, including any interests subordinate to and within the easement's grant of rights. *See Loveridge IV*, 149 Fed. Cl. at 71 n.3; *Toscano*, 107 Fed. Cl. at 187–88. Obviously, then, Judge Firestone agreed with *Toscano*'s holdings.

Moreover, as to specific facts regarding OCSR's presence in the context of her citing *Toscano*, Judge Firestone specifically referenced terms of the Trail Use Agreement, including those that expressly incorporated OCSR's use:

Additionally, the **Salmonberry Trail Rail Line Lease Agreement** between the STIA and the POTB specifically states that the POTB had "entered into third party contracts affecting the" right of way prior to that agreement and that the POTB retained the right to administer and renew these existing use agreements. These use agreements granted third parties limited non-ownership rights to use or access the easements, such as "right of way use agreements, **rail line use agreements**, licenses, easements, real property agreements, crossing agreements, encroachment agreements, or permits and other agreements pertaining to [the] rail line."

*See Loveridge V*, 150 Fed. Cl. at 150 (internal citations omitted) (emphasis added).

The provisions Judge Firestone cited specifically reference OCSR and its operations, even going so far as to include OCSR's agreement with POTB as an exhibit. *See* JX49.5 (Appx2061); JX49.43 (Appx2099). Judge Firestone also discussed the Final Plan Report, which also extensively discusses OCSR and identified that OCSR provided input. *See Loveridge V*, 150 Fed. Cl. at 146; *see, e.g.*, JX56.10-11 (Appx2311-2312); JX56.22-23 (Appx2323-2324). Therefore, it is reasonable to assume that the basic facts regarding OCSR's use were before Judge Firestone the entire time.

Accordingly, Judge Firestone's holdings that the Before Condition must be assessed without POTB's easement demonstrate that the OCSR issue was already decided. Regardless, even if one assumes Judge Firestone did not directly connect *Toscano* and related precedent with OCSR's operations, Judge Firestone's liability Opinions were correct because they fall directly in line with CFC and Federal Circuit precedent, including *Toscano*.

Additionally, because OCSR was purportedly a pre-existing condition that could not be ignored, the CFC relied on *Rasmuson*, which held that physical conditions should be considered in the Before Condition, and ignored whether OCSR had a legal right to use the Corridor, the only scenario in which OCSR could even be considered a "physical condition." In *Rasmuson*, the sole, and narrow, issue was whether the Before Condition should include the railroad's physical remnants, *i.e.*, rails, ties, etc. *See Rasmuson*, 807 F.3d at 1345. *Rasmuson* exclusively focused on certain aspects of the taken property's physical condition, **not its legal condition**. *Id.* at 1345–46.

Indeed, the CFC recently confirmed *Rasmuson*'s distinction between a railroad corridor's physical and legal attributes as it relates to valuation. In *Nicholson v. United States*, 170 Fed. Cl. 399 (2024) (Judge Tapp), the CFC ruled that "*Rasmuson* and related cases show that the 'Before' conditions distinguish between land that is free of legal restrictions and land that is free of the whispers of a railway. The real-world conditions that the 'Before' condition must consider is the *physical* condition of the property, unencumbered by the easement that the NITU extended." *Id.* at 415.

In *Rasmuson*, as Judge Firestone did in *Loveridge IV*, the trial court found "that but for the government's easement, the railway easements would have lapsed and the land would have returned to the landowners." *See Rasmuson*, 807 F.3d at

1345. As in all Trails Act cases, in *Rasmuson*, the land in the Before Condition was unencumbered, even though this Court ruled that the remaining remnants, like the rails and ties, should be considered. *Id.* at 1345–46.

OCSR's operations are not analogous to the physical remnants of the railroad left behind in *Rasmuson*. Rather, OCSR's use of the right-of-way before the NITU is only possible through OCSR's legal right to occupy and use the right-of-way, which necessarily flows from POTB's easement, which is extinguished for valuation purposes in the Before Condition, as stated in *Loveridge IV* and *Toscano*. Both in its dismissal of Judge Firestone's reasoning, explicit and implicit, regarding OCSR's presence, and in its overreading of *Rasmuson*, the CFC significantly erred in not reaffirming *Loveridge IV*'s findings that the Before Condition in this case must consider the Corridor vacant and unencumbered.

## III. THE CFC ALSO MADE NUMEROUS VALUATION ERRORS IN THE AFTER CONDITION, WHICH WERE DERIVED PRIMARILY BECAUSE THE CFC IGNORED THE NITU DATE AS THE VALUATION DATE AND MADE INCORRECT CONCLUSIONS OF LAW RELATED TO THE NATURE OF THE NEWLY-IMPOSED HIKING AND BIKING TRAIL EASEMENT

The CFC's ruling in *Loveridge VI* that the appraisers "may" or "must" account for OCSR's presence in the Before Condition, rather than appraising the properties as unencumbered, was incorrect as a matter of law. Then, in the After Condition, CFC compounded its OCSR-driven errors by considering OCSR's continuing operations after the NITU date, by inappropriately speculating about the ultimate

likelihood of trail construction after the NITU date, and by failing to follow significant precedent on the exclusivity of federally-imposed hiking and biking trail easements, which produced a fundamentally flawed analysis.

> ### A. The CFC Erred in the After Condition By Considering OCSR's Continuing Operations, By Considering the Likelihood of Construction of the Trail, and By Ignoring the NITU Date as the Valuation Date

Just as in the Before Condition, in the After Condition, the CFC erred in several ways. First, the CFC wrongly considered OCSR's continuing operations after the NITU date and through 2026, when OCSR's "lease" term expired. The CFC repeatedly referred to OCSR's continuing operations, mentioned that the current lease expires in 2026, anticipated that "one or more subsequent leases is likely," and noted that the pre-existing lease "would not extinguish with or without a trail easement." *See Loveridge VII*, 174 Fed. Cl. at 387 n.8. Second, the CFC erroneously ignored the valuation date in this inverse condemnation case, as evidenced by its repeated references to a lack of trail construction to date, the likeliness and/or probability of future construction, and that the trail's purportedly "imaginary" state, all of which were not apparent as of the NITU's issuance. *Id.* at 400–03.

Trails Act takings cases are inverse condemnation cases over which the CFC has exclusive jurisdiction pursuant to the Tucker Act for claims that exceed

$10,000.[17] The most significant difference between an inverse taking claim and a direct condemnation or other affirmative acquisition is the threshold question of liability—the CFC must first determine whether a taking occurred for which just compensation is Constitutionally mandated.[18] If the CFC finds that a compensable taking occurred, as in this case, litigation will proceed to a determination of just compensation, in which standard eminent domain valuation rules apply.

Pursuant to standard valuation rules, the taking date is crucial, as the government is obligated to compensate landowners based on the market value of their property as of the government's taking.[19] In this case, the CFC basically ignored the significance of the valuation date of July 26, 2016, the date of the NITU's issuance, in the context of a valuation trial.

At trial, the CFC asked several questions about the timing of trail construction and its impact on valuation—essentially, the temporal effect on value whether the trail is built in 7 months, 7 years, or 70 years. *See* Tr. 228:20-233:3 (Appx1072-1077), 236:15-237:21(Appx1080-1081), 902:23-903:6 (Appx1746-1747), 903:19-24 (Appx1747). In fact, it does not matter at all when the trail may be built because

---

[17] *See* Tucker Act 28 U.S.C. § 1491.

[18] *See United States v. Clarke*, 445 U.S. 253, 255-58 (1980) (discussing "important legal and practical differences" between condemnation proceedings and inverse takings).

[19] *See United States v. Dow*, 357 U.S. 17, 22 (1958) ("that event which gives rise to the claim for compensation and files the date as of which the land is to be valued").

the taking in this case is permanent. It could eventually become temporary, but until that happens, Appellants' property rights do not retain any semblance of value.

Even after acknowledging that all prior rails-to-trails cases establish a standard of using the NITU date as the valuation date pursuant to CFC, Federal Circuit, and Supreme Court precedent, the CFC nonetheless effectively rejected that standard as "a convenient but unrealistic approach" and inappropriately looked well beyond the NITU date to analyze valuation. *See Loveridge VII*, 174 Fed. Cl. at 400–03. The CFC's failure is significant because appraisers, and ultimately the Court, must disregard events and changes in market value that occur after the date of value.[20]

The taking date is especially important in inverse condemnations cases because, unlike in regular eminent domain proceedings where the government openly admits a desire to take land and proactively provides compensation, landowners in inverse condemnations cases are required to force the government to admit to its taking and retroactively pay just compensation. So, in this case, the government should have paid Appellants **before** taking their property, on or before July 26, 2016, based on the property's market value **at that time**. Failing to do so, and indeed actively fighting its responsibility to do so for almost a decade, simply

---

[20] *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 16–18 (1984); *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913).

cannot result in the government avoiding paying just compensation, yet that is exactly what has happened here. The CFC looked beyond the taking date, to OCSR's operations and the trail's construction status, and in doing so incorporated facts that no market participant in July 2016 could have possibly considered—that is improper on its face.

The CFC's statements that the construction of the trail is "unlikely to materialize," that "the probability is unlikely," and that Appellants should not be compensated "based on the existence of an imaginary trail"[21] are findings completely based on evidence collected years after the taking date. Those findings, by definition, are directly contrary to CFC precedent and valuation methodology that appraisers must assume that the government's proposed project has taken existing improvements and that the hiking and biking trail is in place and constructed as of the NITU date—in this case, July 26, 2016.[22] In the simplest terms, appraisers cannot be smarter than the market—this is Appellants' one and only chance at just compensation, and it is necessarily based on market evidence and assumptions as of the valuation date, the date at which time Appellants should have been paid, and not

---

[21] *See Loveridge VII* 174 Fed. Cl. at 387, 400.

[22] *See Hardy*, 141 Fed. Cl. at 10; *Cheshire Hunt v. United States*, 158 Fed. Cl. 101, 111–12 (2022) (denying government's motion to exclude evidence of damaged improvements in the right-of-way); Tr. 904:18-23 (Appx1748), 905:12-20 (Appx1749).

the Court's knowledge at trial or contemporary suppositions about future trail construction.

**B. Because the Trails Act Imposed an Exclusive Easement in the After Condition, Appellants Lost all of Their Land Within the Area of Take and the Market Value of All Improvements Within the Area of Take Has Been Reduced to Zero Too**

The CFC also erred in its legal conclusion as to the scope of the Trails Act easement imposed on Appellants' property. In the After Condition, the Trails Act imposes a new, exclusive easement and, resultingly, Appellants lose all market value of their land and improvements within the Corridor. The CFC failed to acknowledge this and erroneously concluded "that neither Oregon law nor the Trails Act mandates that such an easement must be exclusive and, accordingly, that Plaintiffs failed to satisfy their burden of establishing the loss of crossing rights and property encroachments." *See Loveridge VII*, 174 Fed. Cl. at 403.

That conclusion is legally wrong, and indeed the opposite is true—in the After Condition, the Trails Act completely destroys Appellants' reversionary right to exclusive use and possession of their property. The CFC's failure to recognize that the newly-imposed Trails Act easement imposed an exclusive easement led to the CFC's failure to award compensation for either the land or the improvements which were taken.

In the After Condition, the owner's reversionary right to exclusive use and possession of their property has been "destroyed" or "effectively eliminated"

because a new easement for public recreation perpetually encumbers an owner's remaining land.[23] Because a new exclusive easement has been imposed in the After Condition, Appellants are entitled to just compensation for the value of the property actually taken, which in this case includes the land and the improvements (Joslin and Jetty Fishery) and severance damages (Old Mill). *See, e.g.*, *Agapion v. United States*, 167 Fed. Cl. 761, 775 (2023) ("An essential characteristic of unencumbered fee ownership—which these [rails-to-trails] plaintiffs no longer have—is the right to exclusive use of one's property"); *Jackson*, 155 Fed. Cl. at 702 (noting courts in rails-to-trails cases have "consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel"); *Hardy*, 141 Fed. Cl. at 15–16 (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)); *Howard*, 106 Fed. Cl. at 367; *Moore v. United States*, 54 Fed. Cl. 747, 751 (2002).

---

[23] *See Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 102 (2014); *Preseault v. Interstate Commerce Comm;n,* 494 U.S. 1, 18-19 (1990) ("*Preseault I*") (explaining that the original easement to operate a railroad across the land terminates but for the government's invocation of section 8(d)); *Preseault II*, 100 F.3d at 1550 (same); *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004) (same); *see also Childers v. United States*, 116 Fed. Cl. 486, 497 (2013); *Rogers*, 101 Fed. Cl. at 296; *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013).

Just as appraisers must value the land as fully taken in the After Condition, appraisers must value any encroaching improvements as fully taken.[24] These improvements include all buildings that encumber the property after the NITU's issuance, and additionally any access or parking that the government has taken or that the government's acquisition could impact. Fundamentally, the encroaching improvements are necessarily deemed taken for valuation purposes because the right to exclude is one of the most essential components of property ownership rights.[25]

Even though Appellants clearly lost their right to exclude, the CFC wrongly found the opposite—that the Trails Act, STIA's trail use pursuant to the same, and OCSR's continuing operations, do not necessarily exclude Appellants from use of their land. *See Loveridge VII*, 174 Fed. Cl. at 403. That ignores the reality of what these Trails Act Appellants lost, as the CFC and Federal Circuit have long

---

[24] *See* Yellow Book, § 1.3.1.2, at p. 18–19 (Appx2457-2458); § 2.3.2.3.2, at p. 62 (Appx2501); § 2.3.4.3.2, at p. 69 (Appx2508); *see also Cheshire Hunt*, 158 Fed. Cl. at 111-112.

[25] *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) ("the very idea of property entails that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe… the right to exclude is universally held to be a fundamental element of the property right, and is one of the most essential sticks in the bundle of rights that are commonly characterized as property") (citations and quotations omitted).

recognized. Indisputably and contrary to the CFC's findings, the Trails Act imposes an **exclusive** easement in the After Condition.

Precedent on the distinctive and exclusive rights the Trails Act contemplates dates to *Preseault I*, in which the Supreme Court held that the Trails Act represented "the culmination of congressional efforts to preserve rail trackage by converting unused rights-of-way to recreational trails" and that "**[t]wo congressional purposes are evident.**" *See Preseault I*, 494 U.S. at 5, 17 (emphasis added). For decades, the CFC and the Federal Circuit have extended that logic regarding the Trails Act's imposed property rights to find that both recreational hiking and biking trail use and preservation of the railroad's right-of-way for future rail service reactivation completely eliminate a Rails-to-Trails plaintiff's right to exclude.[26]

Accordingly, because the Trails Act imposes both a trail use easement and an easement for future railroad use, the right to exclude flows to the trail user (in this case, STIA). Therefore, existing encroachments are subject to the whims of the trail

---

[26] *See, e.g.*, *Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020) ("This categorical treatment of a coerced easement that impairs the landowner's right to exclude by allowing others' occupation finds support in Supreme Court precedent") (citing *Preseault I*, 494 U.S. at 24 (O'Connor, J., concurring)); *Cheshire Hunt*, 158 Fed. Cl. at 111 ("It is important to understand what the easement is in this case [...] The NITU makes no exception for any encroachments; it authorizes converting the "right-of-way" into a recreational trail without any limitation").

user pursuant to their exclusive use, which is factually[27] and legally[28] true here. The most important valuation question is what Appellants lost,[29] and Appellants clearly lost their rights to exclude. That simply must lead to just compensation equal to the full market value of Appellants' taken land and improvements as of the NITU date.

Both *Agapion* and *Cheshire Hunt* illustrate the CFC's errors in this case. In *Agapion*, a case very much on par with this one, the CFC correctly stated:

> Our court often finds that a fee simple landowner effectively loses all property rights within the corridor of a Section 8(d) easement. Through a Section 8(d) transfer, the trail sponsor obtains the authority to dictate how much of the corridor it needs to construct and operate the recreational trail, and the federal government (vis-à-vis the STB) **retains authority to decide the use of the full corridor for purposes of reactivating the rail line. The natural and intended consequence of this allocation of control is that the landowner retains no legal right to use the encumbered portion of the corridor in the face of a conflicting position taken by the City or the STB.**
>
> **The Court sees no reason to conclude differently here. The taking for which plaintiffs are entitled to just compensation is the destruction of their property interest within the corridor and the attendant reduction in value to their land associated with this loss of property interest.** Here, the reversionary right plaintiffs lost is the unencumbered fee ownership of the property underlying the easement.

---

[27] *See* JX49.4-5 (Appx2060-2061) (TUA giving STIA sole discretion to construct trail); Tr. 410:8-411:24 (Appx1254-1255), 593:19-594:23 (Appx1437-1438) (confirming STIA's sole discretion and exclusive control of trail construction and operation).

[28] *See, e.g.*, *Cheshire Hunt*, 158 Fed. Cl. at 108 (noting that use of burdened property under a trail easement is not necessarily the same as it was under the rail easement, and therefore encroachments that did not interfere with railroad use may very well interfere with trail use) (quoting *Toews*, 376 F.3d at 1376).

[29] *See Boston Chamber of Comm. v. City of Boston*, 217 U.S. 189, 195 (1910) ("The question is what has the owner lost? Not, What has the taker gained?").

An essential characteristic of unencumbered fee ownership—**which these plaintiffs no longer have—is the right to exclusive use of one's property**. This right is necessary to maintain structures within the easement corridor in the face of conflicting use. **The 2019 NITU destroyed that right.**

**While the [Trail User] or the STB might never order the removal of any encroaching structures within the right of way, they still have the authority to do so…. As a result, plaintiffs have no legal right to maintain an encroaching structure if either the STB or the [Trail User] determine the encroachment conflicts with the use of their easement.**

*See Agapion*, 167 Fed. Cl. at 775–76 (emphasis added).

The facts the CFC considered in *Agapion* are essentially the same facts present here. First, although options exist for construction that would not impact Plaintiffs' encroachments, STIA's stated preference from its Final Plan Report is waterside construction, which would destroy Joslin's house and the Jetty Fishery's house and business parking (making encroachment damage more tangible than that present in *Agapion*).[30] Second, Joslin and the Jetty Fishery have both had extensive discussions with POTB and STIA before, during, and after the NITU regarding the trail's impact on Plaintiffs' encroachments, yet neither Joslin nor Jetty Fishery have received any

---

[30] *See* JX56.34 (Appx2335); JX56.52 (Appx2353); JX56.64 (Appx2365); JX56.70 (Appx2371); Tr. 405:6-410:8 (Appx1249-1254).

assurances, let alone binding agreements, that POTB/STIA would allow them to maintain their structures.[31]

In *Cheshire Hunt*, as the CFC did here, the CFC relied on the fact that "the Trails Act's 'plain language does not mandate the creation of an exclusive easement for rail use.'" *See Cheshire Hunt*, 158 Fed. Cl. at 105. The CFC noted in *Cheshire Hunt* that while it "may well be so" that the Trails Act does not mandate exclusive use easements, the Trails Act's "plain language… does nothing to prohibit exclusive use easements." *Id.* Importantly, here, just as in *Cheshire Hunt*, "the NITU makes no exception for any encroachments; it authorizes converting the 'right-of-way' into a recreational trail without any limitation," and STIA now possesses the absolute right to define the scope of the new easement and indeed "may use the entirety of the burdened property for the purpose of the easement," including the encroaching improvements. *Id* at 111.

Rail corridors exist pursuant to **exclusive** rail easements, which then become exclusive trail easements (with an exclusive railroad purpose easement preserved for

---

[31] *See* Tr. 415:5-416:1 (Appx1259-1260), 599:2-600:14 (Appx1443-1444), 606:10-607:2 (Appx1450-1451) (detailing POTB/STIA discussions with Joslin); *see also* Tr. 168:14-21 (Appx1012), 169:5-170:9 (Appx1013-1014), 171:3-19 (Appx1015), 172:24-173:7 (Appx1016-1017), 415:5-416:1 (Appx1259-1260), 599:2-600:14 (Appx1443-1444), 606:10-607:2 (Appx1450-1451) (detailing POTB/STIA discussions with Jetty Fishery).

future use).[32] That is why both the CFC and the Federal Circuit consistently find that Trails Act takings Plaintiffs lose virtually all rights in their land and why the *Agapion* and *Cheshire Hunt* Courts found damages to Plaintiffs' improvements in the corridor, and why the CFC should have done the same here.[33]

The federal government authorized STIA to acquire Appellants' land for trail use, and therefore STIA now holds the right to force alteration or removal of Appellants' encroaching structures. The Trails Act offers no protection for landowners in Appellants' position and, in fact, provided the pathway through which STIA acquired its rights, which constituted a federal taking. Plaintiffs lost their reversionary rights and their structures are entirely subject to STIA's discretion.

Because the CFC erred in focusing on OCSR's continued operations after the NITU and that the chances of trail construction were slim, the CFC concluded that "neither Oregon law nor the Trails Act mandates that such an easement must be exclusive and, accordingly, that Plaintiffs failed to satisfy their burden of

---

[32] It is widely settled that a railroad easement is exclusive, and that holds equally true in Oregon. *See W. Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540, 570 (1904) (quoting *New Mexico v. United States Tr. Co. of New York*, 172 U.S. 171, 183 (1898); *LKL Assoc. Inc. v. Union Pacific R.R. Co.*, 17 F.4th 1287, 1296 (10th Cir. 2021); *Ward v. Southern Pac. Co.*, 36 P. 166, 167 (Or. 1894); *Georgia-Pac. Corp. v. Miller*, 304 P.2d 428, 437–38 (Or. 1956).

[33] The CFC's treatment of *Agapion* and *Cheshire Hunt* is puzzling—"the reach of these decisions is circumscribed; all are post-trial opinions examining the actual use of the easements and potential interference with the planned trail." *See Loveridge VII*, 174 Fed. Cl. at 403.

establishing"[34] any just compensation. The CFC's conclusion ignores the reality of what Trails Act Plaintiffs lose, as the CFC has long recognized, because the Plaintiffs fundamentally lost the right to exclude, which is one of the most essential components of property ownership rights. *See Cedar Point Nursery*, 594 U.S. at 149–50.

In short, the CFC's conclusion is not only wrong, but it is also inconsistent because the CFC ultimately, and correctly, recognized that Appellants "have definitively lost property rights, including the right to exclude others."[35] As a matter of law, just compensation had to take that After Condition reality into account, and the CFC's failure to do so was clear error.

## IV. THE EVIDENCE DEMONSTRATES THAT APPELLANTS' APPRAISER'S FINDINGS ON THE VALUE OF APPELLANTS' TAKEN PROPERTY REPRESENTS APPROPRIATE JUST COMPENSATION AND THE CFC'S DETERMINATION OF ZERO COMPENSATION IS UNCONSTITUTIONAL

The standard for determining compensation is the value of what the owner lost, not what the government has gained. *See Seaboard Airline Ry. Co. v. United States*, 261 U.S. 299, 304 (1923); *Virginia Elec. & Power Co.*, 365 U.S. at 635; *Boston Chamber of Commerce,* 217 U.S. at 195. The Supreme Court has made clear that the calculation of just compensation must include every element and attribute

---

[34] *See Loveridge VII,* 174 Fed. Cl. at 403.
[35] *Id.* at 410.

of the subject property that would affect the price a reasonable buyer would be willing to pay. *See, e.g.*, *Almota Farmer's Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973). Given the fact that the government took Appellants' land, and Appellants' improvements lost all market value when the government imposed a new exclusive easement for a hiking and biking trail, the CFC's conclusion that Appellants did not meet their burden of proof to establish just compensation is particularly egregious.

First, the parcels should have been appraised as "unencumbered" in the Before Condition, and the land and improvements should have been valued in the After Condition, which is exactly what Appellants' appraiser did. Second, even if OCSR's continued use was to be properly considered by the appraisers based on the CFC's opinion in *Loveridge VI*, that is exactly what Appellants' appraiser did in his supplemental reports. Simply put, Plaintiffs lost their reversionary rights, their land has been taken and their structures are entirely subject to STIA's discretion and, as a matter of law, just compensation had to take that reality into account—Appellants' appraiser recognized what was taken, and appraised what was taken correctly, and then even followed the CFC's incorrect direction to consider OSCR's presence, and Appellants met their burden based on both tests.

### A. Appellants Established Their Entitlement to Just Compensation for Both Their Land and Their Improvements Through Credible Expert Appraisal Testimony

Appellants presented their testimony regarding just compensation for all parcels through their expert appraiser, David Matthews.[36] Mr. Matthews is one of the premiere appraisers in the United States and is the preeminent appraiser in the United States in rails-to-trails cases. *See* Tr. 181:15-201:1 (Appx1025-1045). Using his extensive experience and expertise, and in compliance with appraisal and legal standards that appraisers should consider land "unencumbered in the Before Condition," Mr. Matthews first produced standard rails-to-trails appraisals.

For the Before Condition, Mr. Matthews whittled down hundreds of comparable sales to find those most suited to value Plaintiffs' properties, including a determination of appropriate highest and best use,[37] and accordingly valued

---

[36] The government presented its testimony regarding just compensation through its expert appraiser, Stacy Hasson. Appellants will not go into detail regarding Ms. Hasson's testimony here, as the CFC's finding of zero just compensation was not based at all on the credibility of Ms. Hasson's testimony. Indeed, the CFC rejected virtually all of Ms. Hasson's assumptions (inclusion of POTB's freight easement in the Before Condition; findings of zero contributory value to unencumbered property within a former railroad right-of-way; insufficient comparable sales analysis to capture Corridor value; ultimate findings of zero difference between Before and After valuations). *See Loveridge VII*, 174 Fed. Cl. at 409–10.

[37] *See* Tr. 240:1-247:23 (Joslin) (Appx1084-1091); Tr. 275:25-277:16 (Appx1119-1121), 282:1-13 (Appx1126), 285:14-286:13 (Jetty Fishery) (Appx1129-1130); Tr. 336:8-340:8 (Old Mill) (Appx1180-1184).

Plaintiffs properties, including any encroaching improvements.[38] In the After Condition, Mr. Matthews performed the same analysis accounting for the government's acquisition—the taking of Plaintiffs' land and improvements for trail use.[39]

For Joslin and Jetty Fishery, using facts a reasonable buyer would know as of the taking date, namely, the Final Plan Report, Mr. Matthews found that Joslin's house and the Jetty Fishery house and business structures were taken. *See* Tr. 228:20-233:3 (Appx1072-1077), 236:15-237:21 (Appx1080-1081). Moreover, Mr. Matthews relied on his correct understanding that a Trails Act easement is exclusive in nature, just like a railroad easement, and that the trail operator has the absolute right to force removal of Joslin's and the Jetty Fishery's encroaching improvements. As such, in addition to the value of the fee simple corridor land the government took,

---

[38] *See* Tr. 248:15-250:23 (Appx1092-1094), 250:24-251:24 (Appx1094-1095), 251:25-258:17 (Joslin) (Appx1095-1102); Tr. 282:1-13 (Appx1126), 285:14-286:13 (Appx1129-1130), 277:25-279:14 (Appx1121-1123), 295:20-304:6 (Appx1139-1148), 279:17-281:22 (Appx1123-1125), 282:14-285:13 (Jetty Fishery) (Appx1126-1129); Tr. 336:8-340:8 (Old Mill) (Appx1180-1184). Appellants note that Ms. Hasson failed to value the improvements whatsoever, leaving Mr. Matthews' valuation of the improvements as the only evidence in the record to establish the improvements' value.

[39] *See* Tr. 258:23-266:6 (Joslin) (Appx1102-1110); Tr. 287:14-295:19 (Jetty Fishery) (Appx1131-1139); Tr. 340:9-342:7 (Appx1184-1186), 347:7-12 (Old Mill) (Appx1191).

for Joslin and the Jetty Fishery, Mr. Matthews found damages in the full value of the buildings taken.[40]

In appraising Old Mill, Mr. Matthews first appraised the land that was taken— he concluded that the stipulated amount of taken land should be valued at $75,000 per acre. Notably, the government's appraiser concluded that the land values for Old Mill were significantly higher at around $76,000/acre for one parcel and around $94,000/acre for the other three parcels. *See* Tr. 849:7-25 (Appx1693), 850:1-15 (Appx1694). In addition to the land value, Mr. Matthews found damages due to loss of access and commercial frontage,[41] which was supported by Doug Rosenberg's testimony[42] and, if anything, damages of 5 percent due to loss of access and commercial frontage is conservative.[43]

Mr. Matthews' original (and correct) valuation opinions resulted in conclusions of just compensation, as follows:

|  | JOSLIN | JETTY FISHERY | OLD MILL |
|---|---|---|---|
| BEFORE VALUE | $504,000 | $942,000 | $3,417,000 |
| AFTER VALUE | $133,000 | $430,000 | $3,212,000 |
| DIFFERENCE | $371,000 | $512,000 | $205,000 |

---

[40] See PX11.D.49-56 (Appx3002-3009), Tr.251:25-258:17 (Appx1095-1102) (Joslin); PX11.C.51-58 (Appx2790-2797), Tr. 287:14-295:19 (Appx1131-1139) (Jetty Fishery).

[41] *See* Tr. 330:20-332:23 (Appx1174-1176), 334:23-336:23(Appx1178-1180), 343:5-344:4 (Appx1187-1188), 349:9-351:14 (Appx1193-1195).

[42] *See* ECF No. 227, Exhibit B (Rosenberg Depo.), at 42:7-13 (Appx673), 44:3-45:6 (Appx673); 46:4-18 (Appx674).

[43] *See* Tr. 336:8-340:8 (Appx1180-1184), 343:5-344:4 (Appx1187-1188), 349:9-351:14 (Appx1193-1195).

After the CFC directed a new path in *Loveridge VI* regarding consideration of OCSR's operations, Mr. Matthews complied with the CFC's instructions and performed supplemental appraisal reports that considered OCSR's presence in the Before Condition.[44] As to Joslin and Jetty Fishery, Mr. Matthews determined that, even if OCSR's use is considered in the Before Condition, then its impact on valuation is limited to removal of the landowners' fee simple rights as to a 17-foot-wide strip in the corridor (to allow for OCSR's use).

In the supplemental portions of his appraisal reports, Mr. Matthews considered *Loveridge VI* in a manner that accurately reflects OCSR's actual operations in the Before Condition, and the impact of those operations is demonstrably minimal. For Joslin and Jetty Fishery, Mr. Matthews viewed the Before Condition as owned in fee simple by Appellants, except for a 17-foot-wide strip that accounted for OCSR's use. *See* PX11C.53-54 (Appx2792-2793); PX11D.51-52 (Appx3004-3005). Mr. Matthews concluded that a width of 17 feet was appropriate based primarily on the Final Plan Report and his own extensive experience with railroad corridors. *See* Tr. 221:8-24 (Appx1065), 222:6-223:13 (Appx1066-1067), 252:7-256:13 (Appx1096-1100), 298:10-299:18 (Appx1142-1143). Moreover, the evidence at trial confirmed that 17-feet is an appropriate

---

[44] *See* PX11C.51-58 (Jetty Fishery) (Appx2790-2797); PX11D.49-56 (Joslin) (Appx3002-3009).

representation of OCSR's use. *See, e.g.*, Tr. 404:17-405:5 (Appx1248-1249), 588:19-589:6 (Appx1432-1433).

Even assuming OSCR should be considered to some extent, as demonstrated at trial and through Mr. Matthews' testimony, OCSR's use of the Corridor adjacent to the Joslin and Jetty Fishery properties never exceeded 17 feet. Moreover, not only was 17 feet appropriate, even under *Loveridge VI*, but also OCSR could never use the entire 100-foot width in the Before Condition adjacent to the Joslin and Jetty Fishery properties because of pre-existing encroachment and crossing agreements that prohibited OCSR from using the entire 100-foot width.[45]

Because the CFC ruled in *Loveridge VI* that OCSR's operation should be considered in the Before Condition, that is exactly what Mr. Matthews did through his supplemental reports, by using a 17-foot width for OCSR's use, and the chart of Mr. Matthews' resulting findings was reproduced in *Loveridge VII*, as follows:

|  | JOSLIN | JETTY FISHERY | OLD MILL |
|---|---|---|---|
| BEFORE VALUE | $468,000 ($248,000 in land value after considering | $899,000 ($445,000 in land value accounting for OCSR's use, | $3,417,000 (land value only, no improvements) |

---

[45] Both Joslin and Jetty Fishery had long-standing encroachment agreements and crossing agreements that protected their rights prior to the NITU. *See* JX11 (Appx1972-1975) (Joslin encroachment agreement); JX12 (Appx1976-1981) (Joslin private roadway agreement); JX22 (Appx1994-1996) (Jetty Fishery encroachment agreement); JX24 (Appx2008-2011) (Jetty Fishery crossing agreements).

|  | OCSR's use, $220,000 in improvement value) | $454,000 in improvement value) |  |
|---|---|---|---|
| AFTER VALUE | $139,000 (all land value, improvements considered taken) | $430,000 ($236,000 in land value, $194,000 in improvement value after considering house, business, and shop taken) | $3,212,000 (land value only, no improvements taken) |
| DIFFERENCE (PLAINTIFFS' PROPOSED JUST COMPENSATION) | **$329,000** ($109,000 in land, $220,000 in improvements) | **$469,000** ($209,000 in land, $260,000 in improvements) | **$205,000** ($83,000 in land value, $122,000 damages to the remainder for loss of highway frontage and change in highest and best use) |

*See Loveridge VII*, 174 Fed. Cl. at 391–92; *see also* PX11B.30 (Old Mill) (Appx2724); PX11C.58 (Jetty Fishery) (Appx2797); PX11D.56 (Joslin) (Appx3009).

Mr. Matthews' compliance with the CFC's ruling in *Loveridge VI* impacted the ultimate value conclusions, but not by much. Mr. Matthews deducted the amount of land subject to OCSR's use in the Before Condition, which yielded a larger parcel 0.18 acres less in size than Mr. Matthews' original calculation for Joslin, and the just compensation amount was $329,000 rather than $371,000. *See* PX11D.47 (Appx3000). Similarly, the deduction for Jetty Fishery yielded a larger parcel 0.39

acres less in size and Mr. Matthews' calculation of just compensation amounted to $469,000, $43,000 less than the original difference of $512,000. *See* PX11C.50 (Appx2789).[46]

In *Loveridge VII*, the CFC reprinted Mr. Matthews' chart of supplemental conclusions that considered OCSR, yet for unknown reasons, the CFC nonetheless concluded that Mr. Matthews did not account for OCSR's presence and accordingly disregarded Mr. Matthews' testimony.[47] This is clear error. In apparent support of its view of Mr. Matthews' testimony, the CFC cited to portions of Mr. Matthews' testimony, elicited by the government, in which Mr. Matthews stated that, in the Before Condition, OCSR's operations adjacent to the Old Mill's property were "*de minimus*" (which is actually correct) to reach an overall conclusion that Mr. Matthews did not consider OCSR's presence for all Appellants,[48] including Joslin and Jetty Fishery, which is clearly a major factual error and omission. In short, the CFC's conclusion that "Mr. Matthews formulated his opinion prior to the Court's

---

[46] Mr. Matthews also considered OCSR's impact on the Before Condition for Old Mill, but due to the *de minimus* nature of OCSR's use adjacent to Old Mill, which Mr. Matthews calculated as less than 1% of the larger parcel, it did not impact Mr. Matthews' Before and After difference, which remained at $205,000. *See* Tr. 327:11-328:19 (Appx1171-1172); PX11B.30 (Appx2724).

[47] *See Loveridge VII,* 174 Fed. Cl. at 391-93.

[48] *Id.* at 392–93.

determination [in *Loveridge VI*] and did not update those figures to account for OCSR" is an astounding error.[49]

In fact, Mr. Matthews supplied supplemental analysis for both Joslin and Jetty Fishery that considered 17 feet of OCSR's use in the Before Condition. The CFC's failure to acknowledge Mr. Matthews' supplemental reports, which actively addressed the CFC's directions in *Loveridge VI*, and indeed the CFC's castigation of Mr. Matthews for an alleged failure to do so, particularly considering the CFC's citations to Mr. Matthews' supplemental conclusions, is clear and reversible error.

### B. The CFC Failed to Properly Credit Appellants' Valuation Evidence Based on Several Fundamental Misunderstandings of Law and Fact and Appellants Met Their Burden of Proof to Establish Just Compensation for Both the Land and the Improvements

Based on accepted appraisal methodology and overwhelming precedent, the CFC has always ruled that appraisers must appraise the property as vacant and unencumbered in the Before Condition.[50] As a result, for Before Condition appraisal purposes, appraisers must value the entire larger parcel as if the railroad's easement

---

[49] *Id.* at 393 n.14.

[50] *See Raulerson*, 99 Fed. Cl. at 12; *Hardy*, 141 Fed. Cl. at 9; *Jackson*, 155 Fed. Cl. at 426; *Technical College*, 145 Fed. Cl. at 702; *Rogers*, 101 Fed. Cl. at 296; *Ybanez*, 102 Fed. Cl. at 88; *Macy Elevator*, 105 Fed. Cl. at 198 (citing *Ladd*, 630 F.3d at 1023); *Ingram*, 105 Fed. Cl. at 539; *Howard*, 106 Fed. Cl. at 368–69; *Anna F. Nordhus Family Trust v. United States*, 106 Fed. Cl. 289, 292 (2012); *Toscano*, 107 Fed. Cl. at 199; *Whispell Foreign Cars, Inc. v. United States*, 106 Fed. Cl. 635, 639–44 (2012).

never existed. Here, at first, the CFC recognized this principle—"[T]o do this, one calculates damages by establishing the fair market value of the property absent any easement on the date of the taking—whereby the before value is the value of the entire fee unencumbered."[51] However, the CFC quickly turned an about face, discarding widely accepted views of the Before Condition to consider OCSR's fictitiously continued "easement," and that prompted the CFC to erroneously disregard Mr. Matthews' testimony.

Even though the CFC acknowledged that the Plaintiffs have "definitely lost property rights, including the right to exclude others,"[52] and even though the CFC admitted that "the Court would be more inclined to accept Mr. Matthews' valuation,"[53] the CFC nonetheless set forth six reasons why Mr. Matthews' valuation was "suspect,"[54] and all six reasons are incorrect legally and/or factually:

1) "A failure to account for the 100-foot easement utilized by OCSR in the Before Condition"—POTB's easement was abandoned, the 100-foot easement did not exist in the Before Condition for valuation purposes, OCSR's use was not 100 feet in any event, and this is incorrect both legally and factually;

---

[51] *See Loveridge VII*, 174 Fed. Cl. at 395 (citing *Ladd v. United States*, 110 Fed. Cl. 10, 13 (2013) (Court looks to "the value of Plaintiffs' land… without any easements—unencumbered property"); *Rogers*, 101 Fed. Cl. at 296 ("[T]he 'Before' Condition of the property… was unencumbered fee simple Plaintiffs would have enjoyed… absent the taking").

[52] *Id.* at 410.

[53] *Id.* at 410 n.26.

[54] *Id.* at 406.

2) "Exclusion of OCSR in the Before Condition despite his claims otherwise"—this is confounding because Mr. Matthews did analyze OCSR's use in his supplemental reports and, as discussed *supra*, this is clear error;

3) "Completion of the recreational trail despite their being—as of yet—no substantial step toward construction or funding of a trail"—this is incorrect legally and is irrelevant because the issue is what Appellants lost on the NITU date;

4) "Complete loss of crossing rights and similar encroachments"—this was the correct valuation methodology, as supported by *Cheshire Hunt* and *Agapion*;

5) "Appraisals did not account for OCSR's 100-foot easement in the Before Condition"—this is exactly the same as Reason 1 and is again incorrect both legally and factually; and

6) "The location of the yet-to-be-realized trail along the western edge of the corridor, *i.e.*, the worst scenario for Plaintiffs"—the fact that it is yet to be realized is incorrect legally and the impact of the construction of the trail on the western side of the right-of-way, that reduces the market value of Appellants' improvements to zero, is a correct appraisal methodology.[55]

After the CFC acknowledged that Appellants lost property rights, the CFC failed to follow a proper valuation methodology and failed to ascertain or quantify what Appellants "lost." Instead, citing fictional shortcomings with the Appellants' expert testimony, the CFC spent several pages of its Opinion discussing the concept of "windfalls" to Appellants.[56] The undisputable fact, given the loss of reversionary rights and the taking of both land and improvements, is that the CFC's conclusion

---

[55] *Id.*
[56] *Id.* at 405–08.

resulted in a significant windfall to the government, and that is an unconstitutional result under both the Fifth Amendment and the Fourteenth Amendment of the United States Constitution.

The CFC ultimately concluded that Appellants did not meet their burden of proof to establish just compensation and accordingly awarded zero dollars in just compensation. Considering Mr. Matthews' well-supported opinions described *supra*, including specific consideration of OCSR's operations in accordance with *Loveridge VI*, that result is not only incorrect and unjust on its face, but it also clearly disregards established standards for a plaintiff to meet their evidentiary burden pursuant to CFC and Federal Circuit precedent.

In federal takings cases, plaintiffs bear the burden of proving damages, and they are held to a standard of "'reasonable certain[t]y,' which 'requires more than a guess, but less than absolute exactness.'" *See Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1364 (Fed. Cir. 2020) (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010)). The trial court should account for error and deficiencies based on unfounded or inaccurate statements of law or fact, "but if plaintiffs present **credible market evidence combined with accurate factual and legal assertions** to make their case, **they have met their burden**." *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614, 622–26) (emphasis added); *Agapion*,

167 Fed. Cl. at 774 (citing *Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1359 (Fed. Cir. 2003).

Here, Appellants clearly met their burden. Every one of the CFC's cited reasons for discrediting Mr. Matthews' opinions is based on either an incorrect statement of law (*e.g.*, OCSR's continued "easement" in the Before Condition; non-exclusivity of Trails Act easement in the After Condition) or an incorrect statement of fact (*e.g.*, OCSR's purported use of the full 100-ft Corridor width in the Before Condition; the frequency, duration, and location of OCSR's use).

Furthermore, to the extent the CFC's reasons are based on Mr. Matthews' purported failure to consider the CFC's erroneous findings regarding OCSR's use, that is also demonstrably incorrect. As to Joslin and Jetty Fishery, Mr. Matthews accounted for OCSR's use of 17 feet of the Corridor in the Before Condition and, accordingly, reduced his valuation conclusions, relying on witness testimony, including from OCSR itself, and the Final Plan Report.

The CFC had no issues with Mr. Matthews' general appraisal methodology—the CFC found Mr. Matthews' land values and comparable sales analysis to be credible and indeed clearly articulated that OCSR was the only factor that prevented the CFC from awarding just compensation in some capacity:

> While the Court acknowledges certain methodological shortcomings in Plaintiffs' proffered analysis, it is important to note that, **were it not for the significant oversight and seeming disregard of the pre-existing scenic train, the Court would be more inclined to accept**

**Mr. Matthews's valuation**. The other identified issues, such as the potential impact of future trail development, while relevant and the deviation from the Yellow Book, while concerning, **do not necessitate pure speculation. As the Federal Circuit recognizes, the Court may award damages, even if it does not fully credit a party's methodology.** In the context of setting just compensation, and especially where dealing with irregular parcels, **the Court acknowledges that valuation transcends mere mathematical calculation, and demands exercise of judgment—first by the experts, but ultimately by the Court.** However, **the failure to adequately account for the existing scenic rail use undermines the credibility of the valuation and renders the Court unable to calculate any level of just compensation**.

*See Loveridge VII*, 174 Fed. Cl. at 410 (internal quotations and citations omitted) (emphasis added).

Appellants not only met their burden to establish just compensation through Mr. Matthews' testimony, but also Appellants' review and rebuttal expert, Dr. John A. Kilpatrick, buttressed Mr. Matthews' opinions. Dr. Kilpatrick is also an MAI appraiser who has substantial experience providing appraisals in rails-to-trails cases and, indeed, Dr. Kilpatrick is probably the only appraiser who rivals Mr. Matthews' rails-to-trails expertise. *See* Tr. 870:10-881:24 (Appx1714-1725). Dr. Kilpatrick urged the Court to accept Mr. Matthews' value conclusions and further established that Appellants had indeed met their burden of proof:

(1) On OCSR's use, Dr. Kilpatrick emphasized that OCSR is not a freight-carrying railroad, is a recreational railroad that runs occasionally, does not run the full length of the area in question, and has sporadic and limited operations across the Joslin and Jetty Fishery properties and has minimal or no impact on the Old Mill property (*see* Tr. 890:9-22 (Appx1734));

(2) On property rights to be appraised in the Before Condition, Dr. Kilpatrick emphasized that the property rights should be considered as a complete reversion of the right-of-way such that it should be appraised as "unencumbered" and, given the CFC's ruling in *Loveridge VI*, the fee simple ownership of Appellants could be subject to the occasional use lease by OCSR (*see* Tr. 894:11-18 (Appx1738));

(3) On Mr. Matthews' 17-foot OCSR consideration, Dr. Kilpatrick concluded that Mr. Matthews' conclusion was "overly cautious" and "overly conservative" because a 17-foot-wide use was certainly wider than the area occupied by the scenic railroad (*see* Tr. 897:10-20 (Appx1741));

(4) On appraising the Joslin and Jetty Fishery improvements, Dr. Kilpatrick testified that, from a real estate transactional perspective, an appraiser would recognize that neither Joslin or Jetty Fishery would be able to transfer marketable title to a buyer and that the value of those encroaching improvements would necessarily have been taken as a result of this action on the NITU date (*see* Tr. 902:23-903:6 (Appx1746-1747)); and

(5) On the relation of marketable title to trail construction, Dr. Kilpatrick confirmed that on the date of the NITU, Joslin and Jetty Fishery, from a real estate perspective, no longer had title to those improvements that they could transfer to a buyer (*see* Tr. 903:19-24 (Appx1747)).

The CFC's findings regarding OCSR's operations and its related findings regarding Appellants' just compensation are egregiously wrong. First, the CFC's findings are substantively wrong as a matter of law and fact. Second, the CFC's conclusion is also procedurally wrong, especially given the actual and thorough evidence that Appellants presented related to the "reasonable certainty" of the value of what was taken and appropriate just compensation.

## V.  CONCLUSION

The CFC's Opinion and the resulting Judgment should be reversed and this Court should confirm that Appellants are entitled to proper just compensation for their land and improvements.

Respectfully submitted,

STEWART, WALD & SMITH, L.L.C.

By  /s/ *Thomas S. Stewart*
Thomas S. Stewart
Reed W. Ripley
2100 Central, Suite 22
Kansas City, MO 64108
(816) 303-1500
(816) 527-8068 (facsimile)
stewart@swslegal.com
ripley@swslegal.com
**ATTORNEYS FOR APPELLANTS**

# ADDENDUM

<strong>CORRECTED</strong>

# In the United States Court of Federal Claims

No. 16-912<br>Filed: November 26, 2024

---

**PERRY LOVERIDGE, *et al.*,**

                ***Plaintiffs*,**

**v.**

**THE UNITED STATES,**

                ***Defendant*.**

---

*Thomas S. Stewart* and *Reed W. Ripley*, Stewart, Wald & Smith, LLC, Kansas City, MO, for Plaintiffs.

*Kimberly A. Cullen* and *LeeAnn Kim*, Trial Attorneys, *David A. Harrington*, Assistant Chief, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant.

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.[1]**

      When a plaintiff's burden of proof is undermined by unconvincing expert testimony, the Court is left in limbo, forced to wind a path between justice and the inadequacy of evidence. Ultimately, with no alternative, this culminates in a verdict of no damages.

      After establishing the government's liability for taking Plaintiffs' property, the Court proceeded to a valuation trial to determine just compensation. At trial, Plaintiffs bore the burden of proving that the fair market value of their land was less than its value under real-world conditions at the time of the taking. Plaintiffs did not meet their burden. Therefore, judgment shall be entered for the United States.

---

[1] The case was originally assigned to Judge Nancy B. Firestone and transferred to the undersigned on October 3, 2022. (*See* ECF No. 161).

# I.    Procedural History and Findings of Fact[2]

The procedural and factual history of this rails-to-trails case is complex.[3] The subject railroad corridor in northwest Oregon primarily served freight transportation, including timber

---

[2] Insomuch as they are relevant, the Court adopts the findings in prior and related opinions. Because the Court's 2023 ruling on the parties' cross-motions for partial summary judgment, *Loveridge v. United States*, 167 Fed. Cl. 44 (Fed. Cl. 2023) ("*Loveridge VI*"), is integral to issues herein, its procedural history is included in this section.

[3] Because many of these filings are noted, this footnote serves as a reference point for all prior substantive opinions.

*Loveridge v. United States*, 139 Fed. Cl. 122 (2018) ("*Loveridge I*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that some deeds in question conveyed a fee interest title to the railroad whereas others only granted an easement), *aff'd sub nom. Albright v. United States*, 838 F. App'x 512 (Fed. Cir. 2020) ("*Albright*").

*Loveridge v. United States*, No. 16-1565L, 2019 WL 495578 (Fed. Cl. Feb. 8, 2019) ("*Loveridge II*") (granting-in-part Plaintiffs' RCFC 59(a)(1) motion, allowing for reconsideration of four (4) deeds), *aff'd sub nom. Albright*.

*Loveridge v. United States*, 148 Fed. Cl. 279 (2020) ("*Loveridge III*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that the alleged railbanking and interim trail use are outside the scope of some deeds but within the scope of others, thus granting broad easements to the Port of Tillamook Bay Railroad ("POTB")), *aff'd sub nom. Stimson Lumber Co. v. United States*, 82 F.4th 1346 (Fed. Cir. 2023) ("*Stimson Lumber*").

*Loveridge v. United States*, 149 Fed. Cl. 64 (2020) ("*Loveridge IV*") (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding (1) that just compensation must be measured assuming subject properties were not encumbered by a rail easement because the evidence demonstrates that the POTB would have abandoned rail use but for the NITU; (2) without additional evidence, plaintiffs are only presumed to own up to the centerline of an "intervening" boundary to the railroad; and (3) where claimants could not produce instrument documenting their ownership, only easements were conveyed over certain disputed parcels, whereas fee interests were conveyed in others).

*Loveridge v. United States*, 150 Fed. Cl. 143 (2020) ("*Loveridge V*") (granting the government's cross-motion for summary judgment as to some disputed easements from *Loveridge III*, holding that takings were not effected because the railroad had not abandoned the easements for all purposes), *aff'd sub nom. Stimson Lumber*, 82 F.4th 1346.

2

from local logging operations. (Joint Stipulation of Facts ("JSOF") at 1–4, ECF No. 225; J.A. Tab 61, DX155; J.A. Tab 62, DX164).[4] The parties agree that the railroad obtained its right-of-way through the 1910 Wright-Blodgett Deed and the 1906 Byrom Deed. (*See* Trial Transcript[5] ("Tr.") Bradley, at 547:3–20; J.A. Tab 61, DX155; J.A. Tab 62, DX164; JSOF at 2, 4–5).



(J.A. Tab 8, JX10.4)

    In December of 2007, a severe storm damaged the railroad tracks, rendering freight services impossible. *Loveridge v. United States*, 150 Fed. Cl. 143, 146 (2020) (the tracks "suffered catastrophic damage due to severe storms, making it impossible to provide service.")

———————————

    *Albright v. United States*, 838 F. App'x 512 (Fed. Cir. 2020) ("*Albright*") (affirming holdings in *Loveridge I* and *II* that twenty-six (26) deeds in question conveyed fee simple absolute titles to the railroad), *cert. denied*, 142 S.Ct. 224 (2021).

    *Loveridge VI*, 167 Fed. Cl. 44 (granting-in-part and denying-in-part cross-motions for partial summary judgment, holding that expert appraisal may assume (1) that the before scenario properties are burdened by real-world conditions, likely including the Oregon Coast Scenic Railroad's ("OCSR") scenic train until 2026 with potential for future extensions as stated in the trail use agreement; (2) potential interference with crossing rights and loss of access and show the impact of any uncertainty over crossing rights on the properties' market values; and (3) potential loss of improvements and show the impact of any uncertainty over Salmonberry Trail Intergovernmental Agency's ("STIA") future exercise of its right on the properties' market value).

    *Stimson Lumber*, 82 F.4th 1346 (affirming holdings in *Loveridge III* and *V*, respectively, that railbanking and interim trail use are within the scope of the disputed deeds and that takings were not effected as the railroad had not abandoned easements for all purposes).

[4] The parties filed a Joint Appendix of Exhibits cited at trial. (ECF Nos. 244 (Ex. Nos. 1–35), 245 (Ex. Nos. 36–63)). These documents are consecutively tabbed and maintain their trial labels. For consistency, the Court identifies these documents by their tab number as labeled in the Joint Appendix and their exhibit number at trial. (J.A. Tab __, Exhibit No. [page number] (where specified)).

[5] The Trial Transcript consists of 980 pages and is separated into five volumes located at ECF Nos. 234 (pp. 1–30), 236 (pp. 31–316), 238 (pp. 317–541), 240 (pp. 542–837), and 242 (pp. 838–980). The Court cites the Trial Transcript using the name of the testifying witness, counsel, or the Court, then the consecutive pagination and line numbers, (Trial Tr. [NAME], at __: __).

("*Loveridge V*"). The damage forced the railroad to halt freight operations; due to the cost of repairs, the Court previously found this cessation to indicate the railroad's intention to abandon the line.[6] *Id.* (finding that the railroad's statement that it "does not believe that it will be able to obtain the necessary funding to repair and rehabilitate the line" qualified as an intention to abandon service); (*see also* Trial Tr. Bradley, at 560:1–14, 583:10–584:9). Even with financial aid to repair the damaged tracks, local officials determined that continuing freight operations was unwise. (Trial Tr. Bradley, at 612:2–5 ("FEMA gave us the option to repair it. We said, Mother Nature clearly doesn't like it up there. We'll take the funds and do things on the industrial park instead.")).

This produced a mixed impact on adjacent lands; while the storm damaged much of the railroad, some sections remained intact, including those near Plaintiffs' properties. (J.A. Tab 46, JX55). In May 2016, the Port of Tillamook Bay Railroad ("POTB") gave formal notice of its intent to partially abandon the rail line located between Milepost 775.01 near Washington County, Oregon, and milepost 856.06, near Tillamook County, Oregon—a distance of 87.01 miles. (JSOF at 1). Thereafter, Salmonberry Trail Intergovernmental Agency ("STIA") requested a Notice of Interim Trail Use ("NITU") for the railway corridor and the Surface Transportation Board ("STB") approved that request. (*Id.*). On October 23, 2017, POTB and STIA jointly executed a Railbanking Agreement and then the Salmonberry Trail Rail Line Lease Agreement the following year. (*Id.* at 2).

Plaintiffs' properties were burdened by the original railroad easement and subsequently by the NITU. *See Loveridge v. United States*, 139 Fed. Cl. 122, 129–130 (2018) ("*Loveridge I*") (docketed at ECF No. 54). Two of these remaining parcels are located in Rockaway Beach, Oregon, and are owned by Camp Double J, LLC, and the Jetty Fishery. (JSOF at 4; J.A. Tab 53, PX13.A). Camp Double J, LLC owns 4.57 acres (sometimes referred to during trial as "the Joslin parcels") and the Jetty Fishery owns 4.48 acres (sometimes referred to during trial as "the Laviolette parcels"). (JSOF at 4). The third property, a 45.56-acre tract near Garibaldi, Oregon, is owned by Old Mill Investment. (JSOF at 5; J.A. Tab 53, PX13.A).[7] The easement encroaches on each of the parcels, (JSOF at 2–6), engendering the possibility that any realized recreational trail will destroy or impair improvements and crossing rights for each property.

The factual scenario from this point deviates from typical rails-to-trails litigation. As explained below, two novel issues mar what would otherwise be a straightforward analysis: (1) the fact that any recreational trail contemplated by the STIA is unlikely to materialize, and (2) the continued robust operation of a scenic passenger train along the "abandoned" rail line.

---

[6] Though not discussed at trial, some portions of the rail line were undamaged, resulting in the termination of all rail services for much of the line, but leaving other portions unharmed including those portions abutting Plaintiffs' properties. (J.A. Tab 46, JX55.5).

[7] Originally, this litigation involved 132 deeds. *See Loveridge I*, 139 Fed. Cl. at 129. The three claimants' parcels described above are all that remain.

Appx4

    *A.*    *A Trail Plan Unrealized*

The proposed trail would cover a twenty-three-mile segment of the rail line adjacent to Plaintiffs' properties. (Trial Tr. Sumption, at 386:16–18, 395:19–396:9; J.A. Tab 43, JX49.4–5 §§ A(1); J.A. Tab 47, JX56). In 2015, prior to issuance of the NITU, the STIA published a concept plan for the trail, exploring both rail-to-trail and rail-with-trail options. (J.A. Tab 46, JX55; Trial Tr. Sumption, at 381:2–11 (explaining that a "rail-to-trail" would entail "taking the rail out and creating a trail" and a "rail-with-trail" would entail "leaving the rail in place and aligning the trail somewhere close by.")). The concept plan emphasized the preliminary nature of its cost estimates, acknowledging that they were based on best-guess assumptions and may vary significantly from actual construction costs. (J.A. Tab 46, JX55.24). The plan also indicated that constructing the trail could take decades. (*Id*.; Trial Tr. Sumption, at 369:20–370:19). A subsequent planning document, titled the Parametrix Report, specifically addressed the coastal segment. (J.A. Tab 59, DX73-CC). Despite various planning efforts over the years, no trail plan has been approved to date. (Trial Tr. Sumption, at 361:8–22). Depending on the design, early cost estimates ranged from $46 million to $139 million. (*Id*. at 387:21–25). Current construction costs could be significantly higher, potentially reaching 50% more than the plan's initial estimates. (*Id*. at 388:3–11, 18–21). Crucial to the Court's analysis, funding for trail construction remains a significant obstacle. (*Id*. at 383:24–384:4).

The future of the proposed trail is uncertain, with construction years away, if ever. (Trial Tr. Sumption, at 363:2–12, 385:5–23, 417:19–24). The prospect of funding is also unknown. (*Id*. at 416:16–22). Despite eight years passing without meaningful development, Plaintiffs maintain that a trail could still be built based on the existence of the NITU, however, testimony and circumstances establish that the probability is unlikely.

    *B.*    *The Scenic Train*[8]

If a rail-with-trail plan were implemented, the concept plan anticipated the continued operation of a scenic train, the Oregon Coast Scenic Railroad ("OCSR"). (J.A. Tab 46, JX55.24).

---

[8] As discussed herein, this scenic train is a pre-existing contract transferring an easement that would not extinguish with or without a trail easement. (*See* JX52.1; Trial Tr. Bradley, 571:6–19, 579:18–580:15 (indicating that POTB's understanding was that OCSR would continue its passenger service even if a rails-to-trails agreement was reached, with no plans to terminate OCSR); *id*. at 571:20–572:2 (indicating POTB also intended OCSR to continue running trains on POTB's railroad if no rails-to-trails agreement was reached)). Its existence plagues this case as the parties failed to inform the Court of the existence of the operational passenger train during the liability determination stage. Plaintiffs argue that Judge Firestone's reliance on *Toscano v. United States*, 107 Fed. Cl. 179 (2012), is an indication that she knew about OCSR in the liability phase. (Pls.' Post-Trial Br. at 9–12). Deduction is not enough. The parties have not since moved to revisit this issue and, for efficiency purposes, the Court declines to do so today. The Court has determined that the before condition would likely include the operation of the scenic train, as it is a real-world factor affecting the property's value. *See Loveridge VI*. As discussed further, this significantly impacts the Court's final ruling.

Adding to the case's intricacies, OCSR continues to operate along the "abandoned" rail line. OCSR is a nonprofit scenic, passenger train service operating between Tillamook and Enright since 2006. (JSOF at 6). OCSR is a popular seasonal tourist attraction in Oregon, with ridership exceeding 18,000 passengers in 2012 and increasing to 55,000 in 2023. (J.A. Tab 46, JX55.10; Trial Tr. Sumption, at 372:3–10; Trial Tr. Bradley, at 564:17:20, 630:13–21). OCSR's ongoing lease and use of the rail line, along with its positive impact on the local community, demonstrate its value and continued viability. (Trial Tr. Bradley, at 578:20–579:17, 580:16–582:19).



(J.A. Tab 59, DX73-Y.20

OCSR does not conduct freight service. (Trial Tr. Aldridge, at 630:20-21). Unlike freight services, OCSR's mission is to educate the public about the historical logging railroad right-of-way. (Trial Tr. Sumption, at 360:4–15; Trial Tr. Bradley, at 559:2–29; Trial Tr. Aldridge, at 620:20–24). The scenic train travels north and south along the corridor, giving passengers views of Plaintiffs' properties and homes. (Trial Tr. Aldridge, at 630:20–21, 647:9–649:7; Trial Tr. Joslin, at 74:14–17, 74:18–75:19 (stating that some renters on the affected parcels found the train to be "big and [] scary and noisy," and that "it impacts privacy."), Trial Tr. S. Laviolette, at 146:15–19). OCSR has a long-term lease agreement with the POTB to use the rail line and a 100-foot right-of-way until 2026. (JSOF at 6–7; Trial Tr. Bradley, at 563:9–22, 578:9–13).

As part of the agreement with POTB, OCSR is responsible for maintaining the railway corridor. (J.A. Tab 44, JX51.4, JX51.19–22; Trial Tr. Bradley, at 565:9–12; Trial Tr. Aldridge, at 631:19–633:21). This is accomplished by "replac[ing] tires, replac[ing] joint bars, fill[ing] ballast, keep[ing] . . . signals in working order" and conducting track inspections. (Trial Tr. Aldridge, at 632:5–9). OCSR is also permitted to allow third parties to run other recreational railroad vehicles, such as rail riders and speeders. (Tr. Trial Bradley, at 565:23–566:4, 608:24–611:6).

While the current lease between OCSR and POTB is set to expire in approximately two years, the parties are negotiating for renewal. (Trial Tr. Bradley, at 578:20–23l, 582:14–20; Trial Tr. Aldridge, at 658:20–23; Trial Tr. Sumption, at 394:4–7). Testimony indicates that continuation of OCSR via one or more subsequent leases is likely. While this is based on a variety of factors, it is noteworthy that OCSR is a source of significant revenue for POTB, and OCSR's ridership and revenue are increasing. (Trial Tr. Bradley, at 580:16–581:5; Trial Tr. Aldridge, at 645:13–646:9; Trial Tr. Sumption, at 372:2–9). POTB receives 12.5% of OCSR's gross revenue, approximately $100,000 annually. (Trial Tr. Bradley, at 580:19–581:11). Further, during a pre-trial site visit, the Court observed new construction related to the POTB/OCSR arrangement. (Trial Tr. Colloquy, 510:15–18). Although the future of the scenic train is somewhat uncertain, it will likely continue to serve the Tillamook County community for years to come. (Trial Tr. Bradley, at 578:20–579:17, 581:9–582:19; Trial Tr. Aldridge, at 658:22–

659:11; Trial Tr. Sumption, at 372:19–25). In the meantime, OCSR and POTB continue to invest in improving the existing rail line. (Trial Tr. Colloquy, at 510:15–18, 511:1–10).

Based on these facts, it is likely that a prospective, reasonable buyer would account for the scenic train when configuring an offer to purchase the affected party. While the parties dispute the frequency with which OCSR serves its 55,000 passengers, there is no dispute that OCSR continues to impact the privacy of the Plaintiffs. (Trial Tr. Colloquy, at 663:13–665:6; Trial Tr. Bradley, at 590:24–591:16, 607:13–609:1). Concerning the Old Mill property, the executive director of OCSR confirmed that its operations (trains, charters, maintenance runs) travel in both northern and southern directions from the Old Mill property. (Trial Tr. Aldridge, at 647:9–649:7). Passengers riding the scenic train can see the properties and homes as the train passes by. (Trial Tr. Joslin, at 74:14–17; Trial Tr. S. Laviolette, at 146:15–19). In testifying as to the privacy concerns posed by OCSR's operation by the properties, Mr. Joslin testified that some who have previously rented his property had found the train to be "big and [] scary and noisy," and that "it impacts privacy." (Trial Tr. Joslin, at 74:18–75:19). For a prospective buyer to ignore the implications of a scenic train is nonsensical.

Neither party nor their experts deny that the scenic train's continued operation after the NITU is an anomaly. (Trial Tr. Colloquy, at 509:2–10 (Plaintiffs' expert acknowledging that in his 50 years as an appraiser, he has never encountered a scenario involving the continued operation of a scenic railroad following a NITU); Trial Tr. Hasson, at 791:3–4 ("I would say having a railroad still operating is unusual"); Trial Tr. Matthews, at 463:20–23 ("To analyze I assume OCSR's existing scenic rail easement is unique and was not extinguished. Definitely is unique. I've done lots of these properties, and I've never seen this before."); Trial Tr. Colloquy, at 487:8–20 (describing discussions with 10 additional appraisers, none of whom had encountered like situations involving continued operation of scenic railway following NITU)). This novel issue is the source of complications in calculating the value of just compensation for two reasons; first, the parties failed to disclose the existence of OCSR in the liability phase of this litigation, and second, an easement continuing to exist in real-world conditions impacts property value.

      i.    The Parties' Failure to Disclose OCSR

While the POTB has not operated freight rail traffic since 2007, its continued support for OCSR's passenger service contradicts the idea of abandonment. (Trial Tr. Bradley, at 568:1–24). On August 13, 2018, the Court determined liability, finding that each of the three remaining Plaintiffs was subject to a taking; it did so without knowledge of the existence of the scenic train. *See generally Loveridge I*. The parties failed to disclose the operational passenger train during the liability phase. The Court has since inquired about the parties' rationale multiple times:

| Court: | At what point prior to June 22nd, 2020, did either party ever let Judge Firestone know about the existence of this scenic excursion trail? |
|---|---|
| U.S. Counsel: | From my review—well, I won't take this as a copout, but I was not the trial counsel at that time, but from my review of |

the docket, I don't believe it was brought up in any briefing explicitly before that point.

(Summ. J. Hr'g Tr. Colloquy, at 14:1–3, ECF 191).

> Court:       You cite back to Judge Firestone's opinion that POTB would have abandoned its easement. Again, that decision was colored—is colored—by the fact you guys didn't tell her about OCSR. There's no dispute of that, right?
>
> Pls.' Counsel: That's right, Your Honor. We just didn't view it as relevant.

(Mot. in Lim. Hr'g Tr. Colloquy, at 73:7–15, ECF No. 229). During summary judgment briefing, the United States asserted:

> At that time, we were still in the liability phase, Your Honor, and we had many parcels over this 81-mile stretch of railroad, and not all of them are affected by the scenic railroad issue. It's just a small portion. So I would guess that when making [] argument, [former] counsel was perhaps focused on, you know, a larger issue and making a different argument about whether or not inconsistent uses abandoned the easement. It just hadn't perhaps crystallized as clearly.

(Summ. J. Hr'g Tr. at 17:5–13). Though Plaintiffs have explained this justification various times, (Pls.' Resp. to Mot. for Partial Summ. J. at 24, ECF No. 180 (arguing that fault was the government's error of omission); Mot. in Lim. Hr'g Tr. at 73:18–19 ("[O]ur view is that that was the Government's to rebut at that point.")), any purported justification remains uncompelling.

That the Court was unaware of OCSR's existence at a time when it mattered to legal analysis gives the Court considerable pause. Following the close of evidence at trial, the Court concluded:

> [N]ow that all the proof is in, I have an incontrovertible fact, which Judge Firestone did not have, which is that the scenic rail was in operation on the same rail corridor prior to and after the issuance of the NITU. I think I've indicated multiple times how uncomfortable I am with the fact that Judge Firestone did not have the benefit of that knowledge, because I certainly think it impacts the decision of whether there was a taking to begin with.

(Trial Tr. Colloquy, at 963:23–964:6; *see also* Mot. in Lim. Hr'g Tr. Colloquy at 85:17–18). The existence of OCSR may have altered the liability outcome. Later in *Loveridge V*, the Court acknowledged that POTB "had entered into third party contracts," which granted third parties, presumably OCSR, "limited non-ownership rights to use or access the easements." 150 Fed. Cl. at 150. The Court elaborated that "[t]hese existing use agreements between the POTB and third parties suggest that the POTB intended to retain (and continues to retain) an interest in the easements," prior to the trail use agreement, and subsequently determined that conduct inconsistent with an intent to abandon. *Id.* ("For these reasons, the court concludes that the

plaintiffs have failed to demonstrate under Oregon law that the POTB abandoned the broad easements at issue in these motions."). However, the parties have not since moved to revisit this issue, and, for efficiency purposes, the Court declines to do so today. (*See* Trial Tr. Colloquy, at 964:12).[9]

ii.    *Loveridge VI:* OCSR in the "Before" Condition

The operation of a passenger train on a supposedly abandoned railway corridor is a novel circumstance, unlikely to be repeated in rails-to-trails jurisprudence. The Court previously ruled on the parties' motions for partial summary judgment as to how to instruct experts on the "before" and "after" conditions as they relate to the OCSR. *See Loveridge v. United States*, 167 Fed. Cl. 44 (Fed. Cl. 2023) ("*Loveridge VI*").

Based on the atypical nature of OCSR's easement, no binding precedent indicates whether and to what degree it should be considered in land valuation. The United States previously argued that the before condition should include the actively operating scenic train. (Summ. J. Hr'g Tr at 6:6-12 (including the scenic train in the before condition "adheres to the well-settled precedent from the Federal Circuit," and that Plaintiffs "are not entitled to windfall.")). Plaintiffs disagreed, arguing that the OCSR train should be excluded from the before condition because, as a matter of law, appraisers must assess the before condition as if the property is "vacant." *Loveridge VI*, 167 Fed. Cl. at 48 (citing Pls.' Cross-Mot. for Summ. J. at 8).

Relying largely on *Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015), the Court found that "damages must be calculated utilizing the real-world conditions of a property" which may include the "pre-existing contract to operate a local scenic train" on the same rail line. *Loveridge VI*, 167 Fed. Cl. at 46. The Court ordered that legal instruction for expert appraisal may "assume that in the 'before' scenario the properties are burdened by the OCSR's scenic train[.]" *Id*. at 55.

---

[9] Plaintiffs moved for reconsideration of the opinion on liability but did not address the status of OCSR's existence or operation. (ECF No. 55; *see also* Summ. J. Hr'g Tr. 14:24-15:3, ECF 191). The United States, while never formally requesting a reconsideration, suggested that the Court revisit the earlier liability decision *sua sponte* in the context of a summary judgment motion. (Def.'s Mot for Part Summ. J. at 32, ECF No. 178). The United States argued that the Court could apply the "justice requires" standard of RCFC 54(b) because OCSR's agreement with POTB was a "real-world condition" that became clear during discovery. (Summ. J. Hr'g Tr. at 9:13–21). RCFC 54(b) instructs that a court may revise a non-final partial judgment (*i.e.*, an interlocutory order) at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 5–8 (1980). A judge has significant discretion under Rule 54(b) to reconsider non-final decisions "as justice requires." *E&I Global Energy Services, Inc., v. United States*, 152 Fed. Cl. 524, 532 (2021). The OCSR agreement was publicly available throughout litigation; thus, the Court found the procedural issues arising from the parties' agreed-upon discovery process did not warrant reconsideration pursuant to RCFC 54(b).

Appx9

The Court "decline[d] to impose its own metric on the [p]arties' experts," noting that doing so without "the benefit of context best provided at trial," would be inadvisable. *Loveridge VI*, 167 Fed. Cl. at 46. The Court emphasized that given the fact-intensive nature of the parties' disagreements "a final determination regarding admissibility and the weight of such expert testimony must await" trial. *Id*. at 46. This was to afford Plaintiffs the opportunity to show that the real-world conditions, including OCSR, did not affect Plaintiffs' property rights or that a reasonable buyer would not consider its existence when establishing fair market value.

      *C.*     *Testimony as to Just Compensation*

At trial, the parties offer competing theories to calculate just compensation. The United States' distilled approach results in zero damages, based on the arguments that: (1) a railroad operated before and after the NITU; (2) the recreational trail will not be constructed; and (3) consequently, Plaintiffs have lost nothing. (Def.'s Post-Trial Br. at 24–25, ECF No. 246 (no difference in the value of properties between before and after scenarios)).

Plaintiffs argue for a valuation based on a fully realized recreational trail in its most damaging configuration, assuming a complete loss of all encroaching improvements and crossing rights.[10] (*See generally* Pls.' Post-Trial Brief, ECF No. 243). As explained below, Plaintiffs request $1,003,000 in total:

|  | **Joslin** | **Jetty Fishery** | **Old Mill** |
|---|---|---|---|
| BEFORE VALUE | $468,000 ($248,000 in land value after considering OCSR's use, $220,000 in improvement value) | $899,000 ($445,000 in land value accounting for OCSR's use, $454,000 in improvement value) | $3,417,000 (land value only, no improvements) |
| AFTER VALUE | $139,000 (all land value, improvements considered taken) | $430,000 ($236,000 in land value, $194,000 in improvement value after considering house, business, and shop taken) | $3,212,000 (land value only, no improvements taken) |

---

[10] The affected improvements and access are admittedly numerous—including crossing rights, a deck, portions of a home, a business office, a shop, a repair facility, and a commercial parking lot. (*See e.g.*, Trial Tr. Matthews at 228:20–233:3, 236:15–237:21; Trial Tr. D. Laviolette, at 163–166.)

| | | | |
|---|---|---|---|
| DIFFERENCE<br><br>(Plaintiffs' proposed just compensation) | **$329,000** ($109,000 in land, $220,000 in improvements) | **$469,000** ($209,000 in land, $260,000 in improvements) | **$205,000** ($83,000 in land value, $122,000 damages to the remainder for loss of highway frontage, and change in highest and best use) |

(*See* Pls.' Post-Trial Br. at 31 (citing J.A. Tab 50, PX11.B (Old Mill); J.A. Tab 51, PX11.C (Jetty Fishery); J.A. Tab 52 PX11.D (Joslin))).

The numerical values assigned to the takings by the experts diverge broadly. For Camp Double J (the Joslin properties), Plaintiffs valued the before condition at $468,000; the after condition at $139,000, for a diminution value of $329,000. (J.A. Tab 52, PX11.D.55). The United States assessed the before and after condition as identical, $268,000, meaning no diminution in value resulted from the taking. (J.A. Tab 56, DX03.0007). For the Jetty Fishery, Plaintiffs valued the before condition at $899,000; the after condition at $430,000, for a diminution in value of $469,000. (J.A. Tab 51, PX11.C.58). The United States' approach results again in no diminution in value ($268,000 in the before and after conditions), and therefore no taking. (J.A. Tab 55. DX02.0007). Lastly, for the Old Mill property, Plaintiffs value the before condition at $3,417,000, and the after condition at $3,212,000, for a diminution in value of $205,000. (J.A. Tab 50, PX11.B.17, 27). The United States initially adopted the same zero-sum approach, assessing the before and after conditions for the two parcels comprising the Old Mill property as identical at $4,151,000.[11] (J.A. Tab 54, DX01.0006).

Plaintiffs' expert, Mr. David Matthews, a seasoned appraiser, faced challenges in valuing the before condition.[12] At trial, when queried about the condition of the property *prior* to the NITU, Mr. Matthews claimed he accounted for OCSR's presence. (Trial Tr. Matthews, at 326:11–16 ("[U]sing the judge's orders, that there is a scenic railroad easement on the property, before and after.")). That declaration is not supported.[13] Mr. Matthews's failure to reference

---

[11] Following a correction, the United States increased its initial assessment to $4,276,620 and left its after valuation identical, for a total loss of $125,620. (J.A. Tab 53, PX13.A.42).

[12] Plaintiffs bill Mr. Matthews as "the most experienced and knowledgeable Rails-to-Trails appraiser in the country." (Pls.' Post-Trial Br. at 2, ECF 243). Plaintiffs utilized a rebuttal expert, Mr. John Kilpatrick, at trial. (J.A. Tab 53, PX13.A). His wholesale adoption of Mr. Matthew's opinions, while ignoring apparent flaws, did not independently support Mr. Matthew's credibility.

[13] The Court finds the Government's cross-examination of Mr. Matthews on this point particularly persuasive. (Trial Tr. Matthews, at 424:8–24, 425:2–6, 425:25–427:12). Aside from the inconsistencies revealed on cross-examination, Mr. Matthews's responses during direct examination about how he accounted for OCSR in the before condition raised doubts, maintaining that the scenic train's effect was "de minimus." (*Id*. at 326:20–25). Later, on cross,

OCSR in the report about the extraordinary presence of an operational scenic train along the same corridor is not plausible:

| | |
|---|---|
| COURT: | Counsel, may I ask? I may have missed something. You asked him if he took my order into account in his opinions. Can you tell me where in the report you're referring to that you see that? |
| COUNSEL: | It's not in the report, Your Honor. He just testified to how he considered that, and he concluded that it was -- the presence of OCSR was a de minimis issue in the -- in this appraisal. |
| COURT: | Yeah, I think I misspoke. It's my apologies. So I thought I understood him to say he took into account my determination that the scenic railway was running in the before condition. And when I'm looking under ordinary assumptions, I don't see that. Did I just miss a reference to a different part of the report? |
| COUNSEL: | No, Your Honor. That conclusion is -- he just testified to that he considered it and didn't include it, and for the reason why. |
| COURT: | Am I missing where that's explained in the report? |
| COUNSEL: | It's not in the report, Your Honor. |

(Trial Tr. Colloquy, at 327:15–328:11 (referencing Trial Tr. Matthews, at 424:8–24)).

The contrary supposition that Mr. Matthews did not account for OCSR in the before situation ignores OCSR's reality.[14] Notably, this was not the sole omission from Mr. Matthews's

---

he attempted again to explain the absence of his reasoning from his report was justified by the "de minimus" frequency of OCSR's operation. (*Id*. at 428:9-22). To be clear, that explanation is unconvincing. Plaintiffs' rebuttal expert, Dr. John Kilpatrick, adopted a similar approach, declaring that in the before and after condition, "the irregular and seasonal use by a scenic railroad has little or no impact on the utility of the property or the property's value." (J.A. Tab 53, PX13.A.4). For similar reasons, the Court does not accept Plaintiffs' characterization of OCSR's operation or its effect.

[14] As the United States correctly notes, Mr. Matthews formulated his opinion prior to the Court's determination and did not update those figures to account for OCSR. (Def.'s Post-Trial Br. at 31; *see also e.g*., J.A. Tab 51, PX11C.51). Moreover, while he claimed at trial that he did account for OCSR's operation in the before condition, the Court is unconvinced. (Trial Tr. Matthews, at 326:10–328:13, 424:13–425:8, 425:12–426:8). Nothing in his report supports that claim. The Court rejects the idea that an expert with the wealth of experience attributed to Mr. Matthews would entirely omit such a significant consideration from his report especially given that only months prior to his deposition he believed that OCSR did not burden the Old Mill property. (*See id*. at 426:16–427:11).

written documentation.[15] These circumstances rendered Mr. Matthews's valuation of the before condition improbable despite protestations otherwise.

Plaintiffs further posit that the passage of time between the issuance of a NITU and trail construction is irrelevant to calculating damages. (Trial Tr. Colloquy, at 506:15–507:7). Plaintiffs' rebuttal expert, also armed with decades of experience involving rails-to-trails valuations, could not recall an instance where a landowner received full value for a permanent taking when a trail had not been constructed. (Trial Tr. Kilpatrick, at 959:7–12).

The United States instructed its expert, Ms. Stacy Hasson, who had limited experience in rails-to-trails litigation but is an otherwise seasoned appraiser, that the OCSR had been operating both before and after the NITU's implementation and that the easement covered the entire 100-foot railway corridor. (Def.'s Post-Trial Br. at 25; J.A. Tab 54, DX1.29–31). Given the Court's rulings in *Loveridge VI*, Ms. Hasson's reliance on these instructions, (*see* J.A. Tab 63, DX179.20-23; J.A. Tab 48, JX58 § 1.2.7.1; Trial Tr. Hasson, at 694:16–700:14), as to the before condition is appropriate and her conclusions are credible.

Ms. Hasson also ran into difficulties appraising the after condition and adopted an alternative approach to valuation. (*See*, *e.g.*, J.A. Tab 54, DX1 (Ms. Hasson's Old Mill Appraisal Report); J.A. Tab 55, DX2 (Ms. Hasson's Jean C. & Shirley J. Laviolette Appraisal Report); J.A. Tab 56, DX3 (Ms. Hasson's Joslin appraisal report)). Ultimately, Ms. Hasson identified five properties affected by the railway easement and concluded that this easement added value to these properties. (Trial Tr. Hasson, at 727:2–11; J.A. Tab 54, DX1.74–76; J.A. Tab 55, DX2.73–75; J.A. Tab 56, DX3.72-74). Ms. Hasson also concluded that a recreational trial offered no additional burden following the NITU. (Trial Tr. Hasson, at 726:14–24, 750:20–751:3, 817:22–818:1, 854:18–855:2; J.A. Tab 54, DX1.134–35; J.A. Tab 55, DX2.103–04; J.A. Tab 56, DX3.101–02). Ms. Hasson's after valuation involved listening to other witnesses, looking for similar comparable properties in the same geographical vicinity, considering the feasibility of discounting future income, and reaching out to an appraisal library for helpful information. (Trial Tr. Hasson, at 756:8–757:15). Ultimately, she was unsuccessful in identifying more than a single "comparable"—i.e., property with similar zoning, use, characteristics, and a railway easement. (*Id.*, at 716:20–23).

Ms. Hasson's evaluation of the potential trail development along the NITU had a minimal impact on her property valuation due to a lack of comparable properties with similar uncertainties. (Trial Tr. Hasson, at 757:16–24). Accordingly, she determined that the uncertainty resulting from the issuance of the NITU and an as-of-yet unrealized (and maybe never-to-be recreational trail) was too speculative. (*Id.* at 760:21–761:6). Ms. Hasson's conclusions as to the after condition lack credibility. Specifically, Ms. Hasson's approach to valuation ignores a

---

[15] Mr. Matthews also omitted justification of a "five percent" impact on Plaintiffs' property values arising from being adjacent to a railroad, (Trial Tr. Matthews, at 495:19–497:7), though he later explained his analysis might be contained within his work files. (*Id.*, at 497:8–499:9). Again, the Court does not credit such a calculation that is neither included within an expert's report nor sufficiently explained within the testimony.

buyer's consideration of the uncertainty that a standalone trail, or rails-with-trail, may still result in the decades to come.

In most cases, determining the before and after conditions is relatively straightforward; this case presents a unique challenge due to the ongoing operation of the scenic passenger train and the uncertainty surrounding the recreational trail. The Court finds that both sets of calculations are problematic and that both parties' methodology is compromised.

## II.    Conclusions of Law

The complexity of the conditions created by OCSR, combined with the parties' failure to disclose the operational passenger train during the liability phase, make it challenging to accurately value the taking. It is Plaintiffs' burden to show that the existence of OCSR in the before condition would not affect the fair market value of the property. They have not carried their burden.

Where a taking has been established, property owners bear "the burden of proving an actual loss has occurred" to determine just compensation. *Otay Mesa Prop*., *L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015). Landowners bear the burden of establishing the value of the railway corridor. *Hyatt v. United States*, 170 Fed. Cl. 417, 432 (2024) (internal citations omitted). Property owners meet this burden if they show actual damages "with reasonable certainty." *Ind*. *Mich*. *Power Co*. *v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). This "requires more than a guess, but less than absolute exactness." *Precision Pine & Timber, Inc*. *v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010).

The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004); *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("[t]he court may use its judgment in selecting the method to determine fair market value."). In ruling on the disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop*., *L.P. v. United States*, 670 F.3d 1358, 1368 (Fed. Cir. 2012). The Court seeks "the full monetary equivalent" of the property interest taken to ensure that property owners receive just compensation under the Fifth Amendment. *Almota Farmers Elevator & Whse*. *Co*. *v. United States*, 409 U.S. 470, 473–74 (1973). In doing so, the Court considers the concept of "compensation." Historically, the Supreme Court of the United States has provided some direction:

> The noun 'compensation,' standing by itself, carries the idea of an equivalent. Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages; the former being the equivalent for the injury done, and the latter imposed by way of punishment. So that, if the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of

14

those two words, be no doubt that the compensation must be a full and perfect
equivalent for the property taken….

*Monongahela v. United States*, 148 U.S. 312, 326 (1893).

Just compensation includes a specific range of damages. In addition to the value of the
property taken, just compensation encompasses severance damages which are the diminution in
value of the owner's remaining property resulting from the taking. *United States v. Miller*, 317
U.S. 369, 376 (1943) ("[i]f only a portion of a single tract is taken, the owner's compensation for
that taking includes any element of value arising out of the relation of the part taken to the entire
track."). The Court's polestar in assessing damages is the fair market value of what property
owners have lost. *Otay Mesa*, 670 F.3d at 1369 ("[w]hile diminution in value is a useful
methodology in many cases, we reiterate that the focus of the damages analysis must always
remain on awarding just compensation for what has been taken.").

In permanent takings, fair market value is defined as the price that a willing buyer would
have paid a willing seller, with both having reasonable knowledge of the relevant facts. *United
States v. Cartwright*, 411 U.S. 546, 551 (1973). Because a hypothetical willing buyer could
consider both existing and potential future uses for the property, fair market value takes into
consideration "the highest and most profitable use for which the property is adaptable and
needed or likely to be needed in the reasonably near future." *Olson v. United States*, 292 U.S.
246, 255 (1934). The ultimate determination of just compensation is informed by expert
testimony and experts' analysis of comparable sales. *Wash. Metro. Area Transit. Auth. v. United
States*, 54 Fed. Cl. 20, 28 (2002) ("[e]xpert testimony ordinarily is essential in setting the
minuend and subtrahend of this equation, often informed by the analysis of sales involving
comparable parcels.").

As the Supreme Court has acknowledged, the quantification of just compensation can be
a complex endeavor and is not subject to a rigid formulaic approach. *See United States v.
Commodities Trading Corp.*, 339 U.S. 121, 123 (1950) ("This Court has never attempted to
prescribe a rigid rule for what is 'just compensation' under all circumstances and in all cases.");
*United States v. Toronto*, *Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949)
("Perhaps no warning has been more repeated than that the determination of value cannot be
reduced to inexorable rules."); *United States v. Cors*, 337 U.S. 325, 332 (1949). The Supreme
Court has characterized the damages analysis as "a guess, as well informed as possible, as to
what the equivalent would probably have been had a voluntary exchange taken place." *Kimball
Laundry Co. v. United States*, 338 U.S. 1, 6 (1949). This "guess" is based in large part on expert
testimony. As Justice William Curtis Bok of the Pennsylvania Supreme Court famously noted
expert opinion "is only an ordinary guess in evening clothes." *Earl M. Kerstetter*, *Inc. v.
Commonwealth*, 404 Pa. 168, 173, 171 A.2d 163, 165 (1961).

In *Moore v. United States*, 54 Fed. Cl. 747, 749 (2002), the Court held that "fair market
value of the entire affected parcel [is determined] as if the easement did not exist and then
another determination in light of the taking." This Court has expounded on this to say that the
before and after calculation requires "a determination of the fair market value of the entire
affected parcel as if the easement did not exist and then another determination in light of the

15

taking." *Illig v. United States*, 58 Fed. Cl. 619, 624 (2003) (citing *Moore*, 54 Fed. Cl. at 749)). The facts of this case evince that it is not amenable to such a straightforward calculation.

### A. The "Before" Condition

In rails-to-trails cases, the most used mechanism is the before-and-after method of assessing damages where just compensation equals the difference in market value of the land before and after the easement is imposed. *Otay Mesa*, 670 F.3d at 1364 (quoting *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961)). To do this, one calculates damages by establishing the fair market value of the property absent any easement on the date of the taking—whereby the before value is the value of the entire fee unencumbered. *See e.g.*, *Ladd v. United States*, 110 Fed. Cl. 10, 13 (2013) (Court looks to "the value of plaintiffs' land . . . without easements – unencumbered property"); *Rogers v. United States*, 101 Fed. Cl. 287, 296 (2011) ("[T]he 'before' condition of the property . . . was the unencumbered fee simple[] Plaintiffs would have enjoyed . . . absent the taking.").

The Court has previously found that the source deeds did not convey railbanking and trail use easement. *Loveridge v. United States*, 148 Fed. Cl. 279 (2020) (*Loveridge III*). Based on these facts alone, the Court found that Plaintiffs were entitled to just compensation for a taking that superimposed "a railbanking and trail use easement" on their lands. *Loveridge v. United States*, 149 Fed. Cl. 64 (2020) ("*Loveridge IV*"). With liability already determined, this Court went on to rule that the parties may instruct experts on the existence of the scenic train; that testimony would be subject to the weight of evidence at trial. *See generally Loveridge VI*; *see also Nicholson v. United States*, 170 Fed. Cl. 399, 412 (2024) ("just compensation is largely fact–dependent and varies between each case; it does not do to impose legal prohibitions on fact-intensive issues."); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 509, n.3 (1979) (denying motion in limine to exclude damages evidence because "a complete factual record should be developed from which an independent determination of the appropriate measure of compensation can be made.").

Plaintiffs would like the Court to ignore the existence of the OCSR and its corresponding agreements. With the benefit of a site visit, testimony, and the introduction of evidence, Plaintiffs again argue that the Court's earlier reliance on *Rasmuson* is misplaced because *Rasmuson* "exclusively focused on certain aspects of the taken property's physical condition, not its legal condition," and that absent the NITU, OCSR's "legal right to occupy and use," the easement corridor would have extinguished. (Pls.' Post-Trial Br. at 26). The Court previously rejected this argument because "nothing in the language of *Rasmuson* itself points to this distinction," and OCSR's operation is both a physical reality and a legal reality detached from the NITU. *Loveridge VI*, 167 Fed. Cl. at 48–49 (noting that POTB expressly preserved its legal obligation to OCSR throughout the NITU process). Considering the entire record before it, the Court concludes that to disregard this reality is to overlook the thousands who annually utilize the train as a means of experiencing the coastal communities of northwest Oregon. The Court declines to accept the "legal condition" loophole fashioned by Plaintiffs.

The Court concludes that including OCSR in the before condition is essential to accurately value the affected properties. A core precept of just compensation is that the public should not compensate property owners for anything more than what they have lost. *Bauman v.*

16

*Ross*, 167 U.S. 548, 574 (1897) (noting that an owner "is entitled to receive the value of what he has been deprived of," and "to award him more would be unjust to the public."). Here, OCSR operated before the NITU, continues to operate, and would operate in any conceivable circumstance. The Court concludes that excluding OCSR from the before condition would artificially inflate the properties' before-value and compensate Plaintiffs beyond what was actually taken. *Va. Elec*., 365 U.S. at 633 (citation omitted); *see also Almota Farmers Elevator & Warehouse Co*., 409 U.S. at 473–74 ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.") (citation omitted). The facts established at trial only solidify the Court's prior findings. The Court declines Plaintiffs' invitation to conceptualize a hypothetical scenario in which a locomotive carrying thousands of tourists annually does not exist, thereby artificially enhancing their potential recovery.

The reality Plaintiffs face is that OCSR's agreement would not extinguish with or without a trail easement; the future of the trail or the railroad makes no difference to OCSR until at least 2026 and likely for lease periods thereafter. (*See* J.A. Tab 45, JX52.1; Trial Tr. Bradley, at 571:6–19, 579:18–580:15 (indicating that POTB's understanding was that OCSR would continue its passenger service even if a rails-to-trails agreement was reached, with no plans to terminate OCSR); *id*., at 571:20–572:2 (indicating POTB also intended OCSR to continue running trains on POTB's railroad if no rails-to-trails agreement was reached)). Stated another way, Plaintiffs' land would be "shared" in any feasible condition. Consequently, for the interim period preceding the NITU, the properties "belonged" both to OCSR, by virtue of its legal right of use, and to Plaintiffs in their capacity as property owners along the rail corridor. Were the Court to disregard the OCSR/POTB contract, thereby excluding OCSR's operation in the before condition, Plaintiffs would be compensated for a value they never solely owned. To prevent this unjust enrichment, the Court concludes that OCSR's operation must be part of the before condition.

Given that OCSR's continued operation on the supposedly abandoned rail line is fixed, the Court must now evaluate its impact on the property values both before and after the potential trail easement. The scope and implications of that easement are contested.

### i.    OCSR's Scope of Use

The parties disagree on how the scope of OCSR's easement should be measured and defined. The United States argues that POTB granted OCSR the right to use both POTB's rail line and the full 100-foot right-of-way under the OCSR Agreement. (Def.'s Post-Trial Br. at 9–10). That agreement references OCSR's obtaining the right to use—in addition to the "POTB's rail line"—POTB's "right-of-way." (*See* J.A. Tab 44, JX51.1. ¶ 6–7, JX51.2–3 § 2(A)). Exhibit A to the agreement is labeled as "Description of Right-of-Way," and notes a 100-foot right-of-way for both mileposts 835.417 to 839.12, and 842.6 to 856.18. (J.A. Tab 55, JX51). In contrast, language in the concept plan and the Final Plan Report supports Plaintiffs' argument that OCSR's operation needs are limited to the 17-foot boundary around the rail line. (*See e.g*., J.A. Tab 46, JX55.23 ("OCSR stated that a six-foot separation from center line of the rail to the safety fence eight feet from the center line to the edge of trail would be needed for adequate clearance for all rail equipment"); Pls.' Post-Trial Br. at 19 ("Mr. Matthews concluded that a width of 17 feet was appropriate based primarily on the Final Plan Report and his own extensive experience with railroad corridors." (citing Trial Tr., at 221:8–24, 222:6–223:13))).

Regardless of the language of the OCSR agreement and the concept plans, OCSR's actual use of the right-of-way is broad and aligns with the supposition promoted by the United States: "We use our maintenance equipment. We use areas like that for storing things. And then we also tend to utilize it for our general operations." (Trial Tr. Aldridge, at 630:4–11). OCSR's museum operations and activities may entail the use of the right-of-way space beyond the rail line, which includes using OCSR's "rolling stock as museum pieces," so that "stationary items that are parked either on siding tracks in the right-of-way or pieces that may be off its tracks and in the right-of-way," are available for "people . . . to go and view those." (*Id*. at 631:10–17). Furthermore, during the site visit, the Court took note of the ongoing construction activities along a substantial expanse of the railroad corridor proximate to the Old Mill property. (*See* Trial Tr. Colloquy, at 510:15–18). In sum, the Court cannot rely on an unenforceable concept plan while OCSR enjoys the reality of an enforceable contract.

This testimony and observation are unassailable; OCSR utilizes, with the consent of POTB, far more than the narrow seventeen-foot swath urged by the Plaintiffs. Its use is consistent with the written "Description of Right-of-Way." (J.A. Tab 44, JX 51.1. ¶ 6–7, JX51.2–3 § 2(A)). Consequently, the Court concludes that the written agreement accurately represents OCSR's right of use to the full 100-foot right-of-way.

## ii.    POTB's Freight Easement

The United States incorrectly assumes that including OCSR's operation in the before condition also requires including POTB's original railroad easement. (*See* Def.'s Post-Trial Br. at 16 ("Under . . . this Court's summary judgment order, the before condition includes . . . the continued existence of POTB's original railroad easement.")). The Court held that, for the limited purpose of calculating damages, the parties' experts may consider OCSR's active operation so that damage calculations conform with *Rasmuson*. *Loveridge VI*, 167 Fed. Cl. at 48. Stated differently, the Court found that the real-world conditions for this property may encompass the scenic train. Based on this finding, the United States deduces that POTB's original railroad easement, including its common carrier use, must also be included in the before condition. This suggested approach mischaracterizes the Court's summary judgment opinion as well as the landscape of case law.[16] The Court did not, as the United States would suggest, determine whether POTB's original railroad easement should be included in the before condition as a matter of law. (*See* Def.'s Mot. for Part. Summ. J. at 17 ("the baseline 'before' valuation must appraise Plaintiffs' parcels burdened by *an operating* railroad.") (emphasis in original), ECF No. 178); *see also Loveridge VI*, 167 Fed. Cl. at 50 ("the Court agrees that base valuation must find the parcels burdened by *the operating scenic railroad* . . .") (emphasis added).

In its Post-Trial Brief, the United States argues that because "POTB is using its railroad by leasing the right-of-way to OCSR," then "POTB's easement would have persisted through the continued use granted to OCSR . . . ." (Def.'s Post-Trial Br. at 18). The United States supports this argument by citing Oregon's abandonment law. (*See id*. ("Oregon law requires "non-use" of

---

[16] The Court's opinion was exclusively concerned with addressing the unavoidable fact of OCSR's continued operation. *See generally Loveridge VI*.

the easement and "either a verbal expression of an intent to abandon or conduct inconsistent with an intention to make further use" of the easement.")). The application of state abandonment law to the specific facts of this case is fundamentally a matter of liability—a matter that should have been presented proximate to *Loveridge IV*.

The Court finds that this argument is the government's veiled attempt to relitigate liability in the absence of a motion to reconsider. *See Caldwell v. United States*, 391 F.3d 1226, 1236 (Fed. Cir. 2004) (considering state law reversionary interests to find liability), holding modified by *Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020). As stated above, the Court declines to do so. Such an action directly contravenes the United States' repeated assurances to preserve the liability determination. (Def.'s Reply, ECF No. 181 at 14 ("The United States is not contesting liability . . . ."); (Summ. J. Hr'g Tr. at 6:17–18 ("We are not contesting liability. We are not using just compensation as a workaround from the liability finding.")). It is evident that including POTB's railroad's easement, i.e., freight operation, in the before condition would eliminate any real difference between before and after values and render minimal, if not zero, damages in almost every case; this proposition is inconsistent with established case law and is inequitable. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) ("Once the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation[.]'").

The United States' argument also counters this Court's well-established practice. In the case of a permanent taking in the rails-to-trails context, the Court often establishes the fair market value of the property absent any easement on the date of the taking. *See Ladd*, 110 Fed. Cl. at 13 (The court looks to "the value of plaintiffs' land . . . without easements—unencumbered property"); *Rogers*, 101 Fed. Cl. at 296 ("[T]he 'before' condition of the property . . . was the unencumbered fee simple[ ] Plaintiffs would have enjoyed . . . absent the taking."). "In other words, the [C]ourt starts with the value of the property assuming that, but for the issuance of the NITU, the former easement for railroad use would have been extinguished." *Balagna v. United States*, 138 Fed. Cl. 398, 404 (2018). This is because by the time a Court gets to valuation, liability has been established and it is presumed that the railroad would have abandoned; meaning what was "taken" equates to the total fee, absent extenuating circumstances. *See id*. While this case presents a unique set of challenges, the United States does not distinguish this case from other cases where liability has already been established.

Furthermore, the United States is incorrect to argue "that there is no factual or legal basis for" segmenting the easements given the Court's finding that OCSR's operation should be included in the before condition. (Def.'s Post-Trial Br. at 18–19). As the United States previously argued, the real-world conditions of the property inform the damage assessment. (*See* Def.'s Mot. for Partial Sum. J. at 17 (before condition "could not ignore the real-world condition of the property."), 32 ("It would be contrary to justice to overlook the real-world situation.")). The parties were aware of OCSR's operation prior to summary judgment briefing but failed to inform the Court for *years*. The Court will not now condone the United States' waiver of this significant issue; the mere fact that it is advantageous for the United States to raise this issue now does not excuse its previous silence.

In arguing for a departure from the Court's liability decision regarding the composition of the before condition, the United States conveniently overlooks a critical factual finding: although

19

the railroad tracks remain suitable for OCSR's passenger train service, POTB contends that they are irreparably damaged for common carrier service. *See Loveridge IV*, 149 Fed. Cl. at 64, 71–2. As the Court noted, POTB's notice of intent to abandon expressly provided: "POTB does not believe that it will be able to obtain the necessary funding to repair and rehabilitate the line," from what POTB characterized as "catastrophic damage." *Id*. at 71 ("It is [] undisputed that the Notice indicated that the POTB would not be able to repair damage to the railroad line . . . .").

The United States rightly argued the Court should consider real-world conditions as a factor in valuation proceedings. The same reasoning requires that the real-world condition that POTB's freight carrier service be excluded from the before condition. POTB could not have used the easement for that purpose, though passenger service remains not only a possibility but a reality. (*See* J.A. Tab 45, JX52.1). The facts at trial further support this finding. There has been no revenue from freight traffic on the line since 2007. (Trial Tr. Bradley, at 583:10–584:9). The Court also gives weight to the railroad operator's decision not to pursue repairs. (*Id*.,65483 at 612:2–5 ("FEMA gave us the option to repair it. We said, Mother Nature clearly doesn't like it up there. We'll take the funds and do things on the industrial park instead.")). The Court credits that freight service became an effective impossibility after a December 2007 storm:

> And so that December of 2007 storm left huge landslides, totally destroyed where the rail was. There's chunks where bridges were hanging — hanging rail and things like that up in the middle. Up toward the top there's about a 200-foot landslide where the rail went with it down into the canyon.

(*Id*. at 611:7–25).

To the extent that the Court's earlier finding rests on determinations that the parties now dispute, the parties cannot rest silently, hoping to qualify those findings years later. *Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir. 1984) ("[N]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.") (internal citation and quotation omitted). The trial evidence is unequivocal: freight and passenger operations were severed following the devasting storm of 2007.

Based on the Court's adherence to the real-world conditions of the properties for evaluating damages, POTB's freight easement is excluded from the before condition. *See Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010) ("A taking occurs when state law reversionary property interests are blocked . . . . The NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement." (citations omitted)); *Ybanez v. United States*, 102 Fed. Cl. 82, 87 (2011) ("The determination of what was taken from plaintiffs turns not on the status of the land at the time of the NITU but what interest plaintiffs would have had in the absence of the NITU."); *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011) ("Contrary to defendant's position, the extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." (quotation omitted)). Upon consideration of the evidence presented at trial, the Court finds that POTB's freight easement does not accurately reflect the conditions prevailing on the property. Absent such an

extraordinary circumstance, the inclusion of the POTB rail easement in the baseline condition is not consistent with established legal precedent.

### B. The "*After*" Condition

In a takings context, valuing the after condition looks to the market value of the remainder of the property after the government's acquisition. Interagency Land Acquisition Conference, Uniform Appraisal Standards or Federal Land Acquisitions (6th ed. 2016) ("Yellow Book") at 49 (citing *Va. Elec.*, 365 U.S. at 632; *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cnty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (*per curiam*)) (J.A. Tab 48, JX58). The after condition, therefore, centers on any diminution in the value of plaintiffs' property that resulted from the taking. However, the Court must consider that valuation is dependent on physical, legal, and economic practicability. Yellow Book at 156 (citing *Sharpe v. United States*, 112 F. 893, 897 (3d Cir. 1902), aff'd sub nom. *Sharp v. United States*, 191 U.S. 341 (1903) (discussing insufficiency of evidence of "possibilities more or less remote")). Given the anomalous circumstances, the determination of the after condition is also a complex inquiry. Specifically, the existence of OCSR and the potential impact of trail construction raise questions that mirror many of those associated with the before condition.

#### i. OCSR

As established, OCSR currently has a contract with POTB to operate the scenic train until 2026. (J.A. Tab 44, JX51; Trial Tr. Bradley, at 563:9–22, 578:9–13). The Court previously found that while OCSR's operation may be included in the before condition, the impact of OCSR's operation going into the future is a fact-dependent inquiry and that "[e]valuating the exact extent of that impact awaits trial." *Loveridge VI*, 167 Fed. Cl. at 50. The Court now has the benefit of testimony regarding uncertain future events.

The current OCSR lease ends in 2026. POTB and OCSR are negotiating a renewal. (Trial Tr. Bradley, at 578:20–23l, 582:14–20; Trial Tr. Aldridge, at 658:20–23; Trial Tr. Sumption, at 394:4–7). OCSR constitutes a significant source of revenue for POTB, and its ridership and revenue are experiencing growth. (Trial Tr. Bradley, at 580:16–581:5; Tr. Aldridge, at 645:13–646:9; Tr. Sumption, at 372:2–9). OCSR also maintains the rail line by "replac[ing] tires, replac[ing] joint bars, fill[ing] ballast, keep[ing] . . . signals in working order" and conducting track inspections. (Trial Tr. Aldridge, at 632:5–9). Moreover, OCSR is currently engaged in the expansion of the rail line. No evidence has been presented to indicate that OCSR's continued viability is compromised. Based on the testimony presented, the Court concludes that the continuation of OCSR's operations through one or more subsequent leases is probable.

#### ii. Trail Use Easement

Other judges of this Court have held that, in the after condition of rails-to-trails cases, appraisers are to assume that the hiking and biking trail is in place and has been constructed. *Hardy v. United States*, 141 Fed. Cl. 1, 10 (2018). This Court does not dispute the appropriateness of such an approach in many cases; however, it has been established that the

21

present case does not fall within the category of "most cases." Based on the combination of uncommon factors, the United States has convincingly argued that the after condition should not assume a trail is already constructed. That is because "almost eight years after the NITU issued, STIA has not created a public trail, no trail is under construction, no design has been selected, and no funding is available." (Def.'s Post-Trial Br. at 10). As there "will not be [a trail] for the foreseeable future," the Plaintiffs should not be compensated for the diminishment of land value based on the existence of an imaginary trail. (*Id*.). While the Court agrees that it should not presume the construction of a trail post NITU, neither can it disregard the possibility of such construction and its potential negative impact on market value.

As this applies to property value, the Court considers Plaintiffs' highest and best use of the property. "To be a property's highest and best use, the use must be (1) physically possible; (2) legally permissible; [and] (3) financially feasible," and "must result in the highest value." Yellow Book at 23. In dealing with "a thorny issue of valuation" the Court must investigate to what extent expert opinions are grounded in operative fact. Plaintiffs maintain that the market value in the after condition should be premised on the assumption that the trail manager's project is already constructed—and in the manner that imposes maximal depreciation of the Plaintiffs' property values. As Mr. Matthews opined,

> In this case, the notice of interim trail use, NITU. And that freezes time July 26, 2016. So everything is done as of that date. What is the market doing as that date? What's the buyers' and the sellers' attitudes? What do you know at that date? You can't really go past that date.

(Trial Tr. Matthews, at 233:8–14; 483:20–25).

The Court agrees, in part, that the issuance of the NITU is not an entirely dispositive factor in a takings analysis. Certain post-NITU events may be relevant to the inquiry. *See e.g.*, *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020) (compensable temporary taking occurred despite expiration of NITU with no trail use agreement resulting). It is through post-NITU events, for example, that temporary takings occur. *See Independence Park Apartments v. United States*, 465 F.3d 1308, 1312 (Fed. Cir. 2006) ("When subsequent action converts an otherwise permanent taking into a temporary one, just compensation is typically calculated in the same manner, adjusted to account for the subsequent events so that the damages will accurately reflect the value of what was taken.") (internal citations omitted).

Applying Plaintiffs' preference, suggesting that the NITU freezes time and that damages must be calculated without regard to subsequent events, is a convenient but unrealistic approach, particularly here. *See Cooley v. United States*, 324 F.3d 1297, 1305–06 (Fed. Cir. 2003) (recognizing that agency decision to reverse course could convert permanent takings to temporary one). The notion that the date of the NITU serves as a temporal checkpoint does not align with Mr. Matthews' testimony: "[m]aybe you can use a sale a year or something like that afterwards, maybe even more . . . ." (Trial Tr. Matthews, at 233:23–25); *see also United States v. 63.04 Acres of Land, Lido Beach, Town of Hempstead, Nassau County, State of N.Y.*, 245 F.2d 140, 145 (2d Cir. 1957) (no "absolute rule" precludes consideration of subsequent sales as comparables).

Aligning neatly with the theory that time ceases upon the issuance of the NITU, Plaintiffs' rebuttal expert testified that for appraisal purposes, property owners have lost all marketable title on the date of the NITU, and any occasional ancillary occupation of the property is incidental to the loss of such marketable title. (Trial Tr. Kilpatrick, at 903:19–904:2). Notably, Plaintiffs did not present expert testimony from a real estate attorney or title examiner about how the property's title being marketable affects its value. Nevertheless, when questioned regarding the significance of a trail's construction, Dr. Kilpatrick maintained the position that the factual circumstances pertaining to the actual commencement of the project were irrelevant:

> To think about road widening for just a second, you know, real simple eminent domain taking that every appraiser is trained to evaluate, the highway department comes along and says they need to take my front yard because they're going to widen the road. I lose my front yard. I lose my marketable title to my front yard the day they take it. It may take them a year or two or three down the road for them to actually widen the road, but once they've taken my front yard, I've lost marketable title to it.

(*Id.*, at 904:6–15).

Adopting the same logic, Plaintiffs assert that "[t]he [Court of Federal Claims] has followed this logic for decades to find landowners are entitled to compensation for 100 percent of the value of the land taken," in the after condition.[17] (Pls.' Post-Trial Br. at 30). That assertion is partially correct, but such a rigid approach does not fit with the idea of *just* compensation.

Under fundamental constitutional law, private property may not be seized for public use "without just compensation." U.S. CONST. amend. V. Notably, the right to compensation is qualified by the term "just," defined by Black's Law Dictionary as being "legally right; lawful; equitable." JUST, Black's Law Dictionary (12th ed. 2024) (last reviewed November 19, 2024). This principle has been subject to inquiry by other courts for many years:

> Thus, the only standard of compensation mandated by the Constitution is that it be 'just,' which in turn evokes ideas of 'fairness' and 'equity[.]' But what is just, fair, and equitable? To begin with, the Supreme Court has made clear that in the condemnation context, as in all areas of the law, justice is not

---

[17] Plaintiffs rely on an out-of-context statement from *Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021), that courts in rails-to-trails cases have "consistently held that the owners of land subject to a trail easement retain virtually no rights in the encumbered land and awarded the plaintiffs the fee simple value of the encumbered parcel." Judge Williams was not articulating a legal principle but instead discussing commonality for the *facts* of a rails to trails case to show a complete loss of value. This is clear from Judge Williams' own holding about plaintiffs' loss of value in that case which was "[b]ased upon the record as a whole," and not as a matter of law. *Id.*, at 702. Plaintiffs have not cited a single analogous case in which the Court has presumed that landowners forfeit the entirety of their property value when factual disputes pertain to the extent of the trail project.

23

> measured from the jaundiced perspective of either the individual alone or the
> collectivity alone: 'Just compensation means a compensation that would be
> just in regard to the public, as well as in regard to the individual.' Giving yet
> more content to the concept of just compensation, the Court has explained
> that the underlying principle is that the dispossessed owner 'is entitled to be
> put in as good a position pecuniarily as if his property had not been taken. He
> must be made whole but is not entitled to more.'

*United States v. 320.0 Acres of Land*, 605 F.2d 762, 780–81 (5th Cir. 1979) (internal citations
and quotes omitted).

Just compensation in most cases means "the fair market value of the property on the date
it is appropriated." *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984). But the Supreme
Court has cautioned that "other measures" should be employed "when market value is too
difficult to find, or when its application would result in manifest injustice to owner or public." *Id.*
at 10 n.14 (quoting *Commodities Trading Corp.*, 339 U.S. at 123). That is because, at the end of
the day, "[t]he constitutional requirement of just compensation derives as much content from the
basic equitable principles of fairness . . . as it does from technical concepts of property law."
*United States v. Fuller*, 409 U.S. 488, 490 (1973) (citing *Commodities Trading Corp.*, 339 U.S.
at 124)).

Multiple factors affect the calculation of the after condition of Plaintiffs' properties,
including the prominent fact that existence (and/or creation) of an actual trail is slim. The
concept plan was characterized as a general and intended to stimulate further discussion, rather
than a finalized action plan. Given the complexity of the trail, no single solution was proposed,
and instead, advocates and agencies were encouraged to utilize the concept plan as a guide for
developing more specific plans and designs for various segments of the trail. (Trial Tr.
Sumption, at 368:20–22; J.A. Tab 46, JX55.5). STIA held "public open house meetings," to
discuss both plans and it received public commentary including "over 29,000 reviews of the
planning website and thousands of comments." (Trial Tr. Sumption, at 371:1–12; 361:23–362:1;
380:8–10). From the initial discussions of the trail, planners made clear that the trail would likely
take years, even decades, to complete. (J.A. Tab 46, JX55.5). Even one of the property owners
characterized the trail plan as "somebody's pipe dream." (Trial Tr. S. Laviolette, at 153:3–4).

Since these preliminary meetings, the realization of a trail has stalled. Ms. Sumption, co-
convener of the STIA, elaborated on the impediments to progress:

> We'd have to have funding. We'd have to have community engagement.
> We'd have to work with the local jurisdictions around what we can do from
> a planning perspective. We'd have to go back and reassess the trail. A lot has
> happened on there just with Mother Nature and those types of things. So there
> — a whole new plan would need to be developed.

(Trial Tr. Sumption, at 384:11–21; *see also id.*, 385:6–22; 382:20–25, 384:11–21). In 2017, the
coastal segment was projected to cost between $46 million (for rail-to-trail) and $139 million
(for rail-with-trail). (*Id.*, at 387:20–24; J.A. Tab 47, JX56.104). Hypothetically, if construction
could somehow commence, costs for the trail now are likely 50 percent higher. (*Id.*, 388:2–20).

24

In sum, no mechanism for financing the substantial construction costs has been identified that would make the existence of a trail a likely scenario. Numerous other complications exist, the least of which is OCSR's continued operation—other stakeholders, engineering complexities, and coordination with local jurisdictions are also issues to consider. (*Id.*, at 384:15–20, 390:2–7; *see also* J.A. Tab 47, JX56.107–12, 104–08).

Against this backdrop, Plaintiffs' expert relied on the concept plan outlining potential trail layouts and designs, as well as a limited number of emails, to assume the construction of a trail in the most detrimental configuration. (Trial Tr. Matthews, at 230:21–231:25, 481:20–482:6). In balancing the evidence indicating the uncertainty of trail construction against the evidence offered by Plaintiffs, the Court draws two conclusions. First, the construction of the trail is improbable. Second, such an uncertainty does not absolve the United States from its obligation to provide just compensation for the property taken. Stated differently, while the Court finds that the after condition should not contemplate a fully realized trail, this determination is not dispositive.

> iii.   Crossing Rights, Improvements, and Trail Location

The parties disagree as to the appropriate method for measuring the loss of crossing rights or potential interference with improvements within the right-of-way. The Court determines that neither Oregon law nor the Trails Act mandates that such an easement must be exclusive and, accordingly, that Plaintiffs failed to satisfy their burden of establishing the loss of crossing rights and property encroachments.

Plaintiffs rely on cases to argue that "[a]s a matter of law" the Court should assume that property owners lose the full value of their encroaching improvements as a result of the NITU. (*See* Pl.'s Post-Trial Br., at 33–36 (discussing *Agapion v. United States*, 167 Fed. Cl. 761 (2023))). The reach of these decisions is circumscribed; all are post-trial opinions examining the actual use of the easements and potential interference with the planned trail. In *Agapion*, for example, the Court noted the trail manager's testimony that encroachments "might be removed in the future if they do interfere with the trail." 167 Fed. Cl. at 769; *see also Childers v. United States*, 112 Fed. Cl. 617, 648 (2013) ("the Court finds that, *based on the evidence as informed by the site visit*, the trail impacts the entire remainder of properties of less than 25 acres, and the trail substantially impacts the remainder of larger properties.") (emphasis added).

The Court has previously addressed this issue:

> The United States' position that the Trails Act does not automatically vanquish the Plaintiffs' access rights under state law is supported by caselaw. But a mere possibility of recourse to state law does not mean that Plaintiffs are barred, as a matter of law, from recovering crossing rights damages. Rather, this simply means that the harm Plaintiffs suffered is one characterized by the legal uncertainty of the future use of the right-of-way as opposed to any actual present deprivation. Therefore, although the parties' experts may not testify as to how this uncertainty will be resolved in the future (whether the trail will be built or not, and in what form), they may testify as to how the uncertainty impacts market value.

…

> [The] expert appraisal shall not take as a given that plaintiffs lost all crossing rights to their properties upon issuance of the NITU, but neither should it exclude the opportunity to show that a reasonable buyer's assessment of the market value may still be impacted by the possibility of that scenario occurring.

*Loveridge VI*, 167 Fed. Cl. at 52 (internal citations and quotes omitted). As this Court signaled, it is the *uncertainty* regarding the loss of crossing rights that must be evaluated at trial. *See Dana R. Hodges Trust v. United States*, 111 Fed. Cl. 452, 459 (2013) (rejecting argument that trail easement eliminated crossing rights); *Schulenburg v. United States*, 139 Fed. Cl. 716, 719 (2018) (concluding that crossing rights are "well established" under state law, and "run with, the land."). The insistence that crossing rights automatically extinguish upon the issuance of a NITU neither aligns with appropriate case law nor the Court's direction.

Oregon state law holds that easement grantors "retain[] full . . . use of the land subject to an easement," unless their use interferes with "the fair enjoyment of the easement," or unless "extrinsic evidence," or "the written document itself expressly and unequivocally," shows some greater restriction on or reservation of rights" than is normally presumed.[18] *Watson v. Banducci*, 973 P.2d 395, 400 (Or. Ct. App. 1999); *see also Loveridge III*, 148 Fed. Cl. 279, 286 (citing *Motes v. PacifiCorp*, 217 P.3d 1072, 1078 (2009) (an easement holder may "change the use of its easement so long as it does not substantially increase the burden on the servient estate") (quotation and citation omitted); *Cotsifas v. Conrad*, 905 P.2d 851, 853 (1995) (substantial interference involves more than petty annoyance); *Long v. Sendelbach*, 641 P.2d 1136, 1138 (1982); *Jones v. Edwards*, 347 P.2d 846, 849 (1959)). Oregon law, in other words, treats easement rights as "non-exclusive," which the United States asserts is vital to the damages analysis. (*See* Def.'s Post-Trial Br. at 14).

The United States opposes any notion that the Trails Act imposes an exclusive trail use easement to support the statutory purpose of railbanking. (Def.'s Post-Trial Br. at 14). The text of the Act, the United States maintains, does not grant exclusive control of the corridor to the trail sponsor, mandate the creation of an exclusive easement, or preclude preexisting uses by the servient estate from continuing. (*Id*. at 15). The United States also relies on an STB decision that held that the Trails Act allows for routine, non-conflicting uses permitted under state law. (*Id*. at

---

[18] Plaintiffs' expert, Mr. Matthews, was neither instructed on nor reviewed relevant Oregon law. (Trial Tr. Matthews, at 422:10–17). The United States also suggests that *Boyer v. United States*, 135 Fed. Cl. 121, 127, 130 (2017) and *Moore v. United States*, 61 Fed. Cl. 73, 78-79 (2004), determined that crossing rights in a railroad corridor were not assumed destroyed.

16 (citing *Jie Ao & Xin Zhou—Petition for Declaratory Order*, Docket No. FD 35539 (STB June 6, 2012), 2012 WL 2047726)). The Court gives credence to this argument.[19]

Credible testimony suggests some adherence to Plaintiffs' crossing rights and other improvements.[20] Thus far, eight years in, Plaintiffs continue to use their lands without change. (Trial Tr. Sumption, at 392:17–393:23). For example, Camp Double J's septic system falls within the railway right-of-way. (Trial Tr. Joslin, at 82:20–22). It exists absent agreement or approval from POTB. (*Id.*, at 82:13–84:18 (confirming no communication with POTB regarding the septic system until shortly before trial)). Parts of Jetty Fishery's property—including the business's shop, store, and crab storage tanks—are within the corridor. Again, they persist without written agreement. (Trial Tr. D. Laviolette, at 176:23–177:5; J.A. Tab 51, PX11C.23; J.A. Tab 38, JX33.25, JX33.28, JX33.34; J.A. Tab 21, JX22.1 ("[F]or the encroach of Lessee–owned porch")). Jetty Fishery also stores a boat in the right-of-way and constructed and maintained a permanent business sign in the corridor, both without approval from POTB. (J.A. Tab 29, JX33.9; J.A. Tab 30, JX33.10; Trial Tr. S. Laviolette, at 108:15–110:15, 174:15–175:6). And nothing in the trial testimony suggests that Jetty Fishery customers are restricted from crossing the railway corridor to gain access to the business. (*See* J.A. Tab 24, JX24; J.A. Tab 27, JX33.7).

At present, STIA has not impaired Plaintiffs' use of any portion of their property that encroaches on the railway or access to their properties. (Trial Tr. Sumption, at 393:8–23). Nor has STIA communicated a future intent to do so. (*See* Trial Tr. Joslin, at 79:21–80:2; Trial Tr. D. Laviolette, at 176:22–178:5, Trial Tr. Sumption, at 390:3–12).[21] As a trail representative stated, after speaking with at least two property owners regarding "concerns about the trails," she could

---

[19] It is worth noting that other judges of this Court have repeatedly dismissed the contention that the Trails Act preempts all uses of encumbered property by the servient landowner. *E.g.*, *Cheshire Hunt, Inc. v. United States*, 158 Fed. Cl. 101, 107–08 (2022); *Dana R. Hodges Tr*ust, 111 Fed. Cl. 452, 457 (2013); *Sears v. United States*, 132 Fed. Cl. 6, 26 (2017), *aff'd per curiam*, 726 F. App'x 823 (Fed. Cir. 2018). "State law claims that do not deal with abandonment issues are not preempted by the Trails Act." *Sears*, 132 Fed. Cl. at 26 (citing *Dana R. Hodges Trust*, 111 Fed. Cl. at 456–57).

[20] There were previous agreements with POTB regarding crossing rights and encroachments. (*See* J.A. Tab 17, JX11; J.A. Tab 18, JX12; J.A. Tab 21, JX22; J.A. Tab 23, 24). Despite ongoing conversations involving property owners, POTB, and STIA, the agreements have not been renewed. (Trial Tr. Joslin, at 58:17–63:12; Trial Tr. Sumption, at 415:4–25; Trial Tr. Bradley, at 599:2–600:14, 606:10–607:2).

[21] As Ms. Sumption testified, a recognition that buildings within the corridor could impact trail construction, (Trial Tr. Sumption, at 405:18-25 (discussing J.A. Tab 47, JX56.33)), does not equate to STIA's intent to destroy the buildings. (*Id.* at 418:3-8). As a matter of common sense, the Court endorses this recognition because concept plans can identify interferences with a potential concept not to signal that such barrier will be removed but to highlight why certain plans may not be easily achieved.

27

not see how constructing the trail in a way that interfered with the owner's improvements "would even be in the realm of possibilities." (Trial Tr. Sumption, at 389:7–390:11, 390:5–11, 418:7–9 (impact plan does not mean encroaching buildings would be demolished)). Even Plaintiffs' own expert indicated that "I think everyone's decided that existing crossing would continue . . . ." (Trial Tr. Matthews, at 428:16–18).

The Court concludes that assigning value under these circumstances would involve improper speculation. As the Supreme Court stated in *Olson v. United States*:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

292 U.S. at 257.

Given the lack of physical interference over eight years and the low likelihood of future interference, the Court finds that the property owners have not lost crossing rights or the use of their improvements. Any unrealized loss of those improvements and crossing rights offend notions of "just" compensation and would constitute a windfall. Neither side has calculated the value of using the crossing rights and improvements. It is therefore impossible to assign a specific value when calculating damages. Since proof of the economic value of these rights remains unknown after trial, the Court cannot apply a non-speculative discount to Plaintiffs' claimed damages.

### C. Damages

It is against this background that the Court considers the parties' proposed damages calculations. Based on the findings and path detailed to this point, calculating just compensation has proven unduly arduous. It remains unclear whether this complexity stems from the adversarial positions of the parties or the inherent challenge of the legal framework, but the certainty is that it should not be this difficult. The equation is complicated by extraordinary circumstances arising from OCSR's operation, a fact significantly impacting what would otherwise be a straightforward appraisal process and necessitating the efforts of skilled counsel and experts to confront unprecedented challenges. In reviewing the experts' laudable efforts to grapple with the unusual facts presented here, the Court finds that unforced errors on both sides render reliance on both parties' calculations impossible to accept. Upon careful consideration, the Court concludes that expert testimony was not sufficiently probative and that, based on the evidence, a determination of just compensation is impracticable.

It is well-settled that the government must pay for what it takes. *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1033 (Fed. Cir. 2024) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021)). But attaching value to this is not a simple task even in the best of circumstances. In *Yuba Goldfields, Inc. v. United States*, the Federal Circuit observed that the law of just compensation is hardly a model of clarity. 723 F.2d 884, 887 (Fed. Cir. 1983).

Appx28

Instead, it is characterized by "confusing and incompatible results, often explained in conclusionary terminology, circular reasoning, and empty rhetoric." *Id.* (quoting Arvo Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria*, 44 S.C.L.REV. 1, 2 (1970)); *accord Allard v. United States*, 173 Fed. Cl. 207 (2024). As established above, courts typically look to the "fair market value" standard. *564.54 Acres of Land*, 441 U.S. at 511. Under the fair market value standard, damages equal what a willing buyer would have paid in cash to a willing seller at the time of the taking. *Id.*

 "In ascertaining market value, consideration should be given to all matters that might be brought forward and reasonably be given substantial bargaining weight by persons of ordinary prudence . . . ." *Rasmuson*, 807 F.3d at 1346 (citing Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisition § B–2 (2000 ed.)); *see also 564.54 Acres of Land*, 441 U.S. at 511 (defining fair market value as what a willing buyer would pay in cash to a willing seller at the time of the taking). The burden to establish this lies solely with the property owner. *See Otay Mesa*, 779 F.3d at 1323 ("Once a taking has been established, it is the landowner who bears the burden of proving an actual loss has occurred.") (citing *Bd. of Cnty. Supervisors of Prince William Cnty., Va. v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002)); *accord Hedstrom Lumber Co. v. United States*, 7 Cl. Ct. 16, 28 (1984) ("The burden of establishing the value of the property taken rests upon the claimant."); *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("The burden rests upon the owner to establish by competent evidence his right to substantial compensation.") (citations omitted). "To carry its burden, the landowner must show actual damages 'with reasonable certainty,' which 'requires more than a guess, but less than absolute exactness.'" *Otay Mesa*, 779 F.3d at 1323 (quoting *Precision Pine & Timber, Inc.*, 596 F.3d at 833); *see also Collective Edge, LLC v. United States*, 171 Fed. Cl. 736, 753 (2024).

 The Federal Circuit has noted that the quantum of damages must "be shown to a reasonable approximation," or, stated differently, "estimated with a fair degree of accuracy." *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379 (Fed. Cir. 2013) (internal quotations and citations omitted). The property owner is "entitled to be put in as good a position," monetarily as if the "property had not been taken." *Olson*, 292 U.S. at 255. Yet, as the Supreme Court has cautioned that while the property owner "must be made whole," he "is not entitled to more." *Id.*

 Plaintiffs proffered myriad testimony to establish compensation—including that of Mr. Matthews. However, his input regarding the necessary quantum to make Plaintiffs whole is suspect. Mr. Matthews assumed propositions with which the Court disagrees including: (1) a failure to account for the 100-foot easement utilized by OCSR in the before condition, (Trial Tr. Matthews, at 464:6–13 (agreeing that none of his appraisals account for OCSR use of full easement in before condition and to do so would require "new analysis.")); (2) exclusion of OCSR in the before condition despite his claims otherwise; (3) completion of the recreational trail despite there being—as of yet—no substantial step towards construction or funding of a trail, (*id.*, at 468:1–7); (4) complete loss of crossing rights and similar encroachments; (5) appraisals did not account for OCSR's 100-foot easement in the before condition, (*id.*, at 466:5–9); and (6) the location of the yet-to-be-realized trail along the western edge of the corridor, i.e., the worst scenario for Plaintiffs, (*id.*, at 482:19–483:19). Moreover, Mr. Matthews refused to discuss the concept of windfalls in the calculation of damages and the arithmetic within his expert report was incorrect. (Trial Tr. Matthews, at 513:8– 515:12). Each of these factors impact

credibility. *See e.g.*, *United States v. N. Paiute Nation*, 183 Ct. Cl. 321, 346 (1968) (recognizing that the trial court is charged with assessing whether valuation amount is "supported by all the evidence.").

The requirement that courts consider the entirety of relevant evidence is mirrored in the methodology encouraged for government appraisers. The Court has held that plaintiffs are not strictly bound by the Yellow Book for land valuation. *Ideker Farms, Inc. v. United States*, 151 Fed. Cl. 560, 603 (2020) ("As an initial matter, the Yellow Book applies to only those appraisals being conducted at the request of the government."), *aff'd in part*, *vacated in part*, *remanded on other grounds*, *Ideker Farms, Inc. v. United States*, 71 F.4th 964 (Fed. Cir. 2023) (citing *Hardy*, 141 Fed. Cl. at 32 ("[A]s a matter of law, [Plaintiffs' appraiser] was not bound by the Yellow Book. The Yellow Book applies only to appraisers hired by the federal government for condemnation purposes; it is not mandatory with respect to appraisers not hired by the government.")). However, in novel circumstances that are heavily dependent on the real-world circumstances of the property, appraisers should provide a clear and compelling explanation for deviations from its guidelines.

Explanation for deviation is especially important when the Yellow Book's approach is widely accepted and considered to be standard practice. Despite Mr. Mathews postulating that he was required to assume the eventual construction of a trail in the most damaging configuration, such a requirement is not justified by the Yellow Book, nor was Mr. Matthews able to identify any such requirement when asked at trial. (Trial Tr. Matthews, at 470:15–23, 474:8–16). In circumstances such as these, the Yellow Book does not endorse dogmatic adherence to hard and fast rules:

> Appraisers must exercise sound judgment *based on known pertinent facts and circumstances*, and it is their responsibility to obtain *knowledge of all pertinent facts and circumstances* that can be acquired with diligent inquiry and search. They must then *weigh and consider the relevant facts* with good judgment and make their decision, entirely on their own, in a sound professional manner, completely unbiased by any consideration favoring either the owner or the government.

Yellow Book at 204 (emphasis added). The presumption that appraisers must assume a trail is already constructed in the maximally damaging manner will always favor claimants, sometimes at the unjustified expense of taxpayers. This is problematic in cases such as these, where the likelihood of trail construction is slim and affects the overall uncertainty important to prospective buyers.

Additionally, Plaintiffs seek compensation for the full market value of improvements within the corridor, even though they have enjoyed full and unfettered access to those improvements for both personal and profit-making purposes for eight years since the NITU was issued. (*See generally* Pls.' Post-Trial Br.). The Court simply cannot envision a clearer example of awarding a windfall. *See Agapion*, 167 Fed. Cl. at 777. Despite opining on other matters of potential impact, Mr. Matthews avoided responding to the Court's inquiries about potential windfalls. When asked directly, Mr. Matthews demurred:

30

Appx30

| COURT: | So there was a question that came in about [compensating] windfalls, and you said of course we can't. |
|---|---|

MATTHEWS: I don't have an opinion.

| COURT: | Okay. And that's fine. Are windfalls discussed somewhere in the Yellow Book? |
|---|---|

MATTHEWS: No. Not to my knowledge.

(Trial Tr. Colloquy, at 505:1–7; *see also* Trial Tr. Matthews, at 493:3–8 (offering no opinion whether being paid for loss of improvements while retaining use of improvements constitutes windfall)). Plaintiffs' rebuttal expert also deflected when asked directly about windfalls; when asked the meaning of the term and its use within the Yellow Book, the only response was that "windfall's not an appraisal term." (Trial Tr. Kilpatrick, at 936:24–937:3).

     This is incorrect. The Yellow Book references the windfall principle numerous times. Yet, this topic seemed to evade both of Plaintiffs' experts.[22] Yellow Book at 16, 95 (in acquisitions under the Uniform Act, the assignment may instruct the appraiser to consider changes in value due to physical deterioration within the owner's reasonable control to avoid windfalls), 98 (advising appraisers "to request legal instructions on how to treat government–constructed improvements that predate the date of value," to heed "the equitable principle which condemns unjust enrichment," and to prevent the value of government-built premises "becoming a *windfall* to the owner of the land in the guise of fair compensation." (emphasis added)), 113 ("Thus, to allow landowners to receive compensation not only for their property but for diminution in value to land owned by another would be a windfall and an unfair enrichment rather than just compensation."), 134 n.563 (citing *Rasmuson* for the proposition that holding valuation of agricultural property that "does not take into account the costs of removing [existing] physical remnants of [a] railway will result in an artificially inflated value and yield a windfall to the landowner"), 190 ("Paying compensation for such values would permit private owners to receive *windfalls* to which they are not entitled under the Fifth Amendment." (emphasis added)). An unwillingness to engage with this common principle in assessing just compensation also impacts credibility.

     Lastly, Mr. Matthews' report readily displayed mathematical errors. (Trial Tr. Matthews, at 513:8–515:12). While these mistakes did not impact the final damage amount, such blatant errors in conjunction with other shortcomings are noteworthy and impact credibility.

---

[22] Prior to trial, the Court requested that witnesses' references to the Yellow Book be anchored to specific provisions to enable the Court to locate that reference. (*See* Colloquy, Mot. in Lim. Hrg. Tr., at 92:9–17, ECF 229). They did not, though a complete Yellow Book was provided for the Court to explore at its leisure. (J.A. Tab 48, JX58 (referred to as "Yellow Book")). The lack of reference to specific provisions of the Yellow Book is frustrating. As an example, when asked where in the Yellow Book appraisers were instructed to value a property as if the trail were completed—one of the dominant issues at trial—he was unable to do so. (Trial Tr. Matthews, at 474:9–13).

Additionally, though raised before trial, it became apparent during the trial that Mr. Matthews's initial assessment of the Old Mill property was inaccurate due to misunderstandings about the road frontage and maps. Like his explanation of the omission of OCSR in the before condition, Mr. Matthews's explanation of this issue was unconvincing. (*See generally* Trial Tr. Matthews, at 430:2–434:22, 439:1–446:2). In assessing the Old Mill property initially, Mr. Matthews was also unsure whether OCSR was operating, and if so, he concluded it did not affect valuation. (*Id.* at 438:12–18).

Plaintiffs' expert's failure to adequately explain deviation from the Yellow Book's guidelines, coupled with his inability to convincingly demonstrate how the existing scenic train would not significantly impact the property's present value, renders complete reliance on Mr. Matthews's methodology and conclusion unwarranted.

While the property owners have the burden of proof, the United States' expert, Ms. Hasson, is not more credible. As discussed previously, her valuation in the after condition for Jetty Fishery and Camp Double J after the taking showed no diminution in value. (J.A. Tab 55, DX02; J.A. Tab 56, DX03). Closer examination shows that her valuation in the before condition for the Jetty Fishery and Camp Double J were identical despite one being residential and one distinctly commercial. (J.A. Tab 55, DX02; J.A. Tab 56, DX03). This deviation was not adequately explained.

As instructed by counsel, Ms. Hasson incorrectly accepted that the before condition includes the preexisting POTB freight easement, rather than the OCSR easement, despite the actual abandonment of freight operations and the NITU. (*See e.g.*, J.A. Tab 55, DX02.0004 ("Legal Instructions" for the before condition include "the property is subject to the existing railroad corridor and POTB's existing railroad easement.")). Per her instructions, Ms. Hasson's before valuation utilized comparable properties along the Oregon coast with similar zoning, highest and best use, and physical characteristics. (J.A. Tab 54, DX1.58–74, 90–112; J.A. Tab 55, DX2.48–73; J.A. Tab 56, DX3.49–63; Trial Tr. Hasson, at 702:15–17, 703:24–710:9). Ms. Hasson qualified her search for properties with a permanent easement for railroad use, narrowing her results to a single property. (Trial Tr. Hasson, at 716:16–23). Her additional research for open-marketed properties burdened by a railroad easement resulted in five examples. (*Id.* at 722:20–725:6, 727:2–11; J.A. Tab 54, DX1.74). Ms. Hasson concluded that properties subject to a permanent railroad easement provide no contributory value to Plaintiffs. (Trial Tr. Hasson, at 725:9–726:13).[23]

This comparison does not pass muster as it fails to account for the inherent difference between active freight railways and passenger rail services like OCSR—the reality existing in Tillamook County, Oregon. This distinction and Ms. Hasson's position that willing buyers would

---

[23] Hasson provided three explanations for her conclusion: (1) marketing materials for her comparables did not include the area within the railroad corridor in the listing; (2) the county assessor's data also did not include the land within the railroad corridor as part of the overall property size; and (3) non-specific communications with real estate agents that represented buyers and sellers of properties alongside railways. (Trial Tr. Hasson, at 725:9–726:13).

attribute no value to property within a railway easement is unsound. Those portions potentially affected included septic improvements, signage, and crossing access. In addition, disparities between actual and listed size can be credibly attributed to another cause: uncertainty about ownership and control. Plaintiffs concerns here are justified.

Hasson's conclusions gainsay the United States' position regarding the non-exclusivity of the easement. As previously discussed, the United States contended that Plaintiffs "retain[] full dominion and use of the land subject to an easement," so far as their use does not interfere with "the fair enjoyment of the easement" to STIA and OCSR. (Def.'s Post-Trial Br. at 14). Ms. Hasson's assumption that the areas burdened by the easement have no contributory value is unreasonably broad.

In addition, neither of the United States' expert's reports nor testimony paints a clear picture of the nature of the easements in comparable properties. Ms. Hasson's report does not establish if the easement areas excluded from the listing were used in any other way. For example, in this case, facts at trial showed that Jetty Fishery constructed and maintained a permanent business sign in the easement area. (J.A. Tab 29, JX33.9; *see also* Trial Tr. S. Laviolette, at 110:1–16). The United States points to this historic use and the absence of any interference from POTB or trail manager to argue that the easement area accommodates shared use. (*See* Def.'s Post-Trial Br. at 13–16). If the owners of Jetty Fishery attempt to sell the property to another business, it is probable that the sign will change to promote the new business. Handing over such use of the easement area can very realistically be part of the bargain between Jetty Fishery and the new buyer. In other words, the United States' admission that the property owners are entitled to continue many of the frequent uses of the easement area, (*see generally id.* at 13–21; Trial Tr. Hasson, at 818:2–8 (answering question about instructions to consider non-exclusivity of easement when calculating just compensation)), is itself a concession that owners possess usage rights that are of some value and perhaps subject to sale. Ms. Hasson's report does not include sufficient details to ensure that the easement areas in the comparable properties resemble the easements for these properties.

The United States' expert also finds that the new trail use easement had no market effect on improvements in the after condition, largely due to the public understanding in 2016 that the development of any trail was uncertain. (Trial Tr. Hasson, at 752:1–4). Ms. Hasson testified that she attempted to quantify the impact of uncertainty about where the trail may be placed on the market value of the properties, but she met obstacles. First, Hasson was unable to find any comparable sales experiencing similar uncertainty. (*Id.*, at 755:6–756:80). Ms. Hasson testified that she could only find comparables where improvements were impacted with 100-percent certainty and ones where there was 100-percent certainty that improvements would be impacted; Hasson found this range far too broad to have any utility and was susceptible to speculation. (*Id.*, at 757:16–24). Second, Hasson looked at discounting future income loss to the property, but this was not possible given that there is no timeline for when the trail will be built. (*Id.*, at 756:8–757:2). Ms. Hasson also testified that she could not find studies or journal articles describing similar situations, particularly through the Appraisal Institute's Lum Library. (*Id.*, at 757:5–15). Ms. Hasson explained that, as an appraiser, it would be inappropriate for her to posit definitively where the trail would be built based on the information available to her. (*Id.*, at 760:21–761:6).

With this background, Ms. Hasson concluded there was no difference in the before and after values of the properties. (*See e.g.*, J.A. Tab 54, DX01; J.A. Tab 55, DX02; J.A. Tab 56, DX03; Trial Tr. Hasson, at 752:1–4, 817:13–1).This conclusion ignores the fraught reality—not only may a trail someday still result in the loss of home and valuable components of commercial opportunity, but the owners have definitively lost property rights, including the right to exclude others.[24] *See United States v. General Motors Corp.*, 323 U.S. 373, 377–78 (1945) (ownership includes "rights inhering in the citizen's relation to the physical thing" including possession, use, and disposal). That important right now belongs to STIA and POTB.

The uncertainty created by the parties' experts has left the Court in a precarious position, having considered multiple avenues.[25] (Trial Tr. Colloquy, at 963:17–22 ("[T]here are a number of options here. I can completely accept plaintiffs' appraisals. I can completely accept the defendant's appraisals. I could disagree to some extent with both of them and try to fashion something which is consistent with what the Court believes to be full compensation.")).[26] When

---

[24] The uncertainty of those rights was appropriately expressed by Mr. Matthews: "I think someone would look at it and think, hmm, government might take my property. I'm not going to pay much for it. Probably nothing. It's in the right-of-way. It destroys the title. It's a cloud on the title." (Trial Tr. Matthews, at 473:14–18, 231:17–23 ("[W]hen you start thinking about what's being taken, it's pretty much all private rights are being taken. The right to exclude others is being taken. The right to build a building on there is being taken, to grow crops, to fence it[,]" concluding that all the things that you might[ ]do to your property, . . . have been taken.")).

[25] In addition to the options mentioned at trial, the Court has more recently considered additional alternatives including the appointment of an expert independent of each party to assess damages. *See* FRE 706 ("[o]n a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed . . . ."). The Court has also attempted to craft a damages award consistent with notions of just compensation but is unable to do so based on the evidence presented at trial.

[26] As the Federal Circuit recognizes, the Court may award damages, even if it does not "fully credit [a] party's methodology." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d, 817, 833 (2010). While the Court acknowledges certain methodological shortcomings in Plaintiffs' proffered analysis, it is important to note that, were it not for the significant oversight and seeming disregard of the pre-existing scenic train, the Court would be more inclined to accept Mr. Matthews's valuation. The other identified issues, such as the potential impact of future trail development, while relevant and the deviation from the Yellow Book, while concerning, do not necessitate pure speculation. As the Federal Circuit recognizes, the Court may award damages, even if it does not "fully credit [a] party's methodology." *Precision Pine & Timber, Inc.*, 596 F.3d at 833. In the "context of setting just compensation," and "especially where dealing with irregular parcels," the Court acknowledges that "valuation transcends mere mathematical calculation," and demands "exercise of judgment—first by the experts," but "ultimately by the Court." *Wash. Metro Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 36 (2002). However, the failure to adequately account for the existing scenic rail use undermines the credibility of the valuation and renders the Court unable to calculate any level of just compensation.

34

both parties' valuations contain errors, the Court may use either as the basis from which the Court can extrapolate damages. *See Waverley View Inv'rs, LLC v. United States*, 135 Fed. Cl. 750, 814 (2018). As the Federal Circuit held in *Otay Mesa*, the Court is suited to look "at the evidence as a whole," and use its "own methodology," to calculate damages, as the Court "is not necessarily stuck with the stark choice of accepting or rejection of a party's valuation . . . ." 779 F.3d at 324, 1326 (Fed. Cir. 2015); *see also Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("We are unwilling to restrict the trial courts to any single basis for determining fair market value. Those courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case. It may be a single method or some combination of different methods.").

The Court cannot completely discount the uncertainty created by the issuance of the NITU. While the Court is convinced that a trail may never result given the elapsed years since the NITU with no prospect that construction draws near in the ensuing years, it cannot overlook the legal and factual hazard that it may yet occur. As Plaintiffs compellingly argue, the 2017 trail plan presents legitimate concerns that trail construction on the west side of the corridor may impact the Laviolette's and Joslin's use of their home and business; similarly, construction on the east side of the corridor would destroy or damage the commercial parking for the fishery. (*See* J.A. Tab 47, JX56.34, 56.52, 56.64, 56.70; Trial Tr. Sumption, at 405:5–410:7). Declaring that the uncertainty created by the Government's action resulted in no compensable harm is unacceptable. Moreover, without dispute, Plaintiffs have lost at least one important right as the result of the Government's taking—the right to exclude. *Mitchell Arms, Inc. v. United* States, 7 F.3d 212, 215 (Fed. Cir. 1993) (*citing Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation").

The problem lies in the sufficiency of evidence. While it is true that both sides' experts may have presented challenges or shortcomings in their testimony, the burden of proof ultimately rests with plaintiffs. *Otay Mesa*, 779 F.3d at 1323. Though the United States' expert was equally uncompelling, defendants are not required to prove the absence of damages; rather, they can simply argue the plaintiff has failed to meet their burden of proof. A court cannot arbitrarily determine just compensation. *See Cully Corp. v. United States*, 163 Fed. Cl. 676, 688 (2022) (awarding zero damages after taking was established because plaintiff failed to offer affirmative evidence proving that it suffered actual monetary loss compensable under the Fifth Amendment); *Lisbon Contractors*, *Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (finding that plaintiffs are tasked with "proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation."). Such a determination must be grounded in evidence and legal precedent.

To fashion compensation when so many open variables would be speculative and would not provide fair and just compensation to the property owner; the Court must rely on sound appraisal principles and expert testimony to arrive at a reasonable valuation. *See Gadsden Indus*. *Park*, *LLC v. United States*, 956 F.3d 1362, 1373 (Fed. Cir. 2020) (when calculating just compensation trial court must "resolve on its own with reasonable certainty based on the evidence available."). Any deviation from these principles would undermine the fundamental principles of just compensation. *Id*., 956 F.3d at 1370 (holding that trial court in a takings case is

not obligated to fashion its own award when a "plaintiff has not provided evidence sufficient to determine just compensation with reasonable certainty.").[27] As Plaintiffs have not proven just compensation with the requisite degree of certainty, the Court is unable to determine an appropriate damage award. Accordingly, judgment shall be entered for the United States.

### III.    Conclusion

The Court finds and concludes that Plaintiffs failed to carry their burden to prove just compensation for their Fifth Amendment takings claim. Pursuant to RCFC 58, the Clerk is **DIRECTED** to enter final judgment in favor of the United States.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge

---

[27] There is some debate as to the constitutionality of "zero damages" takings cases. However, the Supreme Court has noted that they "have often recognized the existence of a constitutional right, or established the test for violation of such a right (or both), and then gone on to find that the claim at issue fails." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 716–17, (2010) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 341–343 (1985) (holding that the Fourth Amendment applies to searches and seizures conducted by public-school officials, establishing the standard for finding a violation, but concluding that the claim at issue failed); *Strickland v. Washington*, 466 U.S. 668, 687, 698–700 (1984) (recognizing a constitutional right to effective assistance of counsel, establishing the test for its violation, but holding that the claim at issue failed); *Hill v. Lockhart*, 474 U.S. 52, 58–60 (1985) (holding that a *Strickland* claim can be brought to challenge a guilty plea, but rejecting the claim at issue); *Jackson v. Virginia*, 443 U.S. 307, 313–320, 326 (1979) (recognizing a due process claim based on insufficiency of evidence, establishing the governing test, but concluding that the claim at issue failed); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 390, 395–397 (1926) (recognizing that block zoning ordinances could constitute a taking, but holding that the challenged ordinance did not do so); *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 241, 255–257 (1897) (holding that the Due Process Clause of the Fourteenth Amendment prohibits uncompensated takings, but concluding that the court below made no errors of law in assessing just compensation)).

# In the United States Court of Federal Claims

**No. 16-912 L**
**Filed: November 26, 2024**

```
**************************************
PERRY LOVERIDGE, et al.,          *
                    Plaintiffs,   *                   JUDGMENT
                                  *
       v.                         *
                                  *
THE UNITED STATES                 *
                    Defendant.    *
**************************************
```

Pursuant to the court's Post-Trial Opinion and Order, filed November 26, 2024,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of the defendant.


Lisa L. Reyes
Clerk of Court

By:     <u>s/ Ashley Reams</u>
Deputy Clerk


<u>NOTE</u>: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Effective December 1, 2023, the appeals filing fee is $605.00.

Appx37

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>25-1244</u>

**Short Case Caption:** <u>Loveridge v. US</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>13,753</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>02/18/2025</u>

Signature: <u>/s/ Thomas S. Stewart</u>

Name: <u>Thomas S. Stewart</u>

Save for Filing