# United States Court of Appeals
# for the Federal Circuit

---

**SHIRLEY LAVIOLETTE, OLD MILL INVESTMENT LLC, CAMP DOUBLE J, LLC,**
*Plaintiffs-Appellants*

**PERRY LOVERIDGE, ET AL.**
*Plaintiffs*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2025-1244

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00912-DAT, Judge David A. Tapp.

---

Decided:  June 30, 2026

---

THOMAS SCOTT STEWART, Stewart, Wald & Smith, LLC, Prairie Village, KS, argued for plaintiffs-appellants.  Also represented by REED W. RIPLEY.

LEEANN KIM, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by AMBER BETH BLAHA, ADAM R.F. GUFSTAFSON.

---

Before PROST, HUGHES, and STOLL, *Circuit Judges*.

PROST, *Circuit Judge*.

This is not your typical rails-to-trails case. After concluding there was in fact a Fifth Amendment taking stemming from a Notice of Interim Trail Use or Abandonment ("NITU") concerning a railroad corridor located in Oregon, the U.S. Court of Federal Claims held a valuation trial and determined that Shirley Laviolette, Old Mill Investment LLC, and Camp Double J, LLC had failed to meet their burden to prove just compensation. *Loveridge v. United States*, 174 Fed. Cl. 379 (2024) ("*Loveridge VII*"). Particularly unusual in this case is that, before and after the NITU issued (or even if the NITU had never issued), an intrastate scenic railroad service remained operational on that same railroad corridor. For the following reasons, we affirm.

BACKGROUND

I

The Surface Transportation Board ("STB") generally has "exclusive" authority to regulate "transportation by rail carriers." 49 U.S.C. § 10501(b). A railroad that wishes to abandon any portion of a railroad line that it operates must file an application with the STB for permission to abandon. *See id.* § 10903; *see also Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 5 n.3 (1990) ("*Preseault I*").

The National Trails System Act Amendments of 1983, Pub. L. No. 98-11, sec. 208, 97 Stat. 42, 48 (codified as amended at 16 U.S.C. § 1247(d)) ("Trails Act"), provided an alternative to abandonment known as "railbanking," which preserves railroad rights-of-way that might otherwise be lost through abandonment. *See Preseault I*, 494 U.S. at 6–7. When a rail carrier applies to abandon a rail line, a "state, political subdivision, or qualified private organization" may express "interest[] in acquiring or using a right-of-way of a rail line . . . for interim trail use and rail

banking." 49 C.F.R. § 1152.29(a). If the rail carrier agrees to negotiate with a potential trail sponsor, then the STB "will issue a [NITU] to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate." *Id.* § 1152.29(d)(1). If the railroad and potential trail sponsor reach an agreement, the parties notify the STB, after which the corridor is rail-banked (remaining under the STB's jurisdiction), and the trail sponsor may convert the agreed-upon segment of rail corridor to interim trail use. The issuance of a NITU prevents abandonment from occurring under federal law and thereby forestalls the operation of state-law property rules that would otherwise take effect upon abandonment. *Preseault I*, 494 U.S. at 8.

## II

In 2006, the Port of Tillamook Bay Railroad ("POTB") was still actively running freight trains over the relevant railroad corridor. That same year, it entered into a lease agreement with the Oregon Coast Scenic Railroad ("OCSR"), a non-profit organization that operates an intrastate scenic passenger-excursion train service on portions of the railroad corridor. The agreement gave OCSR the right to operate its rail service over the same rail line and a one-hundred-foot right-of-way. The current operative agreement between OCSR and POTB allows OCSR to continue its operations on the relevant railroad corridor until 2026. OCSR's use of this right-of-way includes passenger service, equipment storage, maintenance, and museum operations and activities. In 2007, a storm damaged portions of the rail line, which resulted in POTB ceasing its freight train operations. OCSR, however, continued its operations.

In May 2016, POTB filed its Notice of Intent to Partially Terminate (Abandon) Service with the STB regarding 87.01 miles of the rail line. J.A. 642. The Salmonberry Trail Intergovernmental Agency ("Salmonberry Agency")

expressed interest in being a trail sponsor. J.A. 642. Salmonberry Agency commissioned a 2015 concept plan and held "public open house meetings" to discuss the plan for the trails and to receive the public's input, "[i]ncluding over 29,000 reviews of the planning website and thousands of comments." J.A. 1214–15; *see also Loveridge VII*, 174 Fed. Cl. at 387, 402. "From the initial discussions of the trail, planners made clear that the [Salmonberry Trail] would likely take years, even decades, to complete." *Loveridge VII*, 174 Fed. Cl. at 402. On July 26, 2016, the STB issued a NITU. J.A. 642. A little over a year later, POTB and Salmonberry Agency executed a railbanking agreement and then the Salmonberry Trail rail line lease agreement the following year. J.A. 643. That rail line lease agreement expressly provided for the continuing use of the railroad corridor by OCSR. J.A. 1210.

## III

Appellants are three property owners whose properties are burdened by the railroad corridor at issue in this case. Two of the parcels—Camp Double J, LLC, and the Jetty Fishery (also referred to as the Laviolette parcel)—are in Rockaway Beach, Oregon. The third property—Old Mill Investment—is located near Garibaldi, Oregon.

In 2016, Appellants filed a complaint in the Court of Federal Claims alleging that the NITU issued by STB resulted in a taking of their property rights under the Fifth Amendment. There were extensive briefings, including summary judgment motions, and numerous opinions issued concerning the liability phase of this case not relevant to this current appeal. *See, e.g.*, *Loveridge v. United States*, 139 Fed. Cl. 122 (2018), *aff'd sub nom. Albright v. United States*, 838 F. App'x 512 (Fed. Cir. 2020); *Loveridge v. United States*, 148 Fed. Cl. 279 (2020).

The case proceeded to the valuation phase. The parties filed yet another round of cross-motions for partial sum-

mary judgment—this time about the method for calculating damages in this case. *Loveridge v. United States*, 167 Fed. Cl. 44 (2023) ("*Loveridge VI*"). The Court of Federal Claims granted in part and denied in part the parties' cross-motions, holding that the parties' experts may (1) assume "that in the 'before' scenario the properties are burdened by the OCSR's scenic train until 2026 with potential for future extensions as stated in the trail use agreement"; (2) "show the impact of any uncertainty over crossing rights on the properties' market values"; and (3) "show the impact of any uncertainty over [the Salmonberry Agency's] future exercise of its right on the properties' market value." *Id.* at 54–55.

The Court of Federal Claims held a valuation trial. It determined that Appellants had failed to meet their burden of proving the fair market value of their land was less than their value before the taking and entered judgment for the government. *Loveridge VII*, 174 Fed. Cl. at 384–85.

Appellants timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Following a valuation trial, "we review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1321 (Fed. Cir. 2015) ("*Otay Mesa II*"). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (cleaned up).

The Fifth Amendment's Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. Just compensation "means in most cases the fair market value of the property on the date it is appropriated." *Kirby Forest In-*

*dus., Inc. v. United States*, 467 U.S. 1, 10 (1984). The taking in rails-to-trails cases occurs on the date the NITU issued unless, e.g., the railroad's abandonment would not have occurred until later even without the NITU. *Caquelin v. United States*, 959 F.3d 1360, 1371–72 (Fed. Cir. 2020); *see Memmer v. United States*, 50 F.4th 136, 140 (Fed. Cir. 2022). The owner "is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Bauman v. Ross*, 167 U.S. 548, 574 (1897). "[J]ust compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1368 (Fed. Cir. 2012) ("*Otay Mesa I*") (cleaned up).

"What is critical in the determination of just compensation is not the gain to the government from the taking, but the actual loss to the landowner." *Otay Mesa II*, 779 F.3d at 1322. In the easement context, the conventional method of valuation is the "before-and-after method." *Otay Mesa I*, 670 F.3d at 1364. That valuation methodology requires looking at "the difference between the value of the property before and after the [g]overnment's easement was imposed." *Id.* The property owner bears the burden of proving an actual loss has occurred "with reasonable certain[t]y." *Otay Mesa II*, 779 F.3d at 1323 (cleaned up).

Appellants dispute the Court of Federal Claims' ultimate determination that they are not entitled to any damages, and in particular, the court's definition of the "before" and "after" conditions under the unique circumstances of this case. First, Appellants argue that the Court of Federal Claims erred in considering OCSR's operation of its intrastate scenic railroad when determining the "before" condition. Second, Appellants argue that the court improperly concluded that they failed to prove a diminution in market value of their properties because of the government's taking. We address each issue in turn.

## I

First, we must determine what, if any, impact the operation of OCSR's intrastate scenic railroad service has on the "before" condition. The "before" condition is the condition of the property before the government's easement was imposed. *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015).

Appellants urge this court to ignore POTB's agreement with OCSR when assessing the "before" condition. *See* Appellants' Br. 16–29; Reply Br. 4–19. We decline to do so. The Court of Federal Claims properly concluded that the "before" condition must consider Appellants' property burdened by OCSR's operation of its excursion rail operations on the railroad corridor. Holding otherwise would impermissibly provide Appellants with compensation beyond what was taken. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973) ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.").

Our precedent is instructive here. In *Rasmuson*, we rejected the use of a "before" condition that failed to reflect the real-world conditions of the property. The parties disputed whether the "before" condition should include the physical remnants of the railway that would have remained on the landowners' property but for the issuance of the NITU. We concluded that "[b]ecause the railway companies did not have an obligation to remove the physical railroad construction features, and there is no evidence in the record that they would have done so, the landowners would have regained possession of their land with the physical structures." *Rasmuson*, 807 F.3d at 1346. A proper appraisal methodology thus must account for those physical conditions. After all, "a 'before' calculation that

does not take into account the costs of removing the physical remnants of the railway will result in an artificially inflated value and yield a windfall to the landowner." *Id.*

Appellants argue that *Rasmuson* is narrowly cabined to looking at the physical conditions of the property, not its "legal condition," and so it would not be instructive here. Appellants' Br. 28 (emphasis omitted). Nothing in *Rasmuson* points to this distinction. Nor do we see a meaningful difference between the "physical condition" and "legal condition" in this case. Here, OCSR operated its trains before and after the NITU issued. And even if the NITU had never issued, OCSR would have continued to use POTB's railroad easement. J.A. 1424; *see also Loveridge VII*, 174 Fed. Cl. at 396. OCSR's right to operate its trains is based on a lease agreement with POTB that predates the NITU and continues until at least 2026. Thus, as a matter of law and on this record, the "before" condition for determining just compensation must consider OCSR's operations and POTB's easement.

Appellants nevertheless argue that the "before" condition should be assumed to be vacant, unencumbered land, because POTB's railroad easement was extinguished. *See* Appellants' Br. 18–23; Reply Br. 5–10. That argument ignores the proper before-condition analysis and the facts here.

Appellants' argument that the NITU extinguished the easement in the "before" condition fails because the before-condition analysis requires the court to assess the property interests that would have existed *absent* the government's action. *See Rasmuson*, 807 F.3d at 1345–46. Setting aside that point, Appellants' argument also fails even if we were to consider the relevant federal and state laws. STB has jurisdiction over "transportation by rail carriers" and "the construction, acquisition, operation, abandonment, or discontinuance" of railroad tracks and facilities. 49 U.S.C.

§ 10501(b).  The transportation subject to STB's jurisdiction has certain geographical requirements, such as occurring between a place in one state and a place in a territory of the United States, or between two different places in the same state if the transportation is part of an interstate rail network.  *Id.* § 10501(a)(2).  The statute also provides that remedies provided by STB are "exclusive and preempt the remedies provided under Federal or State law."  *Id.* § 10501(b)(2).  The Trails Act creates the railbanking process, which preserves a railroad corridor for possible future rail service by allowing interim use as a recreational trail, without treating the corridor as abandoned.  The relevant provision states that interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d).  As a result, when STB issues a NITU and a trail-use agreement is reached under § 1247(d), the corridor is not considered abandoned, STB's jurisdiction continues, and federal preemption under § 10501 continues.

Even if we were to consider state law (here, Oregon law), it would not follow that POTB's railroad easements would be extinguished in the "before" condition.  Oregon law requires a party claiming that an easement has been abandoned to prove both "non-use" and "either a verbal expression of an intent to abandon or conduct inconsistent with an intention to make further use."  *Conner v. Lucas ex rel. the Est. of Lucas*, 920 P.2d 171, 174 (Or. Ct. App. 1996) (cleaned up).  Appellants have not made that showing.  For example, there is no evidence of "non-use" here.  POTB leased a segment of the railroad corridor to OCSR in 2006, that lease was renewed in 2012, and it will continue until at least 2026.  And OCSR's operation is within the original scope of POTB's railroad easement.  *See, e.g.*, J.A. 1396–97, 1496–97.

Appellants' reliance on a non-binding Court of Federal Claims decision—*Toscano v. United States*, 107 Fed. Cl.

179 (2012)—does not help them.   Unlike *Toscano*, here there is a wholly intrastate scenic excursion railway that continued to operate subject to its agreement with POTB both before and after the NITU issued.   No analogous facts are present in *Toscano*.

Finally, Appellants argue that even assuming we consider OCSR's operations and POTB's railroad easement in the "before" condition, their appraiser properly considered OCSR's effects.   *See* Appellants' Br. 47–51; Reply Br. 26–29.   Appellants' appraiser used a seventeen-foot-wide right-of-way to conduct his "before" valuation because he contends only seventeen feet of the right-of-way's width (instead of the entire one-hundred feet) would be encumbered by OCSR's operations.   The Court of Federal Claims rejected that argument and found that POTB granted OCSR the right to use the full one-hundred-foot right-of-way under their agreement.   *Loveridge VII*, 174 Fed. Cl. at 397, 406–407.   During trial, there was testimony that OCSR's operation may entail the use of the right-of-way beyond the rail line, such as the surrounding area for storing maintenance equipment.   *Id.* at 397.   On this record, we conclude that the Court of Federal Claims did not err.

II

Next, we must determine whether Appellants have shown that there has been any diminution in market value of their property at the time the NITU issued.   The "after" condition is the condition of the property after the government's easement was imposed.   *See Rasmuson*, 807 F.3d at 1345.

The Court of Federal Claims properly concluded that the "after" condition includes OCSR's operations and the new trail use easement authorized by the Trails Act.   It found that the current OCSR lease ends in 2026 and "that the continuation of OCSR's operations through one or more subsequent leases is probable." *Loveridge VII*, 174 Fed. Cl. at 400.   It also concluded that "the after condition should

not contemplate a fully realized trail," but that alone "is not dispositive." *Id.* at 403; *see also id.* at 411. It determined that "neither Oregon law nor the Trails Act mandates that [the trail] easement must be exclusive and, accordingly, that [Appellants] failed to satisfy their burden of establishing the loss of crossing rights and property encroachments." *Id.* at 403. Against this backdrop, the court concluded that Appellants "have not proven just compensation with the requisite degree of certainty." *Id.* at 411–12.

None of Appellants' arguments on appeal compel us to disturb the Court of Federal Claims' determination that Appellants failed to prove a diminution in market value of their properties in the "after" condition. For example, Appellants argue that no market value remains for their properties because of the NITU. *See, e.g.*, Appellants' Br. 33–34. To support that argument, Appellants assume that the fully realized Salmonberry Trail will be constructed in its most damaging configuration across Appellants' properties. *See* Appellants' Br. 53. The Court of Federal Claims rejected that argument. It found that, at the time the NITU issued, "the construction of the trail is improbable." *Loveridge VII*, 174 Fed. Cl. at 403. The trial record established (and the court found) that in 2016 when the NITU issued, the Salmonberry Agency and the public did not know when, where, and even if the trail would be built. *See, e.g.*, *id.* at 402–03. Nor did Appellants provide evidence that in 2016, the market value of their improvements was entirely diminished because of a potential future use of the trail.

Appellants appear to take the position that "appraisers must assume that the government's proposed project has taken existing improvements and that the hiking and biking trail is in place and constructed as of the NITU date." Appellants' Br. 33. We disagree. "[I]t is the landowner who bears the burden of proving an actual loss has occurred." *Otay Mesa II*, 779 F.3d at 1323. "To carry its burden, the

landowner must show actual damages with reasonable certain[t]y, which requires more than a guess, but less than absolute exactness." *Id.* (cleaned up). If the landowner fails to meet that burden, the court may award no compensation. *See Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1370, 1373–74 (Fed. Cir. 2020). Appellants have not met their burden on this record.

The relevant question here is what a willing buyer would have paid to a willing seller for the property as of the date of the taking—here, the date of the NITU (July 2016). *See Rasmuson*, 807 F.3d at 1345. When making that determination, our valuation analysis may consider possibilities or uncertainties known at the time of the taking that could affect the fair-market value even when they are not certain to occur. *See Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 903 (Fed. Cir. 1986) ("[T]he court must not, itself, speculate, *i.e.,* guess, about potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it. [However,] [i]t does not exclude consideration of a relevant market made up of investors who are real but are speculating in whole or major part."); *see also Almota*, 409 U.S. at 473–74. It follows then that the proper framework under the facts here is to determine what the fair-market value of Appellants' property is in light of the uncertainty of the future trail that was known in July 2016 when the NITU issued. On this record, Appellants have not offered evidence that in 2016 the market believed Appellants' property value would be diminished.

Appellants resist that conclusion by arguing that the new trail use easement is an "exclusive easement" that resulted in Appellants losing all market value of their land and improvements within the rail corridor. *See, e.g.*, Appellants' Br. 34 ("In the [a]fter [c]ondition, the Trails Act imposes a new, exclusive easement and, resultingly, Appellants lose all market value of their land and improvements within the [c]orridor."). We also reject that argument.

Under either federal law or state law, the trail use easement is not an exclusive easement. The Trails Act does not use the word "exclusive" or otherwise limit the rights of property owners whose land is burdened by an easement. *See* 16 U.S.C. § 1247(d). The purpose of the Trails Act is to preserve railroad corridors for potential future rail service by authorizing interim trail use without treating the corridor as abandoned. And under Oregon law, easements are generally not exclusive unless the easement explicitly states otherwise. *See Watson v. Banducci*, 973 P.2d 395, 400 (Or. Ct. App. 1999). Appellants have not pointed to any language in the trail's easement language to suggest it is exclusive.

\* \* \*

We end where we begin. This is an atypical rails-to-trails case. Here, there is the continued operation of an intrastate scenic railroad on the corridor at issue both before and after the NITU issued, and which would have existed even absent the NITU. The Court of Federal Claims did not err in considering the scenic railroad in its "before" condition. It also did not err in (1) rejecting Appellants' argument that they proved their property value was diminished by the NITU's issuance; or (2) considering that the public knew at the time the NITU issued that the Salmonberry trail was unlikely to materialize. We thus see no reason, based on the arguments presented by Appellants, to disturb the court's conclusion that Appellants failed to carry their burden to prove with reasonable certainty the amount of just compensation.

## CONCLUSION

We have considered Appellants' remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm.

## AFFIRMED